## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**VICKTORIA GOCHA and**
**ALAN J. GOCHA,**

       *Plaintiffs,*

**v.**

**MICHIGAN REPRODUCTIVE AND**
**IVF CENTER, P.C. d/b/a The Fertility**
**Center, DR. VALERIE SHAVELL,**
**DR. EMMA GIULIANI, DAWN**
**STILES, and JOHN DOE 1,**

       *Defendant*s.

**Case No.**

## PLAINTIFFS VICKTORIA GOCHA AND
## <u>ALAN J. GOCHA'S COMPLAINT</u>

Plaintiffs Vicktoria Gocha ("Vicktoria") and Alan J. Gocha ("Alan")
collectively, "Plaintiffs") hereby state the following Complaint against Defendants
Michigan Reproductive and IVF Center, P.C. d/b/a The Fertility Center ("Clinic"),
Dr. Valerie Shavell ("Dr. Shavell"), Dr. Emma Giuliani ("Dr. Giuliani"), Dawn
Stiles ("Stiles"), and John Doe 1 ("John Doe") (collectively, "Defendants").

### NATURE OF THE CASE

1.    This action arises from a sustained pattern of deception, medical
misconduct, discrimination, and retaliation perpetrated by the Clinic, Dr. Shavell,
Dr. Giuliani, Stiles, and John Doe. Over the course of three in vitro fertilization
("IVF") cycles, Vicktoria and Alan were subjected to exploitative practices that
prioritized profit over medical ethics, transparency, and patient autonomy—causing
them significant physical, emotional, and financial harm.

2.    As a result of Defendants' misconduct, Vicktoria's already limited
reproductive window has been further narrowed. Her chances of conceiving a
biological child have been drastically reduced, and every lost month carries
irreversible consequences. Time is of the essence, and Defendants' actions have
materially compromised Vicktoria and Alan's ability to build a family using
Vicktoria's genetic material.

3.    Defendants induced Plaintiffs to undergo multiple IVF cycles using
concealed or unjustified medical protocols, misrepresented drug regimens, and

2

treatment plans that deviated materially from accepted standards of care. These deviations were not the result of individualized medical judgment but reflected systemic practices intended to extract financial gain from vulnerable patients, in violation of federal and state law.

4.    When Plaintiffs demanded transparency and accountability for Defendants' unexplained treatment decisions and failures to follow clinical norms, Defendants retaliated against Plaintiffs by terminating their care mid-course. Defendants then issued an ultimatum, giving Plaintiffs only 90 days to relocate their sole embryo, a tactic intended to coerce silence and punish protected activity. (*Cf.* Ex. A.)

5.    Plaintiffs were terminated from the program right before Father's Day.

6.    The actions at issue cannot be fairly characterized as the exercise of medical judgment within the bounds of professional discretion. When stripped of the pretense of care, the practices resemble commercialized drug dispensation masquerading as fertility treatment—a model engineered not for therapeutic benefit, but for volume and profit.

7.    Plaintiffs bring this action to obtain full legal and equitable relief, including damages for emotional distress and economic harm, restitution of improperly retained funds, and accountability for Defendants' systemic and retaliatory abuses.

3

8.    Without waiving any rights or broader claims for damages, Plaintiffs allege their current damages likely exceed $500,000 and their total damages exceed $5,000,000.

9.    Due to the failed cycles and disrupted care, Plaintiffs are expected to require at least 14 additional IVF cycles, each projected (by the Clinic) to cost over $35,000, to even attempt to make up for lost time.

10.    Plaintiffs also anticipate additional costs for ongoing medical supervision, travel, continuity-of-care coordination, and storage or transfer of their remaining embryo.

11.    Beyond these quantifiable harms, Plaintiffs have lost irreplaceable reproductive opportunities, suffered severe emotional and psychological distress, and face complex future risks related to loss of clinical continuity.

12.    Plaintiffs allege exemplary damages in an amount not less than $15,000,000 given the reprehensibility, scale, and recurrence of Defendants' conduct.

13.    This case implicates not only the rights of two patients but also broader systemic failures in fertility medicine that, if left unchecked, may harm countless others who rely on transparency, accountability, and trust in their providers.

## PARTIES

### 1.    *Plaintiffs*

14.    Vicktoria is a natural person and citizen of the State of Michigan. She is a resident of Grand Rapids.

15.    Vicktoria is a patient with a documented diagnosis of diminished ovarian reserve ("DOR") and qualifies as a person with a disability within the meaning of the ADA and Rehabilitation Act.

16.    Alan is a natural person and citizen of the State of Michigan. He is a resident of Grand Rapids.

17.    Alan is Vicktoria's spouse (since December of 2024) and is both a patient and financial contributor in the IVF program at issue. He directly communicated with Defendants throughout the treatment process and was also subjected to the Clinic's fraudulent inducements, misrepresentations, and unlawful retaliation.

18.    Lisa E. Gocha represents both Vicktoria and Alan in this action.

19.    Alan is an attorney with a bachelor's degree from the University of Michigan and a law degree from Georgetown University Law Center. Alan is filing on behalf of himself only, asserting independent claims arising from the same underlying conduct.

### 2.    *Defendants*

20.    Upon information and belief, the Clinic is a Michigan professional corporation with its principal place of business in Grand Rapids, Michigan.

21.    The Clinic operates under the trade name "The Fertility Center" and offers fertility-related services, including IVF.

22.    At all relevant times, the Clinic was responsible for establishing treatment protocols, supervising its agents, and administering care.

23.    Upon information and belief, Dr. Shavell is a physician licensed to practice medicine in the State of Michigan and is the Clinic's medical director and a principal decision-maker in patient care.

24.    Dr. Shavell was directly responsible for the clinical decisions and omissions that harmed Plaintiffs and exercised supervisory authority over other Clinic personnel.

25.    Upon information and belief, Dr. Giuliani is a physician licensed to practice medicine in the State of Michigan and at all relevant times was involved in Vicktoria's treatments.

26.    Dr. Giuliani is the prescribing physician on prescriptions at issue (including Clomid at 200 mg) and participated in the concealment of material facts regarding Vicktoria's care.

27.    Stiles is the Clinic's practice administrator.

28.    Stiles communicated directly with Plaintiffs regarding treatment logistics, financial terms, and access to records.

29.    Stiles participated in the Clinic's retaliatory actions against Plaintiffs, including threats related to the disposition of their embryo and denial of further program access. (*Cf.* Ex. A.)

30.    Upon information and belief, John Doe is an individual or entity that is a law firm, lawyer, consultant, consulting firm, or institutional advisor that provided direction, legal advice, or strategic guidance in furtherance of the scheme described in this Complaint.

31.    Upon information and belief, John Doe materially participated in the planning, implementation, or cover-up of the Clinic's misconduct, including the development or execution of policies used to mislead, retaliate against, or financially exploit Plaintiffs.

32.    John Doe may be one or more individuals or entities. Plaintiffs will amend this Complaint to substitute the true name of John Doe (or John Does) when his, her, its, or their identity is ascertained through discovery.

## JURISDICTION

33.    This Complaint includes claims arising under both federal and state law, including:

      a.    Count I, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c);

b.    Count II, violation of RICO conspiracy under 18 U.S.C. § 1962(d);

c.    Count III, violation of the Michigan Racketeer Influenced and Corrupt Organizations Act ("MRICO"), MCL 750.159g;

d.    Count IV, violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq.;

e.    Count V, violation of the Rehabilitation Act, 29 U.S.C. § 794 et seq.;

f.    Count VI, violation of the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37.1101 et seq.;

g.    Count VII, violation of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116;

h.    Count VIII, violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq.;

i.    Count IX, violation of the Michigan Consumer Protection Act ("MCPA"), MCL 445.901 et seq.;

j.    Count X, tortious interference;

k.    Count XI, fraud, silent fraud, and/or negligent misrepresentation;

l.    Count XII, fraudulent inducement;

m.    Count XIII, fraudulent concealment;

n.    Count XIV, intentional and/or negligent infliction of emotional distress;

o.    Count XV, unjust enrichment and/or quantum meruit;

p.    Count XVI, promissory estoppel; and

8

q.    Count XVII, medical malpractice.

34.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

35.    This Court has jurisdiction to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, as Plaintiffs seek a judicial declaration of their rights under federal law, including their right to access medical services free from discrimination, retaliation, and fraud.

36.    This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367. The state law claims arise from the same nucleus of operative fact as Plaintiffs' federal claims and form part of the same case or controversy under Article III of the United States Constitution.

37.    Venue is proper in the United States District Court for the Western District of Michigan under 28 U.S.C. § 1391(b)(1) and (2), because all Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this District, including Defendants' provision of fertility services, misrepresentations to Plaintiffs, and retaliatory conduct.

38.    This Court has personal jurisdiction over each Defendant as they reside and/or conduct business in the State of Michigan and purposefully availed themselves of the laws and protections of the State of Michigan. The exercise of

jurisdiction over each Defendant is consistent with due process and Michigan's long-arm statute.

## BACKGROUND

39.    Exhibits to this Complaint and other cited materials are fully incorporated herein by reference for all purposes as if set forth in full.

40.    Upon information or belief, documents referenced in this Complaint are in the custody, possession, or control of one or more Defendants, including but not limited to internal communications, clinical records, and protocol justifications.

41.    To the extent any claim is inconsistent with another, Plaintiffs plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and no such inconsistency shall be construed as a waiver of any claim or theory of liability.

## A.    Fertility Treatment: Timed Intercourse, Intrauterine Insemination, and In Vitro Fertilization

42.    Fertility treatments encompass a range of medical interventions designed to assist individuals and couples who are unable to conceive naturally. These interventions may include hormone therapies, timed intercourse, intrauterine insemination ("IUI"), IVF, and other assisted reproductive technologies.

43.    Timed intercourse involves coordinating sexual intercourse with a woman's ovulatory cycle to maximize the likelihood of conception. While it is typically a first-line treatment, it can be ineffective for individuals with complex fertility issues such as DOR, irregular ovulation, or advanced maternal age.

44.     IUI involves the direct placement of concentrated, washed sperm into the uterus at or near the time of ovulation, with or without accompanying hormonal stimulation. IUI is less invasive and less costly than IVF, but also has a lower success rate—particularly in patients with certain underlying conditions, such as low ovarian reserve or advanced age.

45.     IVF is among the most advanced and invasive forms of assisted reproductive technology. It typically involves several phases: (1) ovarian stimulation using hormone injections to produce multiple eggs; (2) transvaginal surgical retrieval of the eggs; (3) fertilization of eggs with sperm in a laboratory setting; and (4) transfer of one or more resulting embryos into the uterus. Each step of the process requires extensive monitoring through ultrasounds and blood work and carries physical and emotional hardship.

46.     Fertility treatments carry significant medical risks, particularly for individuals with underlying conditions such as polycystic ovary syndrome ("PCOS"), a hormonal disorder that can result in irregular ovulation, elevated androgen levels, and enlarged ovaries with multiple cysts.

47.     Patients with PCOS are more susceptible to ovarian hyperstimulation syndrome ("OHSS"), a potentially serious complication of fertility drugs characterized by swollen, painful ovaries, fluid retention, and in severe cases, blood clots, kidney failure, or respiratory distress.

48.    Other common risks of IVF and related treatments include medication side effects, infection, bleeding from egg retrieval procedures, and complications from multiple gestations. Clinicians are obligated to assess these risks based on individual patient history and respond with appropriate monitoring, dosage adjustments, and disclosure.

49.    The IVF process is physically, emotionally, and financially taxing. Patients often endure multiple rounds of daily hormone injections, frequent ultrasounds and blood draws, surgical retrievals, and recovery periods. Success is not guaranteed even under optimal conditions. The cumulative emotional toll— hope, uncertainty, disappointment, and grief—can be profound, particularly after repeated failures.

50.    Financially, IVF is often cost-prohibitive. Many patients prepay for bundled treatment programs in an attempt to manage these costs, placing considerable trust in providers to act in accordance with clinical standards and legal obligations.

51.    For patients with DOR or advanced maternal age, time is a critical and often irreversible factor. Delays, mismanagement, or clinical errors can drastically reduce the likelihood of biological parenthood. Each cycle carries high personal and financial stakes, and any deviation from the appropriate standard of care can have life-altering consequences.

**B.**        **Hormones and Drugs in Assisted Reproductive Technology**

52.        Successful ovulation induction and embryo development in fertility treatment depends on the coordinated interplay of several reproductive hormones. Understanding these hormones and how fertility drugs affect them is essential to safely and effectively managing treatment.

### 1.    *Hormones*

53.        **Anti-Müllerian Hormone ("AMH")** is a marker of ovarian reserve. It is secreted by granulosa cells in preantral and small antral follicles and is used to estimate a patient's remaining egg supply. AMH levels do not fluctuate with the menstrual cycle and are typically used in baseline testing to guide dosage selection for ovarian stimulation.

54.        **Follicle-Stimulating Hormone ("FSH")** is secreted by the anterior pituitary gland and stimulates the growth of ovarian follicles. High baseline FSH levels often indicate diminished ovarian reserve. FSH levels are typically measured on cycle day 2 or 3 to assess ovarian function.

55.        **Luteinizing Hormone ("LH")**, also produced by the pituitary, surges mid-cycle to trigger ovulation. In medicated cycles, monitoring LH levels can be used to time insemination or prevent premature ovulation. In IVF, LH may be suppressed to prevent early follicular rupture.

56.     **Estradiol ("E2")** is the dominant form of estrogen and rises as follicles grow. Estradiol levels are used to assess ovarian response to stimulation, with abnormally low or high levels signaling potential protocol problems or risks such as OHSS.

57.     **Progesterone** is produced after ovulation and during the luteal phase. In IVF cycles, premature elevation of progesterone before egg retrieval can negatively impact endometrial receptivity. In the luteal phase, progesterone support is typically provided to promote implantation.

58.     **Testosterone**, while typically associated with male reproductive function, also plays a role in female fertility. Androgen priming using testosterone patches or gel is sometimes used off-label to promote follicular sensitivity in patients with diminished ovarian reserve.

59.     Proper administration of fertility drugs directly affects hormone levels. IVF protocols typically involve multiple classes of medication, each targeting a different stage of follicular development, ovulation control, or luteal support. Dosing and scheduling must be individualized based on patient response.

### *2.    Drugs*

60.     **Gonadotropins** (e.g., Follistim, Gonal-F, Menopur) are injectable medications containing FSH alone or in combination with LH, designed to stimulate

the development of multiple ovarian follicles. A typical dosage ranges from 75 to 300 International Units ("IU") per day, depending on ovarian reserve and response.

61.    Follistim was prescribed to Vicktoria during the IVF process at a dosage of 450 IU per day—substantially exceeding typical initial doses. (*Cf.* Ex. B.)

62.    Gonal-F was prescribed to Vicktoria during the IUI process at varying dosages across multiple cycles.

63.    Menopur was prescribed to Vicktoria during the IVF process at a dosage of 150 IU per day.

64.    **Selective Estrogen Receptor Modulators (SERMs)** (e.g., Clomid) are oral agents that stimulate endogenous FSH and LH release by blocking estrogen receptors in the hypothalamus, disrupting negative feedback and encouraging follicular development. A typical dosage ranges from 50 to 150 mg per day for five days early in the cycle.

65.    Clomid was prescribed to Vicktoria during both IVF and IUI treatments at a dosage of 200 mg per day—above the typical maximum range—with no clear justification provided. (*Cf.* Ex. B.)

66.    On information and belief, the Clinic and Dr. Shavell prescribe Clomid above the typical dosage as a standard protocol. (*Cf.* Ex. B.) Alternatively, Vicktoria was subjected to blatant discriminatory treatment as described herein—without waiver of the possibility both are true.

67.    **Aromatase Inhibitors** (e.g., Femara) are oral medications that reduce estrogen levels to increase FSH secretion. They are commonly used as first-line agents in IUI protocols. A typical dosage ranges from 2.5 to 7.5 mg per day for five days.

68.    Femara was prescribed to Vicktoria during the IUI process at a dosage of 10 mg per day—above standard therapeutic ranges.

69.    On information and belief, the Clinic and Dr. Shavell prescribe Femara above the typical dosage as a standard protocol. (*Cf.* Ex. B.) Alternatively, Vicktoria was subjected to blatant discriminatory treatment as described herein—without waiver of the possibility both are true.

70.    **Steroids** (e.g., Dexamethasone) may be used to suppress adrenal androgens or modulate immunologic factors during ovulation induction. Typical dosages range from 0.5 to 2 mg per day.

71.    Dexamethasone was prescribed to Vicktoria during both the IVF and IUI processes at a dosage of 0.5 mg per day.

72.    **Ovulation Triggers** (e.g., Pregnyl, Ovidrel) are administered to induce final oocyte maturation once follicles reach an appropriate size. Typical Pregnyl dosages range from 5,000 to 10,000 IU; Ovidrel is commonly administered at 250 mcg subcutaneously.

73.     Pregnyl was prescribed to Vicktoria during the IVF process at a dosage of 5,000 IU, and during IUI cycles at various dosages.

74.     Ovidrel was prescribed to Vicktoria during the IUI process at a dosage of 250 mcg.

75.     **Gonadotropin-Releasing Hormone (GnRH) Antagonists** (e.g., Ganirelix) are used during IVF stimulation to prevent a premature LH surge and early ovulation. The standard dosage is 250 mcg daily once lead follicles approach 14 mm in size.

76.     Ganirelix was prescribed to Vicktoria during the IVF process at a dosage of 250 mcg, administered at varying stages across different cycles.

77.     **GnRH Agonists** (e.g., Leuprolide) are used either for pituitary suppression or as part of a "trigger" protocol. Suppression dosing typically ranges from 10 to 20 units daily, while triggering protocols may use 0.1 to 4 mg.

78.     Leuprolide was prescribed to Vicktoria during the IVF process at a dosage of 4 mg as a trigger shot.

79.     Close monitoring of hormone levels—particularly estradiol, LH, progesterone, and FSH—is essential throughout the stimulation and ovulation process. Proper monitoring ensures that medications are working as intended, permits timely dosage adjustments, and prevents serious complications such as OHSS or premature ovulation.

17

80.    Standard clinical practice includes hormone blood draws every one to three days and transvaginal ultrasounds to monitor follicular growth.

81.    Failure to adequately monitor or appropriately interpret hormone trends can result in avoidable harm, including cycle cancellation, poor oocyte quality, failed fertilization, or compromised endometrial receptivity.

82.    Departures from accepted dosing protocols or monitoring standards—especially without documented medical justification or informed consent—can irreversibly reduce the likelihood of reproductive success.

## C.        BUNDL

83.    Bundl Fertility, LLC ("BUNDL") markets itself as a financial concierge service for fertility treatment. According to its website, www.bundlfertility.com, BUNDL offers bundled payment programs intended to provide patients with financial predictability and multiple IVF cycles under a single contract. BUNDL promotes its programs through clinics across the country, including the Clinic in Grand Rapids, Michigan.

84.    Upon information and belief, BUNDL is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of Texas.

85.    BUNDL offers four primary package options: BUNDL Guard™ ("Guard"), BUNDL Basic ("Basic"), BUNDL Back-to-Back, and BUNDL 1+1.

Each plan includes either 2 or 3 IVF retrieval cycles and unlimited frozen embryo transfers ("FETs"), with different refund options, structure, and medication add-on availability.

86.    Upon information and belief, Plaintiffs enrolled in the BUNDL Basic program, which is advertised as BUNDL's most cost-effective option.

87.    The Basic plan includes 2 or 3 IVF retrieval cycles within a 36-month period and unlimited FETs. Unlike the Guard plan, the BUNDL program does not offer a refund guarantee if the patient does not achieve a live birth, but it is marketed as providing "peace of mind" and expanded opportunity for success at a more accessible cost.

88.    On November 24, 2024, Vicktoria entered into a contract with BUNDL for the Basic 2-retrieval package at a cost of $24,300. She also added the optional medication package for an additional $10,000, bringing the total program cost to $34,300.

89.    Vicktoria was deemed ineligible for Guard.

90.    BUNDL's promotional materials—including brochures distributed at the Clinic—emphasize that patients who enroll in the Basic program avoid the financial risk of paying for IVF "à la carte" and reduce stress by committing to multiple cycles upfront. BUNDL also markets its program as a shield against "financial investment loss" and "uncertainty."

91.    Despite Plaintiffs' participation in a comprehensive prepaid treatment arrangement through BUNDL, the Clinic billed Plaintiffs directly for significant out-of-pocket expenses throughout cycles.

92.    BUNDL collaborated directly with the Clinic to coordinate the administration of Plaintiffs' package. The Clinic offered BUNDL as a payment solution and worked with BUNDL throughout Plaintiffs' treatment to facilitate billing, treatment timing, and retrieval planning.

93.    Although marketed as a protective, patient-centered financing tool, BUNDL's business model creates perverse incentives. Because the program is prepaid and milestone-based, it encourages early retrievals, discourages transparency, and penalizes patients for cycle delays—even when medically warranted.

94.    On information and belief, BUNDL was aware of the deviations from clinical norms described herein, and its rigid structure contributed to the medically unnecessary, prematurely timed, and inadequately monitored cycles Plaintiffs experienced.

**D.    Vicktoria and Alan**

95.    Vicktoria first began fertility treatment at the Clinic in April 2022 with a prior partner. During that time, she pursued a series of IUI cycles under the care of the same clinical team named in this action, including Dr. Shavell and Dr. Giuliani.

96.    These early treatments included ovulation induction with medications such as Clomid, Femara, Gonal-F, and trigger injections, followed by timed IUIs.

97.    Following the unsuccessful IUI attempts, Vicktoria paused active treatment at the Clinic.

98.    Vicktoria later returned in July 2024 with her now-husband and co-Plaintiff, Alan, to continue fertility efforts and explore IVF as the next step.

99.    The couple consulted with the Clinic regarding their combined medical profiles and were advised to proceed with advanced assisted reproductive technology ("ART"). As part of the intake and evaluation process, the Clinic conducted a semen analysis for Alan.

100.    The Clinic initially misdiagnosed Alan with azoospermia—i.e., an absence of sperm in the ejaculate.

101.    That diagnosis was later proven incorrect when Alan, without consultation or coordination with the Clinic, independently submitted another sample for analysis.

102.    The corrected result directly contradicted the Clinic's prior conclusion.

103.    In 2025, Vicktoria and Alan underwent three IVF cycles under the Clinic's care, each with differing protocols and outcomes.

104.    These cycles were managed primarily by Dr. Shavell, with contributions from Dr. Giuliani, Stiles, and other Clinic staff.

105.   IVF protocols generally follow a defined and evidence-based progression: pre-cycle testing and hormone suppression or priming (when indicated), ovarian stimulation using controlled doses of gonadotropins, monitoring through bloodwork and ultrasound, ovulation suppression (if needed), trigger injection for final maturation, transvaginal oocyte retrieval, fertilization, and embryo transfer or cryopreservation.

106.   Dosages, drug timing, and decisions around trigger and retrieval must be precisely calibrated based on hormone levels and follicular response. Central to that process is the frequent monitoring of key hormones—including estradiol, LH, progesterone, and FSH. In this case, the Clinic repeatedly deviated from these standards.

107.   Stimulation drugs were started without consistent pre-cycle baselines.

108.   Suppressive agents like Ganirelix were prescribed at inconsistent and medically unjustified times.

109.   Gonadotropins were prescribed at unusually high doses (e.g., 450 IU of Follistim), with no clinically justified adjustment for hormone response.

110.   Clomid was prescribed at 200 mg—a level above standard usage—across all three cycles.

111.   LH levels were not monitored in any of the three IVF rounds, despite their critical role in identifying premature ovulation and guiding use of suppression agents.

112.   FSH was tested only three times while Vicktoria and Alan were both at the Clinic—on July 3, 2024 (long before the first round began); May 16, 2025 (after the second round failed); and May 20, 2025 (well after the second round failed).

113.   Estradiol and progesterone were prescribed in extended and elevated dosages across all cycles, but their levels were inconsistently interpreted and rarely used to guide treatment decisions.

114.   In all three rounds, Ganirelix was prescribed at different stages without and/or contradictory explanations.

115.   Despite multiple clinical warning signs, cycles were initiated, continued, or reversed with no coherent rationale.

116.   For **Round 1** of IVF treatment, cycle day ("CD") 1 was on March 26, 2025.

117.   Prior to CD 1, the patient was instructed to take Estradiol (4 mg per day) from February 20 through March 23 and Progesterone (400 mg per day) from March 10 through March 23.

118.   Vicktoria was instructed to take 200 mg of Clomid from March 28 through April 1. In other words, Clomid was prescribed for CD 3 to CD 7.

119.    Vicktoria was instructed to take Ganirelix, pre-cycle, from March 21 to March 23, 2025.

120.    Vicktoria was also instructed to take Ganirelix from April 2 to April 4, 2025. In other words, CD 8 through CD 10.

121.    Vicktoria was instructed to inject Follistim (450 IU), Menopur (150 IU), and Dexamethasone (.5) from March 28 to April 4. In other words, CD 3 through CD 10.

122.    No LH or FSH levels were measured during Round 1 and there was limited pre-cycle assessment.

123.    Despite the absence of key hormonal monitoring, the cycle proceeded to retrieval, resulting in the development of 7 follicles, 2 mature eggs, and **1 embryo**.

124.    Internal Clinic documentation reveals that multiple physicians, including Dr. Giuliani, confirmed a plan to repeat the same stimulation protocol used in Round 1 for the following cycle.

125.    Notes also reflect that this plan was communicated to Vicktoria in connection with post-retrieval counseling and follow-up.

126.    Despite this, the protocol implemented for Round 2 materially departed from the prior approach without a clinically justified explanation being provided to Plaintiffs.

127.    For **Round 2** of IVF treatment, CD 1 was on April 23, 2025.

128.   The patient was instructed to take Estradiol (4 mg per day) and Progesterone (400 mg per day) from April 11 to April 25, 2025. In other words, pre-cycle to CD 3.

129.   Vicktoria was instructed to take 200 mg of Clomid from April 28 through May 2. In other words, Clomid was prescribed from CD 6 to CD 10.

130.   Vicktoria was not instructed to take Ganirelix pre-cycle for Round 2. Vicktoria was instructed to take Ganirelix from April 25 to April 27. In other words, CD 3 to CD 5.

131.   Vicktoria was instructed to inject Follistim (450 IU), Menopur (150 IU), and Dexamethasone (.5) from April 28 to May 2, 2025. In other words, CD 6 to CD 10.

132.   Vicktoria was instructed to discontinue Clomid, Follistim, Menopur, and Dexamethasone on CD 10 because the cycle was abandoned that day—i.e., May 2, 2025. In other words, on Alan's birthday.

133.   No LH or FSH levels were measured during the stimulation phase of the Round 2 cycle and there was limited pre-cycle assessment overall.

134.   For **Round 3** of IVF treatment, CD 1 began on May 30, 2025.

135.   The patient was instructed to take Estradiol (4 mg per day) from May 16 to May 27, 2025.

136.   The patient was instructed to take Progesterone (400 mg per day) from May 19 to May 27, 2025.

137.   Vicktoria was instructed to take 200 mg of Clomid from May 31 through June 3, 2024. In other words, Clomid was prescribed for CD 1 to 6.

138.   Ganirelix was never instructed to be taken in Round 3 and the cycle was abandoned on June 6, 2025. In other words, on CD 8.

139.   Despite this hormone support, the patient's estradiol levels dropped sharply during the stimulation phase, indicating an inadequate ovarian response and raising concerns about the effectiveness of the protocol.

140.   Among other deviations, Ganirelix was introduced on cycle days 3 through 5—an unconventional usage not supported by standard IVF protocols—and the previously used medications and timing were altered.

141.   The failure to follow the internally agreed-upon and patient-communicated plan illustrates a disregard for consistency, individualized care, and basic standards of medical accountability.

142.   On June 4, 2025, Plaintiffs consulted with Dr. Jones, who advised stopping the cycle based on estradiol trends and ultrasound results. Later that day, Dr. Shavell—calling from a conference and expressing a purported lack of access to records—overrode that recommendation and instructed Plaintiffs to continue with medication.

143.   Round 3 was cancelled on June 6, 2025, when an ultrasound confirmed Dr. Jones' and the patients' prior conclusion.

144.   Across all three cycles, the Clinic failed to individualize care, adjust medications in response to hormone levels, or follow standard monitoring protocols. The complete absence of LH testing, irregular FSH tracking, and unexplained manipulation of estradiol and progesterone contributed to flawed medical decision-making. Internal disagreements between physicians and last-minute reversals added confusion and risk—ultimately depriving Plaintiffs of viable outcomes and squandering critical reproductive time.

145.   The cumulative result was one suboptimal outcome and two failed IVF cycles, irreversible loss of reproductive opportunity, and profound emotional and financial distress. For a patient with DOR, these months represented a critical window. The Clinic's departures from accepted medical protocols materially and permanently reduced Plaintiffs' chances of conceiving a biological child.

146.   On numerous occasions, both during in-office visits and telephone consultations, Dr. Shavell explicitly stated that she would "need to review the records," confirming that she had not reviewed Vicktoria's chart prior to or during the interaction. These admissions were made even during time-sensitive clinical decisions and cycle planning meetings.

147.    On more than one occasion, Dr. Shavell altered the treatment plan on the spot in direct response to questions raised by Vicktoria—without any reference to prior cycle performance, hormone trends, or ultrasound data. These spontaneous changes, devoid of clinical anchoring, underscored a disturbing absence of continuity and individualized medical oversight.

148.    Despite Plaintiffs undergoing three IVF cycles, the Clinic never once adjusted medication dosages mid-cycle in response to hormone levels or ultrasound results, a fundamental component of modern IVF monitoring. This failure strongly suggests that real-time monitoring—while performed procedurally—was not being meaningfully interpreted or acted upon. The Clinic's apparent reliance on preset, static protocols, regardless of patient response, reflects a system more focused on throughput than outcome.

149.    The Clinic's casual approach to critical medication management was also evident in staff behavior.

150.    On one occasion, a nurse incorrectly instructed Vicktoria and Alan to refrigerate Ganirelix, contrary to manufacturer guidelines that specify it should be stored at room temperature.

151.    After being corrected by Plaintiffs, the nurse left the room to verify the information and returned acknowledging that Vicktoria and Alan were correct. Nevertheless, the nurse then remarked that they could "keep it fresh" by refrigerating

it anyway—a statement that not only contradicted product labeling but reflected a troubling disregard for precision in administering temperature-sensitive medications.

152.   This interaction typified a broader lack of professionalism and attention to detail in the Clinic's handling of fertility drugs.

153.   On one occasion, Vicktoria was asked to sign a critical consent form related to embryo transfer before Alan had reviewed it. The form appeared largely pre-filled and included a checked box indicating authorization for transfer of only a single embryo, despite the fact that Vicktoria and Alan had consistently communicated their desire to transfer more than one embryo if medically available and appropriate in a fresh transfer.

154.   When Alan reviewed the form before signing, he identified the discrepancy and raised it with Clinic staff.

155.   In response, a staff member dismissed the concern and advised them to "just sign it," characterizing the document as a mere "formality" for the benefit of Ovation Fertility ("Ovation"), a third-party lab, and stating that the Clinic "does what it wants" regardless of the contents of the form. This cavalier approach regarding embryo disposition underscores the Clinic's disregard for patient autonomy and regulatory requirements.

156.   Separately, during Round 1, Dr. Shavell affirmatively represented to Vicktoria and Alan that they would be proceeding with a fresh embryo transfer, consistent with their treatment goals and understanding. However, shortly after the retrieval, they were informed for the first time that the Clinic had decided to proceed instead with a FET, allegedly due to suboptimal endometrial conditions.

157.   Upon review the Clinic's internal records, it became clear that a frozen transfer had been planned internally well before the retrieval—but this change in plan was never communicated to Plaintiffs.

158.   Clinic notes misleadingly state that a discussion regarding the switch to FET occurred with the patient prior to retrieval, but no such conversation ever took place.

159.   In fact, the only explanation given to Vicktoria and Alan came after the retrieval, when they were told the decision had been unilaterally made due to Vicktoria's lining. These facts not only reveal a failure to obtain informed consent but also raise concerns of fabrication by Clinic staff.

**E.    Discriminatory Routing based on BUNDL**

160.   On May 2, 2025, following an ultrasound appointment that yielded discouraging results, Vicktoria and Alan met with a Clinic nurse to discuss next steps. During this conversation, Vicktoria raised questions about the impact that proceeding with a FET might have on their BUNDL program coverage.

161.   Both Vicktoria and Alan explained that, given the time-sensitive nature of Vicktoria's condition, they were open to moving forward with a FET cycle. They clarified that the only reason they had originally planned for a fresh transfer was because Dr. Shavell had previously stated it was preferable.

162.   However, following the first retrieval cycle, Dr. Shavell reversed course and told Plaintiffs that FET cycles were equivalent—or even more favorable—than fresh transfers in terms of success rates.

163.   During the same meeting, Vicktoria and Alan discovered that the nurse had limited access to patient charts and could not answer several important questions about prior cycle outcomes or BUNDL implications. When Vicktoria inquired about BUNDL coverage, the nurse admitted she was unfamiliar with the financial structure but would arrange a meeting with Stiles, the Clinic's office administrator and BUNDL liaison.

164.   Vicktoria also asked how many other patients were using BUNDL. The nurse initially said she did not know, but then stated that she was only aware of three BUNDL patients. When asked how she knew, the nurse replied that "they write it on the top of the paperwork." This disclosure demonstrated that, while clinical staff may be restricted from full medical access, they are expressly informed which patients are using BUNDL, which invites differential treatment based on payment source.

165.   Later that same day, Vicktoria and Alan met with Stiles in her office to discuss BUNDL coverage and treatment continuity. Stiles informed them that Bundl would not authorize additional medications or a second retrieval cycle. In response, Alan picked up a BUNDL brochure, pointed to the representations, and questioned the ethicality of promoting a financial program that imposed limitations which directly influenced clinical decision-making.

166.   He also noted that for patients who were not eligible for the refund guarantee under BUNDL's Guard program, the plan was financially risky and potentially incompatible with effective care. Stiles became combative, eventually telling Vicktoria and Alan to "**get out**." Vicktoria became visibly upset. Alan calmly urged Vicktoria to step away without engaging further so she could process the situation. They walked out of the office toward the main lobby.

167.   As they were leaving, Stiles followed them into the public hallway and shouted, "**get a lawyer**," in front of other patients and staff, in an unprofessional and retaliatory outburst that caused public embarrassment and emotional harm. The outburst, delivered in a clinical setting, was both inappropriate and revealing of the Clinic's hostility toward patients who raised questions about their treatment.

168.   Alan later addressed Stiles' behavior with Dr. Shavell, making clear that such conduct could not happen again. Rather than address the matter with

concern or professionalism, Dr. Shavell was dismissive and quickly moved on, signaling institutional indifference to retaliation or staff misconduct.

169.   During that same discussion, Dr. Shavell stated that she would be "taking over" communications moving forward to avoid further "miscommunication."

170.   After this transition, Vicktoria and Alan were effectively isolated from routine support channels. Access to nurses—who typically have more time and availability to answer clinical questions—was cut off, and all communications were routed through Dr. Shavell, who was often unavailable or unresponsive. The effect was to restrict Plaintiffs' access to timely information and isolate them from the supportive care typically provided to other patients.

171.   Following the meeting with Stiles, Vicktoria and Alan contacted BUNDL directly. Contrary to Stiles' representation, BUNDL made accommodations were available and ultimately authorized them to proceed to the next retrieval cycle under their plan. This confirmation demonstrated that Stiles' statements regarding BUNDL coverage were inaccurate, and her prior refusal to support further treatment under the plan was either mistaken or knowingly false.

## F.        Retaliation and Ejection from Program

172.   Beginning on June 4, 2025, Plaintiffs submitted a series of detailed, respectful communications through the Clinic's patient portal, raising evidence-

based concerns about unexplained deviations in IVF protocols, inconsistent application of medications, and a persistent lack of hormone monitoring-particularly LH. These questions were submitted at a time when Dr. Shavell was allegedly out of state at a medical conference and unavailable for direct response. The communications outlined serious inconsistencies in treatment and requested written explanations before the next cycle proceeded.

173.   In their June 4, 2025, message, Plaintiffs referenced internal notes, in which other physicians had recommended continuing the same protocol used in Round 1. Despite this, Rounds 2 and 3 reflected significant changes—such as the early use of Ganirelix, altered Clomid timing, and reduced stimulation—all without clear rationale or consultation. Plaintiffs' message asked for clarity regarding why these changes were made in contradiction to that prior recommendation.

174.   On June 5, 2025, Dr. Giuliani responded on behalf of the Clinic, stating Vicktoria and Alan would have to reschedule the June 9 appointment if written responses were expected. Plaintiffs opted to reschedule the meeting, asked that any attending physician provide clarification on one time-sensitive issue (Clomid dosing), and requested the scheduling team contact them to rebook. No response was provided to the specific medical question.

175.   On June 6, 2025, Vicktoria reiterated the request for answers and indicated that Alan would handle further correspondence. She also expressed

frustration that their prediction about poor cycle outcome-based on basic hormone logic—had come true without any corrective intervention from the Clinic.

176.   On June 8, 2025, Plaintiffs submitted a follow-up message posing new, focused questions regarding the inconsistent use of Ganirelix across all three cycles. They highlighted that the pattern of use did not correspond to hormone data or individualized monitoring, and that recent explanations appeared to contradict prior medical records and opinions.

177.   On June 9, 2025, Dr. Shavell returned to the office and responded briefly, asserting that all medical decisions had been intentional and individualized. She offered no direct answers to the pending questions but indicated she would meet with her colleagues in the coming days to determine next steps.

178.   On June 10, 2025, Alan replied, reiterating concern over frequent reversals in medical rationale and highlighting a pattern of off-label, high-dosage protocols unsupported by contemporaneous hormone testing. He specifically cited a phone conversation in which Dr. Shavell justified the early use of Ganirelix based on elevated FSH—despite no such testing being conducted during the relevant window.

179.   Alan also requested confirmation that future cycles would include baseline and mid-cycle monitoring of LH, FSH, estradiol, and progesterone. He noted that while Dr. Shavell had expressed skepticism about LH testing, such

35

monitoring was essential when using "aggressive" protocols that affected LH-sensitive pathways.

180.   On June 11, 2025, Dr. Shavell responded by canceling the June 12, 2025 appointment and stating that she and her colleagues required more time to review Vicktoria's history. She referenced the possibility of experimental protocols used at other centers and suggested future collaboration. At no point did she provide substantive responses to the pending questions or confirm whether requested hormone monitoring would be implemented.

181.   Later that day, Alan submitted a formal request for administrative review to Dr. Shavell, citing:

> a.  Clinical inconsistencies and contradictions;
>
> b.  Use of off-label, high-dosage regimens without adequate justification;
>
> c.  Failure to monitor key hormones in a timely and clinically relevant manner;
>
> d.  Rescheduling of appointments following requests for accountability; and
>
> e.  The absence of any independent internal review process due to Dr. Shavell's dual role as treating physician and Clinic director.

182.   On June 12, 2025, in lieu of the rescheduled meeting or a response to the review request, Plaintiffs received a letter signed by Stiles terminating their relationship with the Clinic. (Ex. A.)

183.   The letter stated that the Clinic had "decided to discontinue the physician/patient relationship" and that they would need to find care elsewhere. It further imposed a 90-day deadline to transfer their embryo, creating significant pressure and logistical burden. The letter cited no misconduct or medical justification for the termination and made no mention of the pending review request or the need for time-sensitive care.

184.   Plaintiffs believe the termination was retaliatory, timed directly in response to their insistence on accountability and clinical transparency. Rather than address their concerns through good faith discussion or internal review, the Clinic elected to sever care, depriving Plaintiffs of the opportunity to proceed with time-sensitive treatment and threatening their ability to preserve and utilize their remaining embryo.

185.   Shortly after Plaintiffs raised concerns regarding irregularities in treatment and requested a formal clinical review, their access to communicate through Corewell's patient portal was abruptly terminated. This cut-off occurred without warning, explanation, or alternative means of contact—effectively severing a critical channel for clinical coordination during ongoing fertility care. The timing

and circumstances strongly suggest that the termination was retaliatory, aimed at silencing further inquiry and insulating the Clinic from accountability.

186.   By disabling patient communication in response to protected complaints, Defendants further compromised continuity of care and placed Plaintiffs at increased medical risk.

187.   In light of the lockout, Alan sent an email on June 13, 2025, to Dori Harrison ("Harrison"), a billing employee at the Clinic whose contact information had been obtained through prior communications. That message also copied what Plaintiffs believed to be the appropriate Corewell Health f/k/a Spectrum Health ("Corewell") contact, in an effort to ensure that the request for formal review reached both Clinic leadership and Corewell administration.

188.   The email explained that access had been disabled and respectfully asked Harrison to forward the attached correspondence—which reiterated their prior concerns—to the appropriate individuals. Plaintiffs later continued the email chain with Harrison directly, removing Corewell from the thread after Corewell responded separately.

189.   The forwarded message reiterated Plaintiffs' concern over the abrupt and unjustified termination of care in the middle of a medically urgent fertility protocol. It also reaffirmed their pending request for formal review, highlighted

unresolved symptoms suggestive of PCOS and/or OHSS, and made clear that Vicktoria qualified as an individual with a disability under the ADA.

190.    Alan also invoked the "regarded as" prong of ADA protection on behalf of himself and formally requested a reasonable accommodation, including an immediate referral to another provider and coordination of records.

191.    The email further requested communication with the Clinic's ADA coordinator, if one existed.

192.    Corewell responded directly to Alan later that day, without copying Harrison, and stated unequivocally that the Clinic is not part of the Corewell and that Corewell Patient Relations had no jurisdiction or oversight authority over the Clinic's operations. Plaintiffs were advised to address all concerns directly with the Clinic's leadership.

193.    This response confirmed that the Clinic operated outside of Corewell's administrative structure, leaving no apparent mechanism for independent review or enforcement of patient rights.

194.    Thereafter, Alan sent two additional emails directly to Harrison. The first demanded the names and contact information of the attorneys representing The Clinic and Ovation, noting that the June 12 termination letter appeared to assert control over embryo disposition and implied authority that may not lawfully belong to the Clinic.

195.   In a final email sent later that day, Alan advised Harrison that any law firms or consultants who participated in the development of unlawful protocols or the implementation of the unlawful termination process were being designated as "John Does" in forthcoming legal action. He also formally requested their identities. Despite these urgent and clear communications, no response was received from Harrison or anyone at the Clinic.

196.   The pattern is unmistakable: after Vicktoria and Alan began pressing for accountability, documentation, and adherence to medical norms, the Clinic responded by stonewalling, canceling appointments, terminating care, cutting off communications, and withholding critical coordination regarding their sole remaining embryo. The totality of these actions—combined with the absence of a single clinical or behavioral justification—confirms that Plaintiffs were ejected from care in retaliation for asserting their rights, raising concerns, and requesting transparency.

## G.    Patient Harm and Emotional Impact

197.   As a result of Defendants' conduct, Vicktoria and Alan have suffered profound and multifaceted harm—medically, emotionally, and psychologically. These harms are not speculative; they are immediate, measurable, and ongoing.

198.   Vicktoria, who has been diagnosed with DOR, has a narrow and rapidly closing window to conceive a biological child. Defendants' repeated unjustified

deviations in care, refusal to adjust treatment based on hormone levels, and ultimately, their retaliatory ejection of Plaintiffs from care, have irreversibly undermined Vicktoria's reproductive chances.

199.   Cycle after cycle, Plaintiffs were subjected to aggressive, off-label, and poorly justified medication protocols that deviated from the recommendations of other treating physicians. Each cycle brought hope, physical side effects, emotional investment, and financial strain. With each failed round—particularly Cycles 2 and 3, which produced no embryos—the emotional toll deepened.

200.   Yet, instead of receiving empathy, explanation, or responsive care, Plaintiffs were met with gaslighting, stonewalling, and ultimately expulsion.

201.   The emotional harm to Alan is uniquely compounded by the fact that he personally administered the injections throughout all three IVF cycles. This included both subcutaneous and intramuscular injections—some of which were painful, time-sensitive, or required multiple administrations per day.

202.   In addition to managing the logistical burden, Alan bore witness to the physical and emotional toll each dose took on Vicktoria. His role was not passive; he was actively involved in every stage of care and intimately connected to its consequences.

203.   The failure of each cycle, followed by the Clinic's retaliatory disengagement, has left Alan with profound feelings of helplessness, guilt, and

41

grief—having physically delivered the very treatments that were later revealed to be clinically unsupported and arbitrarily prescribed.

204.   Following the termination letter on June 12, 2025, Vicktoria and Alan were left without access to clinical staff, portal communications, or continuity of care—while being told they had only 90 days to relocate their sole embryo. The emotional impact of that threat cannot be overstated. It signaled not only the loss of a care team, but the destabilization of their path to sharing a biological child.

205.   Vicktoria has endured the physical effects of repeated IVF cycles—daily injections, ultrasounds, hormone surges, and surgical retrieval—while being denied the essential clinical components that make such treatment viable. The physical strain, compounded by unpredictability and lack of support, has resulted in heightened anxiety, insomnia, and trauma.

206.   Alan, who has been a full participant in both the medical and administrative aspects of care, has likewise experienced emotional and psychological distress, especially in witnessing the effects on his wife while being denied clear information or a pathway forward.

207.   The Clinic's actions not only undermined medical care but stripped Vicktoria and Alan of their dignity.

208.   Vicktoria and Alan were left to advocate for themselves in the face of stonewalled records, contradictory medical rationales, and threats to their genetic material.

209.   Requests for information were met with evasion; requests for accountability were met with termination.

210.   The cumulative result is not only loss of trust and reproductive opportunity, but deep emotional injury. Plaintiffs continue to suffer the consequences of Defendants' actions and now face the urgent task of rebuilding care in a system that already failed them—at great emotional and financial cost.

## COUNTS

### COUNT I: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c)) [ALL DEFENDANTS]

211.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

**A.      The Enterprise**

212.   Defendants conducted, or participated directly or indirectly in the conduct of, the affairs of an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). This enterprise ("Enterprise") is distinct from the Defendant entities themselves and includes:

      a.  The Clinic;

b. Dr. Shavell, Dr. Giuliani, and Stiles, acting not merely as employees but as individuals coordinating decisions and communications across departments and with third parties;

c. John Doe, an as-yet unidentified lawyer, consultant, strategic advisor, and/or related entity that, on information and belief, advised or coordinated with the Clinic in crafting and executing decisions to suppress internal oversight, retaliate against Plaintiffs, and enforce the 90-day embryo transfer directive;

d. BUNDL and Ovation, as financially and logistically integrated external entities; and

e. Corewell, which issued billing communications on behalf of the Clinic and provided administrative and clinical infrastructure supporting IVF services delivered under the Clinic's name.

213.   The Enterprise is an association-in-fact, united by a shared purpose: to extract payments from vulnerable fertility patients through the use of fraudulent representations, misstatements about treatment and financial terms, coercive leverage over stored embryos, and systemic retaliation against patients who question the care provided.

214.   The Enterprise is structurally and functionally distinct from the Clinic's corporate existence. It includes outside legal or consulting advisors (John Doe), off-site entities such as BUNDL and Ovation, and Clinic actors acting in coordination beyond their roles as discrete employees.

215.   The conduct at issue involves not merely malpractice or billing error, but ongoing deceptive, coordinated schemes driven by interlocking actors who worked together to induce payments and suppress oversight.

**B.      Effect on Interstate Commerce**

216.   The Enterprise engages in, and substantially affects, interstate commerce, including:

a.   Plaintiffs' contract with BUNDL, a Delaware corporation and Texas-based entity;

b.   Funds wired by Plaintiffs from Michigan across state lines to BUNDL in reliance on Clinic representations;

c.   Brochures mailed or delivered to the Clinic from out-of-state and physically distributed to Plaintiffs;

d.   Use of U.S. mail to transmit patient bills, appointment letters, and financial documents, including statements mailed by Corewell f/k/a Spectrum Health;

e. Email and patient portal communications exchanged via interstate electronic systems, including communications intended to mislead Plaintiffs about care plans, coverage, and consent; and

f. Insurance claims submitted for services materially misrepresented to both Plaintiffs and third-party payors.

## C.    Predicate Acts

217.    Defendants engaged in a pattern of racketeering activity, including the following predicate acts under 18 U.S.C. § 1961(1).

218.    **Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)**. Defendants used the U.S. mail and interstate wire systems to execute and conceal a fraudulent scheme. These include the following.

219.    **Wire Transfer**: Plaintiffs wired funds to BUNDL across state lines to enroll in a bundled IVF program based on representations from the Clinic. This constituted a wire act that induced financial commitment under false pretenses.

220.    **BUNDL Brochures**: On information and belief, BUNDL brochures were mailed to the Clinic or distributed to Plaintiffs from out-of-state. The materials claimed the program reduced financial investment loss and stress and uncertainty, while failing to disclose that medical decisions would be financially constrained or governed by third parties.

221. **Clinic Billing via Mail**: Bills were sent via U.S. mail, including materials sent by Spectrum Health, creating the false impression that treatment was clinically appropriate and services rendered as agreed. These statements were used to induce payment and justify billing for services not provided in full or not medically justified.

222. **In-Person and Digital Misrepresentations**: Plaintiffs were told orally that a fresh embryo transfer would occur in Round 1, only to be informed-after retrieval-that a FET had already been planned. Internal Clinic notes falsely state that this change was discussed with the patient prior to retrieval; it was not. These misrepresentations directly led Plaintiffs to continue treatment under false premises.

223. **Stiles' False Statements About BUNDL Coverage**: Stiles stated that Plaintiffs would not be allowed to proceed to another cycle under BUNDL, when in fact BUNDL later granted that accommodation. This false statement was made in person and was used to manipulate treatment decisions and patient behavior.

224. **Extortion (18 U.S.C. § 1951)**. On June 12, 2025, Defendants terminated care and issued a letter demanding that Plaintiffs transfer their only remaining embryo within 90 days.

225. This demand came within days of Plaintiffs' protected communications raising concerns about treatment practices and requesting administrative review.

226.    **The threat had coercive power**: failure to comply could result in loss of the embryo, additional legal risk, and further delays in care. No clinical justification was offered. The intent was to punish Plaintiffs for asserting rights, silence further inquiry, and eliminate external review. This constitutes extortion under the Hobbs Act, with a direct impact on property rights and the delivery of interstate medical and logistical services (including embryo storage and shipment).

227.    **Honest Services Fraud and/or Embezzlement (18 U.S.C. § 1346, 664)**. The Clinic misrepresented the nature and quality of services rendered, charged for complete IVF cycles that were never completed or monitored as required, and failed to adjust treatment in response to hormone data—all while refusing to refund or adjust for incomplete care.

228.    These actions deprived Plaintiffs of the honest services of licensed medical professionals and deprived third-party payors (e.g., insurance) of accurate billing information and lawful claims submissions. The scheme thus harmed both private payors (Plaintiffs) and public/third-party payors (insurers).

229.    **Obstruction of Justice and/or Witness Retaliation (18 U.S.C. §§ 1503, 1513).** After Plaintiffs formally requested an internal review and submitted a complaint referencing their legal rights under the ADA and federal standards of care, the Clinic canceled their appointments, revoked portal access, and ceased all communication—while simultaneously imposing a fixed embryo transfer deadline.

230.   These acts were undertaken to interfere with Plaintiffs' pursuit of oversight. The Clinic's conduct obstructed potential reporting to external administrative bodies and constitutes retaliation in response to protected communications.

**D.     Proximate Cause**

231.   Each predicate act directly and foreseeably harmed Plaintiffs.

232.   The brochures induced Plaintiffs to enter a costly BUNDL contract under false pretenses, governed by Texas law and funded via interstate transfer.

233.   The false statements by Dr. Shavell and Stiles deprived Plaintiffs of meaningful informed consent, caused emotional harm, and led to time-sensitive failures in care.

234.   The embryo transfer threat and portal cutoff blocked Plaintiffs from communicating with other care providers, compounding logistical, medical, and legal costs.

235.    Indeed, Plaintiffs are, in fact, also patients of Corewell in connection with their IVF treatments.

236.   The cumulative result was financial loss, emotional trauma, and a materially diminished chance of conceiving a biological child.

237.   Defendants violated 18 U.S.C. § 1962(c) by operating an enterprise through a pattern of racketeering activity.

E.    **Damages and Relief**

238.   Plaintiffs are entitled to damages, including but not limited to:

      a.   Actual damages, including financial losses for services not rendered, unreimbursed medication costs, and logistical expenses associated with forced care transfer;

      b.   Compensatory damages, including physical and emotional harm suffered as a result of improper treatment protocols and retaliatory conduct;

      c.   Pecuniary damages, including lost opportunities for reproductive treatment and embryo preservation, as well as travel, legal, and transfer-related costs;

      d.   Non-pecuniary damages, including pain and suffering, humiliation, and loss of dignity associated with the handling of Plaintiffs' reproductive care;

      e.   Consequential damages, including costs reasonably incurred as a result of Defendants' misconduct, including delay-related harms and forced coordination with alternative providers;

      f.   Treble damages, as permitted under 18 U.S.C. § 1964(c) for RICO violations;

    g.  Restitution, including the return of funds paid for cycles that were abandoned, unjustified, or never rendered in a manner consistent with accepted medical standards; and

    h.  Nominal damages, where appropriate, for violations of federal and statutory rights that may not be fully quantifiable in financial terms.

239.  Plaintiffs are entitled to equitable relief, including but not limited to:

    a.  Preliminary and permanent injunctive relief, to prevent further disposition of Plaintiffs' embryo without consent;

    b.  Orders preserving the status quo, including medical records, financial information, and evidence relevant to the claims in this action; and

    c.  Declaratory relief, recognizing Plaintiffs' rights under federal and state law and clarifying Defendants' legal obligations.

240.  Monetary damages alone are insufficient to compensate Plaintiffs for their injuries, particularly the loss of reproductive opportunity and ongoing emotional harm. Equitable relief is required to protect Plaintiffs' remaining medical rights and to prevent continuing or irreparable injury.

## COUNT II: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(D)) [ALL DEFENDANTS]

241.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

242.   This claim is brought pursuant to 18 U.S.C. § 1962(d), which makes it unlawful for any person to conspire to violate the provisions of 18 U.S.C. § 1962(c).

### A.        Conspiracy

243.   Defendants knowingly and willfully conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, as alleged in Count I.

244.   Defendants agreed, either explicitly or implicitly, to the commission of the predicate acts described in Count I, including mail fraud, wire fraud, extortion, honest services fraud, and obstruction of justice, and each knowingly facilitated or concealed the misconduct of others within the Enterprise.

245.   Specifically, Defendants coordinated and reinforced each other's efforts in:

> a.  Soliciting participation in bundled fertility programs through misrepresentations (mail and wire fraud);
>
> b.  Executing or enforcing clinic policies that financially and clinically constrained patient care;

c.  Issuing deceptive billing communications and false records to
justify withheld services;

d.  Retaliating against patients who requested transparency or
oversight;

e.  Enforcing coercive deadlines and treatment terminations in
response to protected conduct; and

f.  Suppressing reporting channels, including efforts to misdirect
oversight.

246.  On information and belief, each Defendant understood the general
scope of the Enterprise and intended to further its fraudulent and coercive goals
through coordinated action.

## B.  Damages and Relief

247.  Plaintiffs are entitled to damages, including but not limited to:

a.  Actual damages, including amounts paid under false
pretenses, medical and logistical expenses, and lost services;

b.  Compensatory damages, for physical, emotional, and
reproductive harm suffered due to Defendants' coordinated
conduct;

c.  Pecuniary damages, including costs tied to legal, medical, and
logistical burdens from the retaliation and ejection;

    d. Non-pecuniary damages, including emotional distress, humiliation, and the loss of trust in medical institutions;

    e. Consequential damages, incurred as a foreseeable result of the conspiracy and resulting misconduct;

    f. Treble damages, as authorized under 18 U.S.C. § 1964(c);

    g. Restitution, including reimbursement for unused or improperly delivered IVF services; and

    h. Nominal damages, as appropriate for recognized legal wrongs.

248. Plaintiffs are entitled to equitable relief, including but not limited to:

    a. Preliminary and permanent injunctive relief, to preserve their remaining embryo and medical records;

    b. Orders restraining further retaliatory conduct or disposal of disputed materials; and

    c. Declaratory relief, affirming Plaintiffs' rights under federal law and confirming Defendants' legal obligations.

249. Monetary damages alone are insufficient to remedy the full extent of harm suffered by Plaintiffs. Equitable relief is essential to protect ongoing and irreparable interests, including reproductive opportunity and continued access to their genetic materials.

## COUNT III: MICHIGAN RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("MICHIGAN RICO") [ALL DEFENDANTS]

250.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

251.   Defendants have violated MCL 750.159i(1) by being employed by or associated with an enterprise and knowingly conducting or participating in the affairs of that enterprise through a pattern of racketeering activity, as defined under MCL 750.159g.

### A.        MRICO

252.   The enterprise includes the persons and entities described in Count I and is distinct from the Clinic as a legal entity. It operated with continuity and a shared purpose to extract financial payments from fertility patients through fraud, concealment, and coercive treatment structures.

253.   The predicate acts supporting this claim include, but are not limited to: fraudulent billing, false pretenses, use of the mail and wire to defraud, retaliatory threats, and the misappropriation of funds—all of which are chargeable under Michigan law and incorporated by statute into the definition of racketeering activity.

254.   Plaintiffs were directly and proximately harmed by Defendants' conduct, including through financial losses, emotional distress, and the loss of medical opportunity.

B.        **Damages and Relief**

255.   Plaintiffs are entitled to damages, including but not limited to:

a.   Actual and compensatory damages, including unreimbursed medical expenses and costs of replacement care;

b.   Treble damages, as authorized under MCL 750.159j;

c.   Restitution, for amounts paid for services not rendered or induced by fraud; and

d.   Attorneys' fees and costs, including under MCL 750.159j(2).

256.   Plaintiffs further seek equitable and injunctive relief as necessary to prevent continued harm, ensure the preservation of medical records and genetic material, and protect the integrity of future treatment.

## COUNT IV: AMERICANS WITH DISABILITY ACT – TITLE III (42 U.S.C. §§ 12181 ET SEQ.) [THE CLINIC, DR. SHAVELL, STILES]

257.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

258.   This claim is brought pursuant to Title III of the ADA, 42 U.S.C. §§ 12181–12189, and its implementing regulations.

A.        **Disability Rights**

259.   The Clinic is a place of public accommodation under 42 U.S.C. § 12181(7)(F), as it is a professional office of a healthcare provider open to the public.

260.   Vicktoria qualifies as a person with a disability under 42 U.S.C. §
12102(1), due to her diagnosis of DOR, which substantially limits her reproductive
function—a major life activity.

261.   Vicktoria qualifies as an individual with a disability under 42 U.S.C. §
12102(1) due to her documented history of DOR, a prior chemical pregnancy, and
underlying reproductive health conditions, including symptoms consistent with
PCOS.

262.   These conditions substantially limit one or more major life activities,
including reproductive function, endocrine regulation, and the ability to conceive
and bear biological children. Her clinical history, medical records, and treatment
needs place her squarely within the statutory definition of disability under both
federal and state law.

263.   In addition, Vicktoria is "regarded as" having a disability under 42
U.S.C. § 12102(3), as the Clinic consistently treated her as a patient with impaired
reproductive function requiring aggressive or experimental intervention.

264.   Alan is "regarded as" disabled under 42 U.S.C. § 12102(3), based on
the Clinic's erroneous diagnosis of azoospermia.

265.   Alternatively, he is entitled to protection as a person associated with an
individual with a disability under 42 U.S.C. § 12182(b)(1)(E).

266.   Shortly after Plaintiffs submitted formal concerns regarding disability accommodations and requested oversight, their ability to communicate via the patient portal was terminated without notice or alternative access—functionally ending the patient relationship and preventing access to critical coordination during time-sensitive care.

267.   Defendants discriminated against Plaintiffs in violation of Title III by:

    a.  Failing to provide appropriate modifications in care protocols based on Vicktoria's known or perceived disability;

    b.  Retaliating against both Plaintiffs after they requested disability-related accommodations and accountability;

    c.  Terminating services and imposing a rigid embryo transfer deadline after Plaintiffs requested hormone monitoring and oversight; and

    d.  Refusing to process or respond to a formal accommodation request submitted on June 13, 2025, and failing to identify an ADA coordinator or process for disability-based complaints.

268.   These failures constitute a denial of "full and equal enjoyment" of services under 42 U.S.C. § 12182(a) and reflect prohibited discrimination in both policy and practice.

**B.**       **Relief**

269.   Plaintiffs seek equitable relief under 42 U.S.C. §§ 12188(a)(1) and 12205, including:

>    a. Preliminary and permanent injunctive relief, prohibiting Defendants from denying fertility services or embryo access based on disability status, perceived disability, or protected requests for accommodation;
>
>    b. An order requiring Defendants to preserve and maintain Plaintiffs' medical records and stored embryo, and refrain from transfer or destruction without written authorization;
>
>    c. An order requiring Defendants to appoint an ADA coordinator, develop written disability accommodation policies, and train all staff on compliance with Title III of the ADA;
>
>    d. Declaratory relief, affirming that Defendants violated Title III by discriminating against Plaintiffs based on actual and perceived disabilities; and
>
>    e. Attorneys' fees and costs, as permitted by statute.

270.  Plaintiffs do not seek monetary damages under this count, as such relief is not available under Title III of the ADA. However, injunctive and declaratory relief are essential to prevent further harm and ensure future compliance.

## COUNT V: REHABILITATION ACT (29 U.S.C. § 794 ET SEQ.) [THE CLINIC, DR. SHAVELL, AND STILES]

271.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

272.  This claim is brought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

## A.    Discrimination

273.  Upon information and belief, the Clinic (and Corewell as an affiliated entity), receive federal financial assistance and are therefore subject to the requirements of Section 504.

274.  Vicktoria qualifies as an individual with a disability under 29 U.S.C. § 705(20)(B), due to her diagnosis of diminished ovarian reserve, which substantially limits her reproductive function—a major life activity.

275.  She was otherwise qualified to participate in and benefit from Defendants' fertility services and programs.

276.  Defendants discriminated against Plaintiffs solely by reason of disability or perceived disability, including by:

a.  Failing to provide necessary accommodations related to her reproductive impairment;

b.  Imposing medically unnecessary and punitive deadlines;

c.  Terminating access to fertility services after Plaintiffs raised disability-related concerns and requested accountability;

d.  Refusing to process or respond to a formal accommodation request submitted on June 13, 2025; and

e.  Failing to maintain or disclose a grievance procedure, ADA/504 coordinator, or accessible mechanism for patients with disabilities to seek modifications or report discrimination.

277.   Alan is entitled to protection under Section 504 both as an individual "regarded as" having a disability and as someone associated with an individual with a disability.

278.   As a direct and proximate result of Defendants' violation of Section 504, Plaintiffs were denied equal access to medical care, suffered disruption in ongoing treatment, emotional distress, financial harm, and irreversible setbacks in their reproductive health outcomes.

279.    On information and belief, Plaintiffs were denied continued care, access to information, and full participation in fertility services solely because of Vicktoria's actual or perceived disability, and Alan's association with her.

280.    No legitimate medical, behavioral, or financial justification was offered for the Clinic's termination of care, denial of access, or refusal to accommodate. Defendants' conduct was not based on treatment outcome, patient conduct, or clinic capacity—it was the disability-related concerns and protected advocacy that triggered adverse action, making disability the sole and proximate cause of the discrimination Plaintiffs suffered.

**B.    Damages and Relief**

281.    Plaintiffs are entitled to damages and equitable relief, including:

   a. Actual and compensatory damages, including emotional distress, pain and suffering, and psychological injury resulting from discriminatory treatment and forced cycle abandonment;

   b. Pecuniary damages, for out-of-pocket losses associated with medication, embryo transfer, transportation, replacement care coordination; and

   c. Consequential damages, stemming from delays in treatment, increased medical complexity, and reproductive harm; and

d. Attorneys' fees and costs, including as permitted under 29 U.S.C. § 794a(b).

282. Equitable relief, including:

a. Preliminary and permanent injunctive relief to preserve Plaintiffs' embryo, records, and access to future care;

b. A court order requiring Defendants to implement and publicize clear accommodation policies for patients with reproductive disabilities;

c. Staff retraining, particularly for administrative staff and treating physicians, regarding Section 504 compliance; and

d. Declaratory relief, affirming that Defendants violated Section 504 and discriminated against Plaintiffs based on disability and protected association.

283. Because Defendants acted with deliberate indifference to Plaintiffs' clearly communicated medical needs and legal rights, compensatory damages are appropriate. Plaintiffs' injuries—including reproductive loss, emotional trauma, and financial harm—were foreseeable and directly caused by Defendants' discriminatory conduct.

## COUNT VI: MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (PDCRA) (MCL 37.1101 ET SEQ.) [THE CLINIC, DR. SHAVELL, AND STILES]

284.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

285.    The PDCRA, MCL 37.1101 et seq., prohibits public accommodations from denying services, access, or equal enjoyment on the basis of disability or perceived disability.

### A.        Disability Rights

286.    The Clinic is a public accommodation within the meaning of MCL § 37.1301(a), as it is a healthcare facility offering services to the general public.

287.    Vicktoria has a qualifying disability-diminished ovarian reserve-that substantially limits her reproductive function, a major life activity.

288.    Alternatively, the Clinic regarded her as having a disability, within the meaning of MCL 37.1103(d)(iii).

289.    Alan was also regarded as disabled based on the Clinic's incorrect diagnosis of azoospermia and is independently protected under the PDCRA as a person associated with a person with a disability.

290.    Defendants discriminated against Plaintiffs solely because of disability or perceived disability, including by:

        a.  Denying continued fertility services despite medical urgency;

64

      b.  Terminating access to care and communications following disability-related accommodation requests;

      c.  Failing to provide reasonable modifications to treatment or care access; and

      d.  Imposing arbitrary and coercive restrictions, including the 90-day embryo transfer deadline, after Plaintiffs asserted protected rights.

291.   Defendants did not offer any legitimate, non-discriminatory reason for the adverse treatment. Rather, the Clinic's conduct demonstrates that Plaintiffs' actual or perceived disabilities were the sole cause of denial of care, retaliation, and exclusion.

## B.      Damages and Relief

292.   Plaintiffs are entitled to all relief available under MCL 37.1606, including:

      a.  Compensatory damages for economic harm and emotional distress; and

      b.  Consequential damages, including reproductive losses and costs of care transition.

293.   Injunctive and declaratory relief, including:

      a.  An order preserving and protecting Plaintiffs' stored embryo;

b. Required implementation of policies to prevent disability-based exclusion; and

c. Attorneys' fees and costs, including as authorized by MCL 37.1606(3).

294.    Defendants' conduct was intentional, knowing, and undertaken in violation of clearly established state law rights.

## COUNT VII: AFFORDABLE CARE ACT (42 U.S.C. § 18116) [THE CLINIC AND DR. SHAVELL]

295.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

296.    Section 1557 of the Affordable Care Act, codified at 42 U.S.C. § 18116, prohibits any healthcare program or activity that receives federal financial assistance from discriminating on the basis of race, color, national origin, sex, age, or disability.

297.    The implementing regulations for Section 1557 incorporate the standards of enforcement from Section 504 of the Rehabilitation Act (disability) and Title IX of the Education Amendments (sex).

298.    Defendants operate a healthcare program or activity within the meaning of the ACA and receive federal financial assistance, including payments through Medicaid, ERISA-regulated insurance, and/or other federally subsidized insurance plans. The Clinic is therefore a covered entity subject to Section 1557.

A.    **Disability-Based Discrimination**

299.   Vicktoria is a person with a disability-diminished ovarian reserve-which substantially limits her reproductive capacity, a major life activity. She was also regarded as disabled by Defendants.

300.   Alan is either regarded as disabled (due to Defendants' erroneous azoospermia diagnosis) or is protected by virtue of his association with a person with a disability.

301.   Defendants intentionally discriminated against Plaintiffs based on actual or perceived disability by:

> a.  Refusing to monitor and tailor fertility protocols based on Vicktoria's known limitations;
>
> b.  Retaliating after Plaintiffs submitted formal accommodation requests;
>
> c.  Terminating care mid-cycle without clinical cause and imposing rigid deadlines on embryo removal; and
>
> d.  Ignoring or denying access to a disability coordinator, despite clear ADA- and Rehabilitation Act-based requests.

302.   Defendants' conduct constitutes a violation of Section 1557 under the Rehabilitation Act standard, as it resulted in the denial of full and equal access to a covered healthcare program.

**B.      Sex-Based Discrimination**

303.   Vicktoria was also discriminated against on the basis of sex, within the meaning of Title IX and Section 1557, including:

        a.  Denial of equal treatment in fertility care based on her sex-specific condition;

        b.  Imposition of non-medically justified treatment modifications and cycle cancellations, in a manner not similarly applied to male patients;

        c.  Internal records showing differential embryo transfer planning based on non-disclosed policies affecting women; and

        d.  Retaliation following protected sex- and disability-based advocacy, including the shutdown of portal access and refusal to communicate.

304.   These acts constitute intentional discrimination on the basis of sex under the ACA, and Defendants acted with at least deliberate indifference to Plaintiffs' rights.

**C.      Damages and Relief**

305.   Plaintiffs are entitled to relief under 42 U.S.C. § 18116 and 45 C.F.R. 92.301, including:

    a.  Compensatory damages, including emotional distress and pecuniary loss resulting from the denial of medically necessary care;

    b.  Consequential damages, including reproductive harm and cycle cancellation costs; and

    c.  Attorneys' fees and costs, including pursuant to 42 U.S.C. § 1988 and incorporated enforcement provisions.

306.  Equitable relief, including:

    a.  Preliminary and permanent injunctive relief preserving Plaintiffs' embryo and access to care;

    b.  An order requiring Defendants to implement and publish non-discriminatory fertility treatment protocols;

    c.  Mandatory staff training on sex- and disability-based discrimination; and

    d.  Declaratory relief, affirming that Defendants violated Section 1557.

307.  Because Defendants' actions were taken with knowledge of Plaintiffs' protected status and with deliberate indifference to their federally protected rights, relief under Section 1557 is appropriate.

## COUNT VIII: MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT
### (MCL 37.2101 et seq.) [THE CLINIC AND DR. SHAVELL]

308.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

309.  The ELCRA, MCL 37.2302(a), prohibits a place of public accommodation from denying an individual the full and equal enjoyment of its services, goods, facilities, privileges, advantages, or accommodations because of sex, marital status, or other protected characteristics.

310.  The Clinic is a place of public accommodation under MCL 37.2301(a), as it offers healthcare services to the public.

A.        **Sex-Based Discrimination**

311.  Vicktoria is a woman who sought access to fertility services on equal terms. Throughout her care, she was subject to unequal, medically unjustified treatment on the basis of her sex and reproductive capacity, including:

> a.  The application of rigid, non-individualized, and sex-specific protocols that disregarded her actual hormonal profile;
>
> b.  A shift from planned fresh embryo transfer to FET based on internal, undisclosed assumptions about female physiology, without her informed consent;

70

      c. Protocol reversals and drug dosages inconsistent with clinical indications, which directly affected her reproductive outcomes; and

      d. Dismissive responses to her concerns and requests for explanations regarding treatment variations across cycles.

312. Plaintiff was also retaliated against for challenging these decisions, including being excluded from treatment, denied access to the patient portal, and threatened with a 90-day embryo removal deadline, all shortly after requesting transparency and an administrative review.

313. These actions were not applied equally to male patients or other similarly situated individuals. To the contrary, the Clinic's internal documentation and verbal representations reflect differential treatment of patients based on sex-specific expectations about reproductive function and protocol compliance.

314. Defendants' actions also affected Alan, a male patient and Vicktoria's spouse. As a co-patient, he suffered exclusion from participation in treatment decisions, was falsely diagnosed with azoospermia, and was ultimately barred from communicating through the clinic's systems—all in connection with the adverse treatment of his female partner. These facts support a claim of associative discrimination based on Vicktoria's sex and protected activity.

315.   Defendants' conduct constitutes discrimination "because of sex" under ELCRA, as interpreted by Michigan courts to include unequal treatment tied to reproductive function, sex-specific medical assumptions, and retaliatory exclusion following protected requests.

**B.    Damages and Relief**

316.   Plaintiffs are entitled to full relief under MCL 37.2801, including:

    a.   Compensatory damages, including emotional distress, psychological injury, and the loss of reproductive opportunity;

    b.   Economic damages, including treatment expenses, costs of embryo transfer and storage, and loss of benefit under Bundl program arrangements;

    c.   Exemplary damages, due to the retaliatory, willful, and knowing nature of the discrimination; and

    d.   Attorneys' fees and costs, including as authorized by MCL 37.2802.

317.   Equitable relief, including:

    a.   An order preserving the embryo, prohibiting its destruction or transfer without Plaintiffs' written consent; and

      b. Training for staff and revision of clinic protocols to ensure sex-based equity in reproductive treatment and communication.

318. Defendants' actions were undertaken with knowledge of Plaintiffs' protected status, and with intent or reckless disregard for their civil rights under Michigan law.

## COUNT IX:  MICHIGAN CONSUMER PROTECTION ACT (MCL 445.901 ET SEQ.) [THE CLINIC, DR. SHAVELL, STILES, AND JOHN DOE]

319. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

320. The MCPA, MCL 445.901 et seq., prohibits the use of unfair, unconscionable, or deceptive business practices in trade or commerce, including false advertising, misrepresentations, and omissions in consumer transactions.

321. The Clinic—acting through its staff, including Dr. Shavell—offered bundled treatment packages through BUNDL, a third-party program marketed directly to patients at the Clinic.

322. These packages were presented via brochures distributed at the Clinic, verbal statements by staff, and quotes or contracts provided to patients, including Vicktoria and Alan.

323. These representations-made before any course of medical treatment was selected-were commercial in nature and not part of the rendering of medical

services or professional medical judgment. They were part of the Clinic's administrative and marketing practices and fall outside the malpractice exemption under MCL 445.904(1)(a).

## A.    Deceptive and Unconscionable Practices

324.   Defendants violated the MCPA by engaging in the following deceptive business practices, among others prohibited by MCL 445.903(1):

a. MCL 445.903(1)(a): Causing a probability of confusion or misunderstanding as to the approval or sponsorship of fertility packages;

b. MCL 445.903(1)(c): Representing that services have benefits or characteristics they do not have;

c. MCL 445.903(1)(e): Misrepresenting that a consumer will receive a price advantage (e.g., suggesting the Bundl package includes multiple covered cycles with drug costs);

d. MCL 445.903(1)(s): Failing to reveal facts that are material to the transaction in light of representations made (e.g., failing to disclose limits on medication, embryo transfer, or provider discretion); and

e. MCL 445.903(1)(bb): Making representations of fact that could not be substantiated at the time they were made.

325.   Specifically, Defendants:

    a.   Marketed BUNDL as offering peace of mind and price protection, while concealing the Clinic's intent to treat BUNDL patients differently;

    b.   Provided contradictory information regarding whether medications were covered under specific packages;

    c.   Induced Plaintiffs to pay over $34,000 under the impression that multiple retrievals and consistent care would be provided, only to later deny that coverage existed or threaten removal from care;

    d.   Failed to disclose that staff marked patients as "BUNDL" on the top of their charts, which triggered internal routing or restrictions not disclosed to the patient; and

    e.   Presented BUNDL participation as clinically neutral, but subsequently cited it as a reason for denying or limiting treatment options, including cycle access and medication coverage.

326.   These practices were part of the Clinic's trade and commerce activities- not its provision of professional medical advice. Plaintiffs were misled at the point of sale before the actual medical judgment occurred.

**B.**      **Damages and Relief**

327.   Plaintiffs are entitled to relief under MCL 445.911, including:

   a. Actual damages, including financial loss related to the Bundl

      program, unrefunded payments, uncovered medications, and

      expenses for transfer of care; and

   b. Statutory damages, to the extent applicable.

328.   Injunctive relief, including:

   a. An order requiring Defendants to cease deceptive marketing

      of BUNDL packages;

   b. Public disclosure of the limitations and financial impact of

      program options;

   c. Implementation of written disclosures and consumer

      education policies; and

   d. Attorneys' fees and costs, including under MCL 445.911(2).

329.   Defendants' deceptive practices were intentional, targeted vulnerable

patients in urgent medical situations, and had immediate and irreversible financial

and reproductive consequences.

## COUNT X: TORTIOUS INTEFERENCE WITH A CONTRACT [THE CLINIC, DR. SHAVELL, AND STILES]

330.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set

forth herein.

**A.       Interference**

331.   In November 2024, Vicktoria entered into a valid and enforceable contract with BUNDL, which included a two-cycle IVF program and an optional medication package. The program was expressly designed to ensure care continuity across multiple retrievals.

332.   Defendants knew of the existence and material terms of the BUNDL contract, as they marketed the program, coordinated its implementation, and served as Bundl's point of contact within the Clinic.

333.   On or around May 2025 through June 2025, Plaintiffs raised concerns about whether their care decisions were being improperly restricted or shaped by the BUNDL structure. These concerns included drug limitations, cycle cancellations, and adverse routing.

334.   In response, Defendants intentionally retaliated against Plaintiffs by:

    a. Denying future IVF care despite time-sensitive medical needs;

    b. Cutting off all communication via the patient portal;

    c. Refusing to respond to accommodation requests or transfer coordination; and

    d. Issuing a letter demanding removal of the embryo within 90 days.

335.   This conduct was intentional, improper, and unjustified, and was undertaken with knowledge that it would frustrate or obstruct the ongoing BUNDL contract.

336.   As a direct and proximate result of Defendants' interference:

    a.  Plaintiffs were unable to complete the full course of retrievals under the BUNDL program;

    b.  The financial value and intended benefit of the BUNDL contract were lost; and

    c.  Plaintiffs were forced to scramble for care coordination, suffer delays, and incur further out-of-pocket costs.

**B.        Damages and Relief**

337.   Plaintiffs are entitled to:

    a.  Compensatory damages, including the loss of contract value, expenses related to transfer or replacement care, and other consequential losses;

    b.  Restitution, for the portion of the BUNDL program rendered impossible or void due to interference;

    c.  Exemplary damages, as Defendants' conduct was willful, retaliatory, and in bad faith; and

d. Attorneys' fees and costs to the extent permitted under applicable law.

338.    Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XI: FRAUD, SILENT FRAUD, AND/OR NEGLIGENT MISREPRESENTATION [ALL DEFENDANTS]

339.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

### A.    Fraud (Intentional Misrepresentation) [The Clinic, Dr. Shavell, and Stiles]

340.    The Clinic, Dr. Shavell, and Stiles made material false representations to Plaintiffs, including but not limited to:

a. Statements suggesting that Plaintiffs' participation in the BUNDL program would not impact clinical decisions or care;

b. Statements that medical protocols were "individualized," despite clinical records and patterns to the contrary;

c. Statements that fresh embryo transfer would occur during Round 1, when a frozen transfer had been pre-planned internally;

d. Reassurances that hormone testing (e.g., LH, FSH) was not needed, despite records showing it was not measured at key junctures; and

e. The assertion that Vicktoria's treatment plan was based on medical necessity, while in fact it was guided by BUNDL coverage constraints and internal disputes among staff.

341.   These statements were false at the time they were made, and Defendants either knew them to be false or made them with reckless disregard for their truth.

342.   Plaintiffs relied on these false statements in agreeing to enroll in the Bundl program, proceeding with IVF at the Clinic, undergoing expensive and physically invasive treatments, and forgoing alternative care paths.

343.   As a result of this reliance, Plaintiffs suffered damages, including lost reproductive opportunity, financial loss, and emotional harm.

**B.      Silent Fraud (Fraudulent Omission) [All Defendants]**

344.   Defendants committed silent fraud by failing to disclose material facts under circumstances where they had a duty to speak, including:

a. Failing to disclose that Bundl participation would result in different treatment access or cycle constraints;

b.  Failing to disclose that the Clinic would not honor recommendations from Dr. Jones and Dr. Giuliani to repeat Round 1's protocol;

c.  Failing to disclose that a FET had already been selected for Round 1 despite affirmatively stating a fresh transfer would occur;

d.  Failing to disclose that key hormone levels were not being measured, including LH, FSH, or estradiol mid-cycle; and

e.  Failing to disclose that certain medications (e.g., Ganirelix) were being administered off label.

345.  These omissions occurred in contexts where Defendants held superior knowledge, Plaintiffs had no reasonable means to discover the truth, and Defendants had affirmative duties as fiduciaries and healthcare providers.

346.  Plaintiffs justifiably relied on Defendants' omissions in making high-stakes treatment decisions and suffered harm as a direct and foreseeable consequence.

**C.      Negligent Misrepresentation [All Defendants]**

347.  In the alternative, Defendants negligently misrepresented material facts, including but not limited to:

a. The accuracy of statements made about protocol decisions, test results, and treatment coverage;

b. Statements minimizing the impact of Bundl on patient care; and

c. Representations about hormone monitoring and drug scheduling that were objectively unsupported.

348.   Defendants owed Plaintiffs a duty of reasonable care in providing truthful and accurate information during the course of ongoing contractual and fiduciary relationships.

349.   Defendants breached that duty by communicating inaccurate, misleading, or incomplete information, upon which Plaintiffs reasonably relied.

350.   As a result of that reliance, Plaintiffs incurred financial loss, physical risk, emotional distress, and disruption of fertility care.

**D.    Damages and Relief**

351.   Plaintiffs are entitled to recover:

a. Compensatory damages, for financial loss, wasted medical expenses, and emotional harm;

b. Restitution, including the return of payments made under false pretenses;

    c.   Consequential damages, tied to reproductive harm, embryo risk, and cycle failure;

    d.   Exemplary damages, for intentional deception and abuse of trust; and

    e.   Attorneys' fees and costs, where permitted.

352.   Defendants' conduct was intentional, reckless, or grossly negligent, and entitles Plaintiffs to relief under all three theories pled.

353.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XII: FRAUDULENT INDUCEMENT [THE CLINIC AND DR. SHAVELL]

354.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

**A.      Inducement**

355.   Prior to entering into a binding agreement with BUNDL, Plaintiffs were exposed to representations made directly by the Clinic and its staff suggesting the BUNDL program would not affect clinical decisions or treatment quality.

356.   These representations were made in brochures, verbal statements during consultations, and written summaries of BUNDL options-all of which

preceded the execution of Plaintiffs' contract with BUNDL and selection of the Clinic as their treatment site.

357.    These statements were false and misleading at the time they were made, and Defendants knew-or should have known-that they were false because:

      a.  BUNDL patients are identified and handled differently, including by marking of their charts;

      b.  Clinical decisions were in fact altered or constrained based on Bundl coverage limits;

      c.  The Clinic terminated care after Plaintiffs questioned whether financial constraints were interfering with medical decision-making;

      d.  Plaintiffs were threatened with embryo removal after asserting protected rights and requesting oversight; and

      e.  BUNDL ultimately granted Plaintiffs an accommodation that the Clinic falsely denied was possible.

358.    Plaintiffs reasonably and detrimentally relied on these misrepresentations in:

      a.  Electing to join the BUNDL program and invest over $34,000 in bundled care;

b.  Undergoing fertility treatment at the Clinic instead of seeking care elsewhere; and

c.  Delaying or forgoing alternative, potentially more effective, treatments or providers.

359.  As a direct and proximate result of this fraudulent inducement, Plaintiffs suffered:

a.  Financial harm, including loss of BUNDL contract value, treatment fees, and medication costs;

b.  Reproductive harm, through canceled cycles, lost opportunities, and treatment disruption; and

c.  Emotional and psychological distress, including grief, betrayal, and escalating anxiety.

## B.    Damages and Relief

360.  Plaintiffs are entitled to the following relief:

a.  Rescission of the transaction, including any associated financial obligations induced by fraud;

b.  Compensatory damages, for financial loss, reproductive impact, and emotional harm;

c.  Exemplary damages, due to the deliberate nature of the deception;

      d.  Attorneys' fees and costs, to the extent permitted by law; and

      e.  Equitable relief, including an injunction protecting the embryo, treatment records, and access to a neutral facility.

361.  Defendants' conduct constitutes intentional fraud, undertaken with full knowledge that Plaintiffs would rely on the false assurances in making high-stakes medical and financial decisions.

362.  Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XIII: FRAUDULENT CONCEALMENT [ALL DEFENDANTS]

363.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

364.  Defendants had a legal duty to disclose material facts to Plaintiffs by virtue of the fiduciary and contractual relationship between patient and provider, as well as their role in promoting, coordinating, and administering third-party bundled care (i.e., BUNDL).

## A.    Concealment

365.  Despite that duty, Defendants intentionally concealed or failed to disclose numerous material facts, including but not limited to:

a.  That Plaintiffs' participation in the BUNDL program would affect the timing, drug selection, and clinical discretion exercised in their care;

b.  That a FET had already been internally selected during Round 1 despite representations that a fresh transfer would be performed;

c.  That no meaningful hormone monitoring (e.g., LH, FSH) was taking place during key phases of stimulation or retrieval cycles;

d.  That internal documentation from other physicians recommended repeating the prior successful protocol, which was later disregarded without explanation; and

e.  That the Clinic planned to terminate care and impose a 90-day embryo deadline following Plaintiffs' requests for transparency and accountability.

366.  These omissions were not oversights, but part of a pattern of concealment designed to secure Plaintiffs' ongoing participation in a treatment program and payment structure while avoiding scrutiny of clinical inconsistencies, financial influence, and internal disagreement.

367.   Defendants were in a unique position of trust and superior knowledge, and Plaintiffs had no reasonable means of discovering these omissions until after care was terminated or documents were retrospectively reviewed.

368.   Plaintiffs reasonably relied on the assumption that relevant medical information, treatment planning, and financial limitations would be fully and timely disclosed.

369.   As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered:

a. Loss of reproductive opportunity, including two failed cycles and one suboptimal cycle that might have been prevented with proper disclosure;

b. Financial losses, including medication costs, embryo transfer fees, and program expenses that could have been avoided with accurate information; and

c. Emotional harm, including shock, betrayal, and the trauma of care termination during a time of medical urgency.

**B.      Damages and Relief**

370.   Plaintiffs seek the following relief:

a. Compensatory damages, including but not limited to lost treatment value, emotional distress, and future care needs;

b. Restitution, for payments made under circumstances that were fraudulently concealed;

c. Exemplary damages, given the intentional and deceptive nature of Defendants' conduct;

d. Equitable relief, including injunctions to protect the stored embryo and require full disclosure of the medical record and Bundl coordination; and

e. Attorneys' fees and costs, to the extent available.

371.   Defendants' concealment was not incidental, but part of a deliberate and coordinated effort to mislead Plaintiffs into proceeding with treatment while suppressing known facts that would have altered their decision-making.

372.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XIV: INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS [The Clinic, Dr. Shavell, and Stiles]

373.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

## A.      Intentional

374.   The Clinic, Dr. Shavell, and Stiles engaged in conduct that was extreme and outrageous, including:

a.  Terminating medically urgent care mid-cycle without warning or clinical justification;

b.  Issuing a letter that threatened the status of Plaintiffs' only viable embryo and imposed a rigid 90-day removal deadline;

c.  Retaliating against Plaintiffs after they requested transparency, clinical review, and accommodation for known disabilities;

d.  Cutting off access to the patient portal and refusing to coordinate transfer of care while Plaintiffs were in a state of medical dependence;

e.  Publicly shouting "get a lawyer" in the presence of staff and other patients after a Bundl-related financial discussion; and

f.  Misrepresenting treatment plans, hiding key clinical recommendations, and overriding physician consensus-all while knowing the emotional toll of failed IVF cycles.

375.  Defendants acted with intent or reckless disregard for the consequences of their conduct, knowing that fertility patients-particularly those with diminished ovarian reserve-are extremely vulnerable and emotionally invested in each cycle.

376.  As a direct result of Defendants' conduct, Plaintiffs suffered severe emotional distress, including:

     a. Anxiety, panic, and insomnia;

     b. Feelings of betrayal, helplessness, and grief; and

     c. Long-term psychological trauma, particularly around reproductive decisions and medical trust.

**B.        Negligent**

377.   In the alternative, Defendants' conduct was negligent, and breached duties owed to Plaintiffs as patients, contract parties, and foreseeable victims of their conduct.

378.   Defendants owed Plaintiffs a duty of care in handling fertility treatment, program coordination, and patient communications. Their conduct fell far below the applicable standard of care.

379.   As a direct and proximate result of Defendants' negligence, Plaintiffs suffered emotional harm that was foreseeable, severe, and medically significant.

**C.        Damages and Relief**

380.   Plaintiffs are entitled to the following relief:

     a. Compensatory damages, including damages for mental anguish, emotional distress, and psychological suffering;

     b. Medical expenses for counseling or psychiatric support resulting from Defendants' conduct;

     c. Exemplary damages, where applicable; and

d.  Any other relief deemed appropriate by the Court.

381.   The psychological harm in this case was not speculative or incidental-it was a foreseeable and devastating consequence of the Clinic's pattern of mistreatment, retaliation, and clinical abandonment.

382.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XV: UNJUST ENRICHMENT AND/OR QUANTUM MERUIT
### [THE CLINIC AND DR. SHAVELL]

383.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

**A.        Unjust Enrichment**

384.   Plaintiffs conferred a substantial financial benefit on Defendants, including but not limited to:

a.  Payment of fees associated with the BUNDL program, totaling over $34,000, including service coordination fees retained by the Clinic;

b.  Out-of-pocket payments for medications, embryo storage, consultation, and laboratory services, many of which were rendered incomplete, misrepresented, or abruptly terminated; and

c. Participation in bundled services that were promoted, sold, and coordinated by Clinic staff acting in a quasi-commercial capacity.

385.   Defendants retained these benefits despite:

a. Cancelling medically necessary treatment mid-cycle without clinical justification;

b. Refusing to complete contracted or anticipated cycles;

c. Denying access to services for which payment was already made;

d. Retaining fees for coordination with BUNDL while interfering with Plaintiffs' ability to complete the bundled services; and

e. Failing to refund, credit, or coordinate further care after exclusion from the program.

386.   It would be unjust and inequitable for Defendants to retain those funds without repayment, reimbursement, or continuation of the services originally contemplated.

## B.      Quantum Meruit

387.   In the alternative, Plaintiffs seek recovery under quantum meruit, which permits compensation for the value of services rendered or benefits conferred where

there is no express contract governing the relationship, or where performance was interrupted by wrongful conduct.

388.   While certain services were coordinated under the BUNDL agreement, the Clinic's conduct disrupted and prevented full performance, thereby entitling Plaintiffs to a restitutionary measure of damages based on the value of incomplete or undelivered services.

389.   Plaintiffs relied on representations by Clinic staff regarding cycle availability, medication coverage, transfer timing, and completion of IVF services—expecting fair value in exchange for their payments.

390.   Defendants' abrupt withdrawal of care, refusal to coordinate remaining services, and obstruction of further retrieval or transfer access prevented Plaintiffs from receiving the reasonable value of what was paid.

**C.      Damages and Relief**

391.   Plaintiffs are entitled to:

   a. Restitution, including a refund or proportional return of unused, undelivered, or prematurely terminated services;

   b. Compensatory damages, equivalent to the value of the unjustly retained benefit;

   c. Equitable relief, including a declaration of Plaintiffs' right to continued access to any services already paid for; and

      d.   Constructive trust, if needed to preserve any funds or benefits improperly retained by Defendants.

392.   Defendants' retention of funds and refusal to complete treatment were unjust, retaliatory, and financially exploitative, and entitle Plaintiffs to equitable recovery.

## COUNT XVI: PROMISSORY ESTOPPEL [THE CLINIC AND DR. SHAVELL]

393.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

### A.      Clear and Definite Promise

394.  Defendants, including staff acting as administrative agents of the Clinic, made clear and repeated promises to Plaintiffs, including but not limited to:

      a.   That participation in the BUNDL program would not affect access to care or alter clinical decisions;

      b.   That treatment protocols would be individualized and informed by medical judgment rather than financial considerations;

      c.   That Plaintiffs would be permitted to complete two IVF retrievals under the BUNDL program as contracted;

      d.   That medications associated with each retrieval would be available and used as needed for treatment success; and

e. That the Clinic would facilitate ongoing care and coordination throughout the treatment plan.

395.   These promises were made verbally, through written brochures and program documents, and by ongoing conduct throughout the planning and execution of Rounds 1 through 3.

**B.      Reasonable and Substantial Reliance**

396.   Plaintiffs reasonably relied on these promises in:

a.  Selecting the Clinic as their fertility provider;

b.  Entering into a bundled program costing over $34,000;

c.  Proceeding with physically, emotionally, and financially taxing treatment cycles;

d.  Declining to seek out alternate care or supplemental coverage that might have mitigated risk; and

e.  Continuing under the assumption that Defendants would follow through on their commitments until that care was unilaterally terminated.

397.   Plaintiffs' reliance was definite and substantial: they underwent multiple rounds of injections, lab visits, financial planning, and procedure scheduling, and were forced to make high-stakes decisions based on promises that were later abandoned or contradicted.

## C.        Injustice

398.  Defendants'     later     reversal—including     program     ejection,
communication lockout, and refusal to coordinate BUNDL obligations—caused
Plaintiffs to suffer foreseeable financial loss, reproductive risk, and emotional harm.

399.  It would be unjust to allow Defendants to benefit from Plaintiffs'
reliance on promises regarding access, treatment, and funding—particularly where
such promises were central to the structure of care and cannot now be fulfilled by
other means.

## D.        Damages and Relief

400.  Plaintiffs are entitled to the following remedies under the doctrine of
promissory estoppel:

    a.  Enforcement of promises made with regard to Bundl program
access, treatment availability, and medication provision;

    b.  Restitution for any financial losses incurred in reliance on
those promises;

    c.  Compensatory damages for disrupted treatment and reliance-
based harm; and

    d.  Equitable relief, including preservation of the embryo,
transfer assistance, and access to necessary records.

## COUNT XIII: MALPRACTICE [THE CLINIC, DR. SHAVELL, AND DR. GIULIANI]

401.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

402.   To the extent any factual allegations may implicate both professional and non-professional conduct, Plaintiffs do not intend to collapse legal theories or impair the viability of any alternative counts pled above.

403.   This Count is being filed in federal court, where state procedural requirements—such as Michigan's affidavit of merit under MCL 600.2912d—do not apply.

404.   To the extent required by MCL 600.2912b, this Complaint shall serve as Plaintiffs' Notice of Intent to file a claim for professional negligence against the defendants identified in this Count. Plaintiffs assert that time is of the essence and that no further waiting period is practicable or just.

### A.      Duty and Standard of Care

405.   Defendants owed Plaintiffs a duty of care arising from their physician-patient relationship, as well as duties imposed by Michigan common law and statutory standards governing the practice of medicine, assisted reproductive technology, and IVF protocol adherence.

406.   Defendants were required to:

a. Exercise the degree of care, skill, and diligence ordinarily exercised by qualified fertility specialists and clinics under the same or similar circumstances;

b. Apply professional standards consistently, including those governing hormone monitoring, medication dosage, and protocol adjustments;

c. Accurately interpret and respond to hormone levels, clinical findings, and ultrasound results;

d. Act in alignment with internal physician recommendations unless contraindicated and clearly documented; and

e. Refrain from employing or continuing experimental or off-label protocols without informed consent and adequate clinical rationale.

**B.    Breach of Standard of Care**

407.   Defendants breached their professional obligations by engaging in a pattern of substandard clinical conduct, including but not limited to:

a. Administering Ganirelix on CD 3 to CD 5 in Round 2 without appropriate FSH or LH testing to justify suppression;

b.  Failing to monitor LH in any of the three cycles, despite elevated progesterone levels indicating a premature LH surge in Round 3;

c.  Prescribing Clomid at 200mg, exceeding typical dosing (50-150mg), and continuing use despite clear anti-estrogenic effects and follicular suppression;

d.  Initiating stimulation on CD 5 in Round 2, a delay that undermined follicular synchronization;

e.  Doubling estradiol and continuing progesterone at the end of Round 2 without hormone justification or documentation of clinical rationale;

f.  Failing to adjust medication mid-cycle in response to lab results or follicular development, despite real-time monitoring being a cornerstone of IVF care;

g.  Misrepresenting the intent to do a fresh embryo transfer, while planning a frozen transfer internally and failing to obtain informed consent for that change; and

h.  Terminating care during active fertility treatment without arranging continuity of care or identifying a qualified replacement provider.

## C.    Causation

408.    These breaches of the standard of care were the direct and proximate cause of:

> a.  Round 2's failure despite 9 follicles, due to poor stimulation, early suppression, and timing errors;
>
> b.  Round 3's complete arrest and premature luteinization, due to omission of Ganirelix and inadequate monitoring;
>
> c.  The irreversible loss of critical treatment time for a patient with diminished ovarian reserve;
>
> d.  Emotional trauma and loss of trust in fertility care systems; and
>
> e.  Financial and reproductive consequences, including wasted medications, canceled procedures, and inability to complete contracted retrievals.

## D.    Damages and Relief

409.    Plaintiffs seek recovery of:

> a.  Compensatory damages, including the cost of the three failed or canceled cycles;
>
> b.  Medical expenses, including medications, procedures, and future replacement treatment;

       c.  Non-economic damages, including pain, suffering, and loss of reproductive opportunity; and

       d.  Exemplary damages, given the intentional and deceptive nature of Defendants' conduct.

410.   Plaintiffs reserve the right to amend this claim to include additional breaches, expert opinions, and documentation following discovery.

411.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Vicktoria Gocha and Alan J. Gocha respectfully request that this Court enter judgment in their favor and against Defendants Michigan Reproductive and IVF Center, P.C. d/b/a The Fertility Center, Dr. Valerie Shavell, Dr. Emma Giuliani, Dawn Stiles, and John Doe, and award the following relief.

1.     Compensatory damages, in an amount to be determined at trial, including but not limited to medical expenses, out-of-pocket costs, lost reproductive opportunity, lost contract value, lost use of services paid for but not received, and associated economic harms.

2.      Consequential and incidental damages, including expenses arising from treatment disruption, embryo transfer complications, and forced relocation of care.

3.      Non-economic damages, including pain and suffering, emotional distress, trauma, anxiety, and psychological harm caused by Defendants' conduct.

4.      Exemplary, punitive, and/or aggravated damages, to the extent permitted by law, based on the willful, malicious, or egregious nature of Defendants' acts.

5.      Treble damages, as authorized under the RICO, MRICO, MCPA statutes.

6.      Restitution or disgorgement, including recovery of funds paid to Defendants or for services rendered under false pretenses, misrepresentations, or without fair exchange.

7.      Equitable Relief, including but not limited to:

    a.   An order requiring continued preservation and non-interference with the Plaintiffs' embryo;

    b.   Immediate transfer or coordination assistance with a neutral fertility provider;

    c.   Disclosure of full and accurate medical records, including Bundl correspondence and internal documentation; and

d.  Constructive trust over any funds or assets unjustly retained by Defendants.

8.      Declaratory and injunctive relief, as authorized by federal and state law, including under the ADA, Rehabilitation Act, and other statutes implicated herein, such as:

a.  A declaration that Defendants' conduct violated Plaintiffs' statutory and contractual rights; and

b.  A permanent or preliminary injunction preventing retaliation, obstruction, or continued interference with reproductive care or coverage access.

9.      Attorneys' fees and costs, as permitted under applicable law, including but not limited to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), and other statutory bases for fee shifting.

10.     Pre- and post-judgment interest.

11.     Any other relief the Court deems just, equitable, or proper.

Plaintiffs further state that no specific relief requested under any individual Count above shall be construed to limit or exclude any form of relief sought herein, and that all legal, equitable, statutory, and common-law remedies are pled in the alternative and in combination, to the fullest extent permitted by law.

# JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully Submitted,

Date: June 16, 2025

/s/ Lisa E. Gocha
Lisa E. Gocha (P42100)
PO Box 398
Hudsonville, MI 49426
LGChapter7@yahoo.com
(616) 797-4206
*Attorney for Plaintiffs*

/s/ Alan J. Gocha
Alan J. Gocha (P80972)
PO Box 398
Hudsonville, MI 49426
alanjgocha@OffLabelLaw.com
(248) 505-4670
*Attorney for Alan J. Gocha*