# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VICKTORIA GOCHA and
ALAN J. GOCHA,

       *Plaintiffs,*

v.

MICHIGAN REPRODUCTIVE
AND IVF CENTER, P.C. d/b/a The
Fertility Center, DR. VALERIE
SHAVELL, DR. EMMA GIULIANI,
DAWN STILES, COREWELL
HEALTH, and JOHN DOES 1–10,

       *Defendant*s.

Case No. 1:25-cv-00665

Hon. Chief Judge Hala Y. Jarbou
Magistrate Judge Phillip J. Green

## [CORRECTED] PLAINTIFFS VICKTORIA GOCHA AND ALAN J. GOCHA'S SECOND AMENDED COMPLAINT

Plaintiffs Vicktoria Gocha ("Vicktoria") and Alan J. Gocha ("Alan") collectively, "Plaintiffs") hereby state the following Second Amended Complaint ("Complaint") against Defendants Michigan Reproductive and IVF Center, P.C. d/b/a The Fertility Center ("Clinic"), Dr. Valerie Shavell ("Dr. Shavell"), Dr. Emma Giuliani ("Dr. Giuliani"), Dawn Stiles ("Stiles"), Corewell Health f/k/a Spectrum Health ("Corewell"), John Does 1–10 (collectively "Does") (Clinic, Dr. Shavell, Dr. Giuliani, Stiles, Corewell, and Does collectively, "Defendants").

## NATURE OF THE CASE

1.    This action arises from a sustained pattern of deception, medical misconduct, discrimination, and retaliation perpetrated by the Clinic, Dr. Shavell, Dr. Giuliani, Stiles, Corewell, and various Does. Over the course of three in vitro fertilization ("IVF") cycles, Vicktoria and Alan were subjected to exploitative practices that prioritized profit over medical ethics, transparency, and patient autonomy—causing them significant physical, emotional, and financial harm.

2.    As a result of Defendants' misconduct, Vicktoria's already limited reproductive window has been further narrowed. Her chances of conceiving a biological child have been drastically reduced, and every lost month carries irreversible consequences. Time is of the essence, and Defendants' actions have materially compromised Vicktoria and Alan's ability to build a family using Vicktoria's genetic material.

3. Defendants induced Plaintiffs to undergo multiple IVF cycles using concealed or unjustified medical protocols, misrepresented drug regimens, and treatment plans that deviated materially from accepted standards of care. These deviations were not the result of individualized medical judgment but reflected systemic practices intended to extract financial gain from vulnerable patients, in violation of federal and state law.

4. When Plaintiffs demanded transparency and accountability for Defendants' unexplained treatment decisions and failures to follow clinical norms, Defendants retaliated against Plaintiffs by terminating their care mid-course. Defendants then issued an ultimatum, giving Plaintiffs only 90 days to relocate their sole embryo, a tactic intended to coerce silence and punish protected activity. (*Cf.* ECF No. 9-3.)

5. Plaintiffs were terminated from the program right before Father's Day.

6. The actions at issue cannot be fairly characterized as the exercise of medical judgment within the bounds of professional discretion. When stripped of the pretense of care, the practices resemble commercialized drug dispensation masquerading as fertility treatment—a model engineered not for therapeutic benefit, but solely for volume and profit.

7. Plaintiffs bring this action to obtain full legal and equitable relief, including damages for emotional distress and economic harm, restitution of

improperly retained funds, and accountability for Defendants' systemic and retaliatory abuses.

8.    Without waiving any rights, claims, or remedies, Plaintiffs allege that their actual and compensatory damages exceed $5,000,000, inclusive of economic and noneconomic losses. These damages arise from past treatment failures, foreseeable future medical and psychological expenses, and the incalculable harm caused by the loss of reproductive opportunities and autonomy.

9.    Vicktoria, age 40, has already endured one suboptimal cycle, two failed cycles, and at least one missed cycle due to Defendants' misconduct.

10.    To recover lost reproductive potential (if possible), Plaintiffs estimate at least nine (9) additional IVF cycles are needed. Each such cycle is projected to cost over $35,000, placing anticipated future treatment expenses in excess of $315,000 for IVF-related care alone.

11.    These estimates do not include the costs of medications, travel, storage, therapy, or donor egg services, which are expected to significantly increase the total financial burden.

12.    Plaintiffs have already incurred over $100,000 in out-of-pocket expenses for fertility treatments, diagnostic procedures, medications, travel, storage, and related expenses.

13. Plaintiffs will incur significant future expenses for, among other things: (a) continuity-of-care coordination with out-of-network providers; (b) medical supervision to monitor risks resulting from prior failed cycles; (c) psychological therapy related to trauma, anxiety, and grief; and (d) storage, preservation, or transfer of their sole remaining embryo.

14. Plaintiffs have suffered substantial pain and suffering.

15. Vicktoria has endured repeated physical invasions, hormonal trauma, and psychological anguish, including the loss of bodily autonomy and despair over compromised reproductive potential.

16. Alan has likewise suffered emotional trauma, helplessness, and chronic stress related to the loss of partnership continuity and the ongoing assault on his family-building rights. These noneconomic harms are ongoing and expected to persist for years, if not for life.

17. Plaintiffs have suffered a loss of reproductive opportunity, which is compensable even if they are ultimately able to conceive. The failure of Round 1's viable outcome, the sabotage of Rounds 2 and 3, and the disruption of continuity-of-care have likely, at a minimum, foreclosed the possibility of Alan and Vicktoria sharing a second biological child.

18. If Plaintiffs are unable to conceive biologically at all, the damages from this lost opportunity will rise dramatically.

19.     Plaintiffs will be required to pursue third-party egg donation, entailing additional costs conservatively estimated at an additional $20,000 per cycle, along with emotional and relational harms resulting from the disruption of genetic continuity and family identity.

20.     Plaintiffs further anticipate long-term psychological support, including lifetime therapy, for trauma, grief, relationship strain, and loss of trust in the medical field.

21.     Plaintiffs have also incurred substantial opportunity costs, including delayed family formation and the loss of time that could have been spent pursuing other viable medical options, personal interests, and professional goals.

22.     Plaintiffs additionally seek exemplary damages in an amount not less than $15,000,000, reflecting the reprehensibility, willfulness, and recurrence of Defendants' misconduct. Defendants' actions were not isolated; they form part of a broader pattern of institutional deception, concealment, and disregard for patient autonomy.

23.     This case implicates not only the rights of two patients but also broader systemic failures in fertility medicine that, if left unchecked, may harm countless others who rely on transparency, accountability, and trust in their providers.

## PARTIES

### *1. Plaintiffs*

24.     Vicktoria is a natural person and citizen of the State of Michigan. She is a resident of Grand Rapids.

25.     Vicktoria is a patient with a documented diagnosis of diminished ovarian reserve ("DOR") and qualifies as a person with a disability within the meaning of the ADA and Rehabilitation Act.

26.     Alan is a natural person and citizen of the State of Michigan. He is a resident of Grand Rapids.

27.     Alan is Vicktoria's spouse (since December of 2024) and is both a patient and financial contributor in the IVF program at issue. He directly communicated with Defendants throughout the treatment process and was also subjected to the Clinic's fraudulent inducements, misrepresentations, and unlawful retaliation.

28.     Lisa E. Gocha represents Vicktoria in this action.

29.     Alan is an attorney with a bachelor's degree from the University of Michigan and a law degree from the Georgetown University Law Center. Alan is filing on behalf of himself only, asserting independent claims arising from the same underlying conduct.

### 2. Defendants

30.     Upon information and belief, the Clinic is a Michigan professional corporation with its principal place of business in Grand Rapids.

31.     The Clinic operates under the trade name "The Fertility Center" and offers fertility-related services, including in vitro fertilization ("IVF").

32.     At all relevant times, the Clinic was responsible for establishing treatment protocols, supervising its agents, and administering care.

33.     Upon information and belief, Dr. Shavell is a physician licensed to practice medicine in the State of Michigan and is the Clinic's medical director and a principal decision-maker in patient care.

34.     Dr. Shavell was directly responsible for the clinical decisions and omissions that harmed Plaintiffs and exercised supervisory authority over other Clinic personnel.

35.     Upon information and belief, Dr. Giuliani is a physician licensed to practice medicine in the State of Michigan and at all relevant times was involved in Vicktoria's treatments.

36.     Dr. Giuliani is the prescribing physician on prescriptions at issue (including Clomid at 200 mg) and participated in the concealment of material facts regarding Vicktoria's care.

37.     Stiles is the Clinic's practice administrator.

38.     Stiles communicated directly with Plaintiffs regarding treatment logistics, financial terms, and access to records.

39.     Stiles participated in the Clinic's retaliatory actions against Plaintiffs, including threats related to the disposition of their embryo and denial of further program access. (*Cf.* ECF No. 9-3.)

40.     Upon information and belief, Corewell is a Michigan nonprofit corporation, headquartered at 100 Michigan St NE, Grand Rapids, Michigan 49503, that operates a statewide healthcare system. At all relevant times, Corewell operated the Corewell Health Grand Rapids Hospitals Laboratory, which was involved in the events alleged herein.

41.     According to Internal Revenue Service filings, Corewell's stated mission is "TO IMPROVE HEALTH, INSTILL HUMANITY, AND INSPIRE HOPE."

42.     Plaintiffs are currently unaware of the full legal structure of Corewell's subsidiaries or affiliated entities and therefore name the Doe Defendants as placeholders for any such entities, including but not limited to any entity formerly doing business as Spectrum Health.

43.      Plaintiffs are presently unaware of the true names and capacities of the Doe Defendants, inclusive, and therefore sue these Defendants by such fictitious

names. Plaintiffs will seek leave of Court to amend this Complaint to allege their true names and capacities when they are ascertained.

44.     Each of the Does is in some manner legally responsible for the wrongful conduct, omissions, or injuries alleged herein. Upon information and belief, each Doe participated in, ratified, directed, authorized, conspired with, aided, abetted, or acted in concert with the named Defendants in committing the acts and omissions alleged herein, and is accordingly liable for damages and subject to injunctive relief.

45.     Plaintiffs allege that some of the Does may include corporate entities or individuals affiliated with one or more Defendants or other related clinics, laboratories, or financial intermediaries, who actively concealed their identities or roles in the misconduct described in this Complaint.

46.     Plaintiffs further allege that the Does may include employees, officers, agents, consultants, attorneys, or contractors who acted under color of authority, participated in the fraudulent, discriminatory, or retaliatory schemes described herein, or otherwise contributed to Plaintiffs' harm.

## JURISDICTION

47.     This Complaint includes claims arising under both federal and state law, including:

a. Count I, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) [All Defendants];

b. Count II, RICO conspiracy, 18 U.S.C. § 1962(d) [All Defendants];

c. Count III, violation of the Michigan Racketeer Influenced and Corrupt Organizations Act ("MRICO"), MCL 750.159g [All Defendants];

d. Count IV, violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq. [Clinic, Dr. Shavell, Stiles];

e. Count V, violation of the Rehabilitation Act, 29 U.S.C. § 794 et seq. [Clinic, Dr. Shavell, Stiles, Corewell];

f. Count VI, violation of the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37.1101 et seq. [Clinic, Dr. Shavell, Stiles, Corewell];

g. Count VII, violation of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 [Clinic, Dr. Shavell, Corewell];

h. Count VIII, violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq. [Clinic, Dr. Shavell, Corewell];

i. Count IX, violation of the Michigan Consumer Protection Act ("MCPA"), MCL 445.901 et seq. [Clinic, Dr. Shavell, Stiles, Corewell];

j. Count X, fraud, silent fraud, and/or negligent misrepresentation [All Defendants];

k. Count XI, fraudulent inducement [Clinic, Dr. Shavell, Corewell];

l. Count XII, fraudulent concealment [All Defendants];

m. Count XIII, intentional and/or negligent infliction of emotional distress [Clinic, Dr. Shavell, Stiles];

n. Count XIV, unjust enrichment and/or quantum meruit [Clinic, Dr. Shavell, Corewell];

o. Count XV, promissory estoppel [Clinic, Dr. Shavell, Corewell];

p. Count XVI, battery [Vicktoria against Clinic and Dr. Shavell];

q. Count XVII, breach of fiduciary duty [All Defendants];

r. Count XIII, medical malpractice [Clinic, Dr. Shavell, Dr. Giuliani];

s. Count XIX, civil conspiracy [All Defendants]; and

t. Count XX, derivative and institutional liability [Corewell].

48. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

49. This Court has jurisdiction to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, as Plaintiffs seek a judicial declaration of their rights under federal law, including their right to access medical services free from discrimination, retaliation, and fraud.

50. This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367. The state law claims arise from the same nucleus of operative fact as Plaintiffs' federal claims and form part of the same case or controversy under Article III of the United States Constitution.

51. Venue is proper in the United States District Court for the Western District of Michigan under 28 U.S.C. § 1391(b)(1) and (2), because all Defendants reside in or principally operate out of this judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this District, including Defendants' provision of fertility services, misrepresentations to Plaintiffs, and retaliatory conduct.

52.     This Court has personal jurisdiction over each Defendant as they reside and/or conduct business in the State of Michigan and in this District and purposefully availed themselves of the laws and protections of the State of Michigan. The exercise of jurisdiction over each Defendant is consistent with due process and Michigan's long-arm statute.

## BACKGROUND

53.     Cited materials in this Complaint are fully incorporated herein by reference for all purposes as if set forth in full.

54.     Plaintiffs incorporate by reference the exhibits filed in support of their respective motions for a temporary restraining order and/or preliminary injunction, including those attached to ECF Nos. 9-2–9-27 and 11-1–11-2, as though fully set forth herein. These exhibits include medical records, clinical notes, correspondence, declarations, protocol summaries, and visual data charts that substantiate the allegations in this Complaint and form part of the operative factual record.

55.     Upon information or belief, documents referenced in this Complaint are in the custody, possession, or control of one or more Defendants, including but not limited to internal communications, clinical records, and protocol justifications.

56.     To the extent any claim is inconsistent with another, Plaintiffs plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and no such inconsistency shall be construed as a waiver of any claim or theory of liability.

57.     The legal theories and counts set forth in this Complaint are not intended to be exhaustive or limiting, but are provided for purposes of clarity, organization, and fair notice to Defendants.

A.      **Fertility Treatment: Timed Intercourse, Intrauterine Insemination, and In Vitro Fertilization**

58.     Fertility treatments encompass a range of medical interventions designed to assist individuals and couples who are unable to conceive naturally. These interventions may include hormone therapies, timed intercourse, intrauterine insemination ("IUI"), IVF, and other assisted reproductive technologies.

59.     Timed intercourse involves coordinating sexual intercourse with a woman's ovulatory cycle to maximize the likelihood of conception. While it is typically a first-line treatment, it can be ineffective for individuals with complex fertility issues such as DOR, irregular ovulation, or advanced maternal age.

60.     IUI involves the direct placement of concentrated, washed sperm into the uterus at or near the time of ovulation, with or without accompanying hormonal stimulation. IUI is less invasive and less costly than IVF, but also has a lower success rate—particularly in patients with certain underlying conditions, such as low ovarian reserve or advanced age.

61.     IVF is among the most advanced and invasive forms of assisted reproductive technology. It typically involves several phases: (1) ovarian stimulation using hormone injections to produce multiple eggs; (2) transvaginal surgical

retrieval of the eggs; (3) fertilization of eggs with sperm in a laboratory setting; and (4) transfer of one or more resulting embryos into the uterus. Each step of the process requires extensive monitoring through ultrasounds and blood work and carries physical and emotional hardship.

62.     Fertility treatments carry significant medical risks, particularly for individuals with underlying conditions such as polycystic ovary syndrome ("PCOS"), a hormonal disorder that can result in irregular ovulation, elevated androgen levels, and enlarged ovaries with multiple cysts.

63.     Patients with PCOS are more susceptible to ovarian hyperstimulation syndrome ("OHSS"), a potentially serious complication of fertility drugs characterized by swollen, painful ovaries, fluid retention, and in severe cases, blood clots, kidney failure, or respiratory distress.

64.     Other common risks of IVF and related treatments include medication side effects, infection, bleeding from egg retrieval procedures, and complications from multiple gestations. Clinicians are obligated to assess these risks based on individual patient history and respond with appropriate monitoring, dosage adjustments, and disclosure.

65.     The IVF process is physically, emotionally, and financially taxing. Patients often endure multiple rounds of daily hormone injections, frequent ultrasounds and blood draws, surgical retrievals, and recovery periods. Success is

not guaranteed even under optimal conditions. The cumulative emotional toll—hope, uncertainty, disappointment, and grief—can be profound, particularly after repeated failures.

66.     Financially, IVF is often cost-prohibitive. Many patients prepay for bundled treatment programs in an attempt to manage these costs, placing considerable trust in providers to act in accordance with clinical standards and legal obligations.

67.     For patients with DOR or advanced maternal age, time is a critical and often irreversible factor. Delays, mismanagement, or clinical errors can drastically reduce the likelihood of biological parenthood. Each cycle carries high personal and financial stakes, and any deviation from the appropriate standard of care can have life-altering consequences.

**B.      Hormones and Drugs in Assisted Reproductive Technology**

68.     Successful ovulation induction and embryo development in fertility treatment depends on the coordinated interplay of several reproductive hormones. Understanding these hormones and how fertility drugs affect them is essential to safely and effectively managing treatment.

*1.      Hormones*

69.     **Anti-Müllerian Hormone ("AMH")** is a marker of ovarian reserve. It is secreted by granulosa cells in preantral and small antral follicles and is used to

estimate a patient's remaining egg supply. AMH levels do not fluctuate with the menstrual cycle and are typically used in baseline testing to guide dosage selection for ovarian stimulation.

70. **Follicle-Stimulating Hormone ("FSH")** is secreted by the anterior pituitary gland and stimulates the growth of ovarian follicles. High baseline FSH levels often indicate DOR. FSH levels are typically measured on cycle day ("CD") 2 or CD 3 to assess ovarian function.

71. **Luteinizing Hormone ("LH")**, also produced by the pituitary, surges mid-cycle to trigger ovulation. In medicated cycles, monitoring LH levels can be used to time insemination or prevent premature ovulation. In IVF, LH may be suppressed to prevent early follicular rupture.

72. **Estradiol** is the dominant form of estrogen and rises as follicles grow. Estradiol levels are used to assess ovarian response to stimulation, with abnormally low or high levels signaling potential protocol problems or risks such as OHSS.

73. **Progesterone** is produced after ovulation and during the luteal phase. In IVF cycles, premature elevation of progesterone before egg retrieval can negatively impact endometrial receptivity. In the luteal phase, progesterone support is typically provided to promote implantation.

74. In the fertility context, estradiol is referred to as "E2" and progesterone is referred to as "P4" when referring to specific test values.

75.     **Testosterone**, while typically associated with male reproductive function, also plays a role in female fertility. Androgen priming using testosterone patches or gel is sometimes used off-label to promote follicular sensitivity in patients with DOR.

76.     Proper administration of fertility drugs directly affects hormone levels. IVF protocols typically involve multiple classes of medication, each targeting a different stage of follicular development, ovulation control, or luteal support. Dosing and scheduling must be individualized based on patient response.

### 2.     *Drugs*

77.     **Gonadotropins** (e.g., Follistim, Gonal-F, Menopur) are injectable medications containing FSH alone or in combination with LH, designed to stimulate the development of multiple ovarian follicles. A typical dosage ranges from 75 to 300 International Units ("IU") per day, depending on ovarian reserve and response.

78.     Follistim was prescribed to Vicktoria during the IVF process at a dosage of 450 IU per day—substantially exceeding typical initial doses. (*Cf.* ECF 9-4.)

79.     Gonal-F was prescribed to Vicktoria during the IUI process at varying dosages across multiple cycles.

80.     Menopur was prescribed to Vicktoria during the IVF process at a dosage of 150 IU per day.

81.     **Selective Estrogen Receptor Modulators (SERMs)** (e.g., Clomid) are oral agents that stimulate endogenous FSH and LH release by blocking estrogen receptors in the hypothalamus, disrupting negative feedback and encouraging follicular development. A typical dosage ranges from 50 to 150 mg per day for five days early in the cycle.

82.     Clomid was prescribed to Vicktoria during both IVF and IUI treatments at a dosage of 200 mg per day—above the typical maximum range—with no clear justification provided. (*Cf.* ECF Nos. 9-4, 9-5.)

83.     On information and belief, the Clinic and Dr. Shavell prescribe Clomid above the typical dosage as a standard protocol. (*Cf.* ECF No. 9-4.) Alternatively, Vicktoria was subjected to blatant discriminatory treatment as described herein—without waiver of the possibility both are true.

84.     **Aromatase Inhibitors** (e.g., Femara) are oral medications that reduce estrogen levels to increase FSH secretion. They are commonly used as first-line agents in IUI protocols. A typical dosage ranges from 2.5 to 7.5 mg per day for five days.

85.     Femara was prescribed to Vicktoria during the IUI process at a dosage of 10 mg per day—above standard therapeutic ranges.

86.     On information and belief, the Clinic and Dr. Shavell prescribe Femara above the typical dosage as a standard protocol. Alternatively, Vicktoria was

subjected to discriminatory treatment as described herein—without waiver of the possibility both are true.

87. **Steroids** (e.g., Dexamethasone) may be used to suppress adrenal androgens or modulate immunologic factors during ovulation induction. Typical dosages range from 0.5 to 2 mg per day.

88. Dexamethasone was prescribed to Vicktoria during both the IVF and IUI processes at a dosage of 0.5 mg per day.

89. **Ovulation Triggers** (e.g., Pregnyl, Ovidrel) are administered to induce final oocyte maturation once follicles reach an appropriate size. Typical Pregnyl dosages range from 5,000 to 10,000 IU; Ovidrel is commonly administered at 250 mcg subcutaneously.

90. Pregnyl was prescribed to Vicktoria during the IVF process at a dosage of 5,000 IU, and during IUI cycles at various dosages.

91. Ovidrel was prescribed to Vicktoria during the IUI process at a dosage of 250 mcg.

92. **Gonadotropin-Releasing Hormone (GnRH) Antagonists** (e.g., Ganirelix) are used during IVF stimulation to prevent a premature LH surge and early ovulation. The standard dosage is 250 mcg daily once lead follicles approach 14 mm in size.

93. Ganirelix was prescribed to Vicktoria during the IVF process at a dosage of 250 mcg, administered at varying stages across different cycles.

94. **GnRH Agonists** (e.g., Leuprolide) are used either for pituitary suppression or as part of a "trigger" protocol. Suppression dosing typically ranges from 10 to 20 units daily, while triggering protocols may use 0.1 to 4 mg.

95. Leuprolide was prescribed to Vicktoria during the IVF process at a dosage of 2 mg as a trigger shot.

96. Close monitoring of hormone levels—particularly estradiol, LH, progesterone, and FSH—is essential throughout the stimulation and ovulation process. Proper monitoring ensures that medications are working as intended, permits timely dosage adjustments, and prevents serious complications such as OHSS or premature ovulation.

97. Standard clinical practice includes hormone blood draws every one to three days and transvaginal ultrasounds to monitor follicular growth.

98. Failure to adequately monitor or appropriately interpret hormone trends can result in avoidable harm, including cycle cancellation, poor oocyte quality, failed fertilization, or compromised endometrial receptivity.

99. Departures from accepted dosing protocols or monitoring standards—especially without documented medical justification or informed consent—can irreversibly reduce the likelihood of reproductive success.

100.   **Estradiol** (e.g., Estrace) is commonly used to support endometrial development prior to embryo transfer or as part of a priming protocol. In most protocols, estradiol is initiated at 2 to 4 mg daily and titrated upward as necessary. Excessive or prolonged administration may disrupt the natural hormone milieu, especially when used without concurrent individualized monitoring.

101.   Vicktoria was prescribed estradiol at 4 mg daily during multiple pre-cycle periods across all three IVF rounds and was later escalated to 8 mg daily during the pre-stimulation phase of Round 3 (May 19–27, 2025)—a level above standard starting doses, without documentation of individualized need or estrogen deficiency.

102.   In Round 2, 4 mg of estradiol was administered on CD 1 to CD 3.

103.   No E2 levels were drawn on CD 1, CD 2, or CD 3 in any round.

104.   **Progesterone** is used to mimic luteal-phase conditions and support implantation or regulate hormone balance. In IVF, it is often introduced post-trigger or after oocyte retrieval. Standard dosages range from 200 to 400 mg per day via oral, vaginal, or intramuscular administration.

105.   Vicktoria was prescribed progesterone at 400 mg daily for extended periods in the pre-cycle phase of all three IVF rounds—despite the absence of embryo transfer or luteal-phase support indication.

106. During the IVF process, 400 mg of progesterone was administered prior to stimulation from March 10–23, 2025 (Round 1), April 11–22, 2025 (Round 2), and May 18–26, 2025 (Round 3), along with 200 mg on May 27, 2025.

107. In Round 2, 400 mg of progesterone was administered on CD 1 to CD 3.

108. No luteal monitoring or justification was documented. This pattern is clinically anomalous and raises concerns regarding premature endometrial advancement or cycle disruption.

109. Upon information and belief, these estradiol and progesterone regimens were implemented as part of a standardized, unindividualized protocol rather than based on Vicktoria's unique hormonal profile. Alternatively, Vicktoria was subjected to intentionally aberrant treatment as alleged herein—without waiver of the possibility that both explanations are true.

**C.    BUNDL**

110. Bundl Fertility, LLC ("Bundl") markets itself as a financial concierge service for fertility treatment. According to its website, [www.bundlfertility.com](http://www.bundlfertility.com), Bundl offers bundled payment programs intended to provide patients with financial predictability and multiple IVF cycles under a single contract. Bundl promotes its programs through clinics across the country, including the Clinic in Grand Rapids.

111.    Upon information and belief, Bundl is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of Texas.

112.    On November 24, 2024, Vicktoria entered into a contract with Bundl at a cost of $24,300. Vicktoria also added the optional medication package for an additional $10,000, bringing the total program cost to $34,300.

113.    Bundl's promotional materials—including brochures distributed at the Clinic—emphasize that patients who enroll in Bundl avoid the financial risk of paying for IVF "à la carte" and reduce stress by committing to multiple cycles upfront. Bundl also markets its program as a shield against "financial investment loss" and "uncertainty."

114.    Despite Plaintiffs' participation in a comprehensive prepaid treatment arrangement through Bundl, the Clinic billed Plaintiffs directly for significant out-of-pocket expenses throughout cycles.

115.    Bundl collaborated directly with the Clinic to coordinate the administration of Plaintiffs' package. The Clinic offered Bundl as a payment solution and worked with Bundl throughout Plaintiffs' treatment to facilitate billing, treatment timing, and retrieval planning.

**D.     Vicktoria and Alan**

*1.     Overview*

116.    Vicktoria first began fertility treatment at the Clinic in April 2022 with a prior partner. During that time, she pursued a series of IUI cycles under the care of the same clinical team named in this action, including Dr. Shavell and Dr. Giuliani. These early treatments involved ovulation induction using medications such as Clomid, Femara, Gonal-F, and HCG trigger injections, followed by timed IUIs.

117.    Following multiple unsuccessful IUI attempts, Vicktoria paused active treatment at the Clinic.

118.    She returned in July 2024 with her now-husband and co-Plaintiff, Alan, to continue fertility efforts and explore IVF as the next step.

119.    In 2025, Vicktoria and Alan underwent three rounds of IVF at the Clinic. Each round involved high-dose stimulation protocols and required close hormonal monitoring and individualized medical oversight. CD 1 occurred on the following dates: Round 1 began on March 26, 2025; Round 2 on April 23, 2025; and Round 3 on May 30, 2025. These dates are confirmed by contemporaneous medical records and serve as clinical anchor points for evaluating treatment decisions, medication timing, and outcomes.

120.    All three rounds were managed by Dr. Shavell, with additional involvement from Dr. Giuliani, Dr. Gary Jones ("Dr. Jones"), Dr. Sarah Bjorkman

("Dr. Bjorkman"), Dr. Mili Thakur, and staff—including Stiles. Each cycle included 200 mg of Clomid and 450 IU of Follistim, but the timing, layering, and coordination of medications varied significantly across cycles.

121. Critically, LH was never tested in any of the three rounds. FSH was tested only once prior to any cycle—on July 3, 2024—and not again until after Round 2 had already failed, on May 10 and May 16, 2025. No FSH testing was conducted during the stimulation phases of Rounds 1 or 2, despite its well-established role in guiding dosage and cycle progression.

122. Protocols shifted erratically across rounds. Ganirelix—a suppression agent typically used mid-stimulation to prevent premature ovulation—was prescribed pre-cycle in Round 1, early in Round 2 (CD 3–5), and not at all in Round 3. Clomid was prescribed at an unusually high dose (200 mg) in all rounds but initiated on varying cycle days, without clinical explanation.

123. The variations in medication timing and sequencing are illustrated in the patient-created protocol summary charts below. The visual data presents when Clomid, Follistim, Menopur, and Ganirelix were prescribed in each round, transposed across cycle days.

| | - CD 5 | - CD 4 | - CD 3 | - CD 2 | - CD 1 | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 | CD 8 | CD 9 | CD 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Follistim and Menopur** | | | | | | | | | | | | | | | |
| Round 1 | | | | | | | | | | | | | | | |
| Round 2 | | | | | | | | | | | | | | | |
| Round 3 | | | | | | | | | | | | | | | |
| **Clomid** | | | | | | | | | | | | | | | |
| Round 1 | | | | | | | | | | | | | | | |
| Round 2 | | | | | | | | | | | | | | | |
| Round 3 | | | | | | | | | | | | | | | |
| **Ganirelix** | | | | | | | | | | | | | | | |
| Round 1 | | | | | | | | | | | | | | | |
| Round 2 | | | | | | | | | | | | | | | |
| Round 3 | | | | | | | | | | | | | | | |

| | - CD 5 | - CD 4 | - CD 3 | - CD 2 | - CD 1 | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 | CD 8 | CD 9 | CD 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Round 1** | | | | | | | | | | | | | | | |
| F & M | | | | | | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ |
| C | | | | | | | | | | | | | | | |
| G | ▓ | ▓ | ▓ | | | | | | | | | | ▓ | ▓ | ▓ |
| **Round 2** | | | | | | | | | | | | | | | |
| F & M | | | | | | | | | | | ▓ | ▓ | ▓ | ▓ | |
| C | | | | | | | | | | | | | | | |
| G | | | | | | | | | | | | | | | |
| **Round 3** | | | | | | | | | | | | | | | |
| F & M | | | | | | ▓ | ▓ | ▓ | | | ▓ | ▓ | ▓ | | |
| C | | | | | | | | | | | | | | | |
| G | | | | | | | | | | | | | | | |

124.  In addition, estradiol and progesterone were prescribed in extended and elevated dosages across all cycles, but their levels were inconsistently interpreted and rarely (if ever) used to guide treatment decisions.

125.  As shown in the patient-created hormone trend charts below, E2 and P4 were tested sporadically and without consistent alignment to stimulation timing.





126. Across all three IVF cycles (Series 18–20), E2 was never measured on or before CD 3—contrary to standard practice for establishing baselines and informing safe and effective dosing.

127. In Round 3, for example, stimulation began on CD 1, yet the first E2 measurement did not occur until CD 6. Likewise, progesterone levels were rarely monitored in real-time despite exogenous progesterone being administered for extended durations in the pre-cycle phase. The absence of early-cycle progesterone testing—combined with premature luteal support—raises the risk of endometrial asynchrony and compromised implantation potential.

128. In addition to the sporadic and inconsistent timing of E2 and progesterone P4 testing, the above charts demonstrate that these hormone levels were never meaningfully controlled throughout the stimulation or pre-cycle phases.

129. Standard IVF protocols rely on careful titration of gonadotropin doses and concurrent adjustment of estradiol and progesterone support to achieve a synchronized hormonal environment conducive to follicular development and endometrial receptivity. Here, E2 levels fluctuated wildly without corresponding medication adjustments, while P4 levels rose prematurely due to exogenous progesterone administration—creating a hormonally disordered environment. This lack of regulation undermined the intended purpose of monitoring, effectively rendering the hormone tests meaningless as a clinical guide.

130. As a result, Vicktoria was exposed to elevated risks of OHSS, poor oocyte quality, and implantation failure—risks that were entirely preventable through basic adherence to monitoring standards.

131. No coherent or consistent explanation was ever provided for these departures from standard practice. Internal notes following Round 1 reflected a plan to repeat the same stimulation protocol due to the limited but promising response. (*See* Ecf. No. 9-15.) That plan was not followed.

132. Instead, Round 2 implemented a materially different stimulation and suppression approach, despite similar baseline characteristics. When Alan questioned the early introduction of Ganirelix, Dr. Shavell claimed it was due to elevated FSH—despite no FSH testing having occurred during the relevant period.

133.   After the failure of Round 2, Plaintiffs formally requested written justification for the protocol deviations and hormone monitoring gaps. (*See, e.g.*, ECF Nos. 19–20, 23–25.) Rather than provide answers, the Clinic escalated its hostility, restricted access to staff, and ultimately terminated care. (*Cf. id.*)

134.   Round 3 proceeded with no suppression at all, despite prior insistence that suppression was medically necessary. Again, Clomid was prescribed at 200 mg but started earlier in the cycle.

135.   When Dr. Jones advised stopping the cycle due to poor estradiol response, Dr. Shavell—calling from a medical conference and lacking access to the records—overrode his recommendation.

136.   The cycle failed two days later.

137.   At no point during any of the three rounds did the Clinic adjust medication dosing mid-cycle in response to hormone levels or ultrasound data. This failure to adapt treatment based on real-time clinical feedback defied core IVF principles and ignored individualized care standards.

138.   Alan played an active and continuous role in supporting Vicktoria, assisting with injections, attending nearly every appointment, and raising evidence-based concerns regarding hormone logic and cycle design. His questions were routinely ignored, contradicted, or dismissed outright.

139.   As a result of these systemic failures, Vicktoria and Alan experienced one suboptimal round and two failed rounds. Given Vicktoria's DOR and narrow fertility window, these lost cycles represent a permanently reduced opportunity to conceive a biological child.

### 2.   *Semen Analysis*

140.   On July 24, 2024, Alan submitted a semen sample at the Clinic as part of the initial workup.

141.   On July 25, 2024, results were uploaded to the patient portal, indicating a diagnosis of azoospermia, handwritten and highlighted in pink.

142.   No one from the Clinic contacted Alan to discuss the result. Believing the diagnosis to be erroneous and having received no guidance, Alan independently submitted another semen sample on August 1, 2024.

143.   On August 3, 2024, the second semen analysis returned with normal parameters, contradicting the initial diagnosis. Despite the significance of the discrepancy, no explanation was ever provided by the Clinic, and no formal re-evaluation of the initial result occurred.

144.   The second analysis came back normal, directly contradicting the Clinic's prior diagnosis and confirming that the original result was inaccurate.

### 3. Round 1

145.   Vicktoria and Alan first met with Dr. Shavell together on July 3, 2024. They met with her in person on only two other occasions: August 7, 2024, and April 23, 2025.

146.   At the July 3 consultation, Dr. Shavell did not have Vicktoria's chart open and answered questions about success rates using generalized Center for Disease Control ("CDC") data rather than individualized medical records. She recommended enrollment in the Bundl payment program and ordered initial lab testing.

147.   That same day, AMH was tested for the first and only time while Vicktoria was under the Clinic's care.

148.   FSH was also tested on July 3, 2024, but was not tested again prior to or during Round 1.

149.   LH was never tested at any point during the cycle, despite its well-established role in IVF monitoring and ovulation suppression.

150.   Plaintiffs met with Dr. Shavell again in person on August 7, 2024, for a follow-up consultation. Dr. Shavell again appeared not to have reviewed Vicktoria's chart. She initially recommended 300 IU of Follistim, but after Vicktoria noted she had previously been prescribed a higher dose, Dr. Shavell spontaneously

increased the recommendation to 450 IU, stating it was "more effective, but more expensive." No individualized rationale was given.

151. Dr. Shavell also advised that a fresh embryo transfer was preferable—a recommendation that shaped Plaintiffs' understanding of the treatment plan and influenced their subsequent decisions.

152. CD 1 for Round 1 began on March 26, 2025, marking the official start of stimulation under the Clinic's supervision.

153. As part of pre-cycle hormonal priming, Vicktoria was instructed to take Estradiol (4 mg/day) from February 20 through March 23, and Progesterone (400 mg/day) from March 10 through March 23.

154. She was instructed to begin Clomid (200 mg) from March 28 through April 1, corresponding to CD 3 through CD 7.

155. Ganirelix was prescribed in two separate regimens: (1) pre-cycle from March 21 to March 23, and (2) again from April 2 to April 4 (CD 8–10), despite the absence of FSH or LH monitoring to justify suppression during those windows.

156. Vicktoria was concurrently instructed to take Follistim (450 IU), Menopur (150 IU), and Dexamethasone (0.5 mg) from March 28 through April 4, corresponding to CD 3 through CD 10.

157. On April 2, 2025, antagonist treatment with Ganirelix was resumed (CD 8), and stimulation medications continued. Clinical notes indicate the protocol

was reviewed and approved by Dr. Jones, confirming continuity with the planned protocol.

158.   On April 4, 2025, Dr. Shavell falsely documented that a freeze-all cycle had been discussed with Vicktoria. No such conversation occurred. In fact, subsequent communications make clear Vicktoria and Alan thought they were proceeding with a fresh transfer, consistent with earlier recommendations.

159.   Alan was not present for the April 4 call, and no effort was made to include him in any consent discussion.

160.   On April 5, 2025, Clinic notes falsely stated that the freeze-all option had been discussed with both Vicktoria and Alan. In reality, the subject was only briefly mentioned and immediately closed when Vicktoria confirmed she was proceeding with a fresh transfer. At no point did either Plaintiff knowingly consent to a freeze-all cycle prior to the retrieval in Round 1.

161.   On April 7, 2025, the Clinic performed the oocyte retrieval procedure. Alan provided a fresh semen sample that morning. Retrieval records indicate that three oocytes were retrieved, two were mature, and one embryo was successfully fertilized.

162.   On April 8, 2025, embryology notes confirmed these results and stated that the single embryo was frozen at the cleavage stage. Plaintiffs were never informed that freezing at this earlier developmental stage was being considered.

Internal documentation later revealed that Dr. Shavell had begun planning for a cleavage-stage freeze as early as February 19, 2025, (*see* ECF No. 11-2), but never disclosed this to Plaintiffs.

163. The Clinic's misrepresentations regarding transfer plans, its failure to obtain timely informed consent, and its concealment of internal decisions deprived Plaintiffs of their legal and ethical right to participate in one of the most consequential decisions of their treatment: the disposition and timing of their only viable embryo.

164. Despite the lack of any mid-cycle hormonal monitoring-particularly of FSH and LH, which are essential to individualized IVF cycle management, the Clinic proceeded to retrieval. The outcome was 7 follicles, 2 mature oocytes, and 1 fertilized embryo.

### 4.   *Round 2*

165. Internal Clinic documentation reveals that multiple providers, including Dr. Giuliani, indicated that the plan for the next cycle was to repeat the same stimulation protocol used in Round 1. This is reflected in internal notes dated shortly after the April 7 retrieval and again during post-cycle follow-up. (*See* ECF No. 15.)

166. Records also confirm that this repeat protocol plan was communicated to Vicktoria in connection with post-retrieval counseling. (*See id.*) Plaintiffs relied on that plan in preparing for the second IVF attempt.

167. Despite this, the protocol implemented for Round 2 materially deviated from the Round 1 approach, without any clinical rationale provided to Plaintiffs and without any plausible explanation documented in Plaintiffs' records. (*But see* ECF No. 9-17.)

168. CD 1 for Round 2 occurred on April 23, 2025.

169. As part of pre-cycle priming, Vicktoria was instructed to take Estradiol (4 mg/day) and Progesterone (400 mg/day) from April 11 through April 25—i.e., continuing through CD 3.

170. Unlike Round 1, no pre-cycle Ganirelix was prescribed. Instead, Vicktoria was instructed to begin Ganirelix from April 25 through April 27—i.e., CD 3 through CD 5. (*See* ECF No. 9-4.) This early-cycle suppression was a marked departure from the previous approach.

171. Clomid (200 mg) was prescribed from April 28 to May 1, corresponding to CD 6 through CD 9—a later administration window than in Round 1. (*See id.*)

172. Vicktoria was also instructed to take Follistim (450 IU), Menopur (150 IU), and Dexamethasone (0.5 mg) over the same April 28 to May 1 window—again, CD 6 through CD 9. (*See id.*)

173.   On May 2, 2025 (CD 10)—which coincided with Alan's birthday—the cycle was abruptly cancelled. Vicktoria was instructed to discontinue Clomid, Follistim, Menopur, and Dexamethasone that day.

174.   No FSH or LH levels were measured at any point during Round 2 stimulation and limited pre-cycle baseline labs were taken. The absence of hormonal monitoring precluded mid-cycle adjustments and directly contradicted standard individualized IVF practices.

175.   When Plaintiffs inquired about the early use of Ganirelix in Round 2, Dr. Shavell claimed that it was used to suppress an elevated FSH level. However, chart review confirmed that FSH had not been tested at the relevant time. (*See* ECF No. 22.) The explanation was thus unsupported by the record and medically implausible.

176.   As with Round 1, the cycle proceeded with no documented mid-stimulation adjustments and a fixed high-dose protocol, despite the lack of follicular response. The failure to modify the approach or to conduct hormonal monitoring rendered Round 2 futile from the outset.

## 5.   *Discriminatory Routing*

177.   On May 2, 2025, following a monitoring appointment that revealed a poor response, Vicktoria and Alan met with a Clinic nurse to discuss next steps.

During that conversation, Vicktoria raised questions about how a frozen embryo transfer ("FET") might affect their coverage under the Bundl program.

178. Both Plaintiffs emphasized their willingness to proceed with an FET cycle, given the time-sensitive nature of Vicktoria's condition. They clarified that their initial preference for a fresh transfer had been based solely on prior guidance from Dr. Shavell, who had stated it was medically preferable.

179. Following the first retrieval, however, Dr. Shavell reversed her recommendation and informed Plaintiffs that FET cycles were equivalent, or even more favorable, than fresh transfers. This inconsistency further complicated Plaintiffs' decision-making and drove further confusion.

180. During a May 2 meeting with a nurse, it became apparent that the attending nurse had only limited access to patient records and was unable to answer key questions about prior outcomes or the Bundl program's financial implications. (*Cf.* ECF No. 9-18.) When Vicktoria inquired about coverage specifics, the nurse admitted she was unfamiliar with the details and stated she would arrange a follow-up with Stiles, the Clinic's alleged office "manager" and Bundl liaison. (*Cf. id.*)

181. Vicktoria also asked how many other patients were using Bundl. The nurse initially responded she did not know, but then added that she was only aware of three such patients. When asked how she knew, the nurse explained, "they write it on the top of the paperwork." This statement confirmed that Bundl status was

visibly flagged on patient documents, enabling differential treatment by staff—even those without full access to medical charts.

182. Later that day, Vicktoria and Alan met with Stiles to clarify their Bundl coverage and treatment options. (*Cf.* ECF No. 9-19.) During this meeting, Stiles informed Plaintiffs—incorrectly—that Bundl would not authorize a second retrieval cycle.

183. In response, Alan pointed to a Bundl promotional brochure, noted the representations made therein, and questioned the ethics of offering a financial product that constrained medical treatment. He also observed that patients ineligible for the refund guarantee under Bundl's Guard program were exposed to disproportionate financial risk, creating a conflict with sound clinical care.

184. Stiles became agitated and hostile, ultimately telling Plaintiffs to "get out." (*Cf. id.*) Vicktoria became visibly emotional. Alan calmly encouraged her to step away to deescalate the situation. As they exited toward the Clinic's public lobby, Stiles followed them into the hallway and shouted, "get a lawyer," in front of other patients and staff. (*See id.*)

185. This public outburst was retaliatory and unprofessional, causing embarrassment and distress. Delivered in a clinical setting by a senior staff member, it exposed a deeper institutional hostility toward patients who questioned financial practices or clinical decisions.

186.    Alan later raised the incident with Dr. Shavell, making clear that such conduct was unacceptable and could not be repeated. Dr. Shavell did not express concern or offer accountability. Instead, she dismissed the incident and moved on, reinforcing a culture of indifference.

187.    During that conversation, Dr. Shavell stated she would be "taking over" all communications going forward to prevent further "miscommunication." This was not offered as a support measure but rather served to centralize and restrict Plaintiffs' access to other clinical personnel.

188.    After this transition, Vicktoria and Alan were effectively cut off from routine support channels. Nurses, who typically serve as a first line of communication and provide day-to-day assistance, were no longer available. All correspondence was funneled exclusively through Dr. Shavell, who was frequently unavailable or unresponsive. This shift created a bottleneck and left Plaintiffs without timely answers to basic questions, compounding their vulnerability during an already fragile period.

189.    Following the altercation with Stiles, Plaintiffs contacted Bundl directly. Contrary to what Stiles had told them, Bundl representatives confirmed that accommodations could be made and ultimately authorized the couple to proceed with a second retrieval cycle under the plan. This directly contradicted Stiles' prior

statements and revealed that her refusal to support further treatment was either mistaken or knowingly false.

190.    Plaintiffs later discovered, through records obtained post-lawsuit, that Stiles internally flagged Alan as dangerous—without any factual basis whatsoever.

191.    Specifically, on May 2, 2025, Stiles placed a clinical note in Vicktoria's chart that was intentionally hidden from patient view. The internal flag stated: "The note has been blocked from the patient for the following reason: Sharing this note will likely lead to the physical harm of the patient or another person."

192.    This assertion was both defamatory and fabricated and was entered immediately after Vicktoria referenced Stiles' unprofessional behavior in a patient portal message, suggesting that the concealment and false designation were retaliatory in nature.

193.    At no point did Plaintiffs threaten or suggest violence, nor was there any clinical or behavioral justification to support such a claim. The false internal flag caused reputational harm, disrupted continuity of care, and formed the basis for subsequent concealment of key medical information.

### 6.    *Round 3*

194.    For Round 3 of IVF treatment, CD 1 began on May 30, 2025.

195.    As part of pre-cycle hormonal priming, Vicktoria was instructed to take Estradiol (4 mg/day) from May 16–27, 2025, and Progesterone (400 mg/day) from May 19–27, 2025.

196.    Clomid (200 mg/day) was prescribed from May 31 through June 3, 2025, corresponding to CD 2 through CD 5.

197.    Notably, Ganirelix was never prescribed at any point during Round 3. This was a sharp departure from prior cycles and contradicted the Clinic's earlier methodologies.

198.    On June 4, 2025, Plaintiffs consulted with Dr. Jones, who recommended cancellation of the cycle based on estradiol trends and ultrasound data. (*See* ECF No. 9-21.) However, later that same day, Dr. Shavell, calling from a conference and claiming she did not have access to the chart, overrode that recommendation and instructed Plaintiffs to continue with medication and injections.

199.    On June 6, 2025 (CD 8), an ultrasound confirmed that the cycle was failing, and the retrieval was formally cancelled—vindicating Dr. Jones' initial assessment.

200.    As a result of Dr. Shavell's intervention, Vicktoria was subjected to a set of verifiably unnecessary injections.

201.    Secondarily, over $1,000 worth of medications were wasted.

202. Round 3 also included several unwarranted departures from internally agreed-upon treatment plans and prior medication protocols. Neither the rationale for these changes nor any effort to tailor the protocol to Vicktoria's individual hormone profile was documented or explained. (*Cf.* ECF No. 15.)

203. Despite documented DOR, no LH testing was performed during Round 3, and FSH was only tested for the second time ever on May 10, 2025—prior to CD 1. The lack of real-time hormone monitoring and failure to adjust dosages in response to estradiol trends reflect a static, one-size-fits-all approach rather than individualized care.

204. The decision to cancel Round 3 was ultimately forced by poor results and was not an outcome of active cycle management or adjustment. Clinic records reveal that internal disagreement about the protocol was suppressed rather than addressed.

205. The result of Round 3 was yet another failed cycle—compounding the emotional, physical, and financial toll on Plaintiffs and further depleting the limited time window available to Vicktoria due to her age and condition.

206. These events occurred shortly after Plaintiffs challenged the Clinic's misrepresentations regarding Bundl and the improper "freeze-all" decision in Round 1. The temporal proximity, sudden deviation from protocol, and lack of explanation

strongly suggest that Round 3 was implemented in retaliation for Plaintiffs asserting their rights and seeking clarity about their care.

### E. Other Irregularities

207. Across all three IVF cycles, the Clinic repeatedly failed to provide individualized care, adjust medication dosages in response to hormone levels, or adhere to standard monitoring protocols. The complete absence of LH testing, irregular and infrequent FSH assessments, and unexplained manipulation of estradiol and progesterone regimens contributed to flawed medical decision-making. Internal inconsistencies, physician disagreements, and abrupt plan reversals further exacerbated the confusion and risk—ultimately depriving Plaintiffs of viable outcomes and squandering their most critical reproductive months.

208. The cumulative result was one suboptimal outcome and two failed cycles. For a patient with DOR, this period represented a rapidly closing fertility window. The Clinic's deviation from accepted standards of care materially and permanently reduced Plaintiffs' chances of conceiving a biological child, while inflicting profound emotional and financial harm.

209. On numerous occasions—during both office visits and telephone consultations—Dr. Shavell explicitly stated that she would "need to review the records," thereby admitting that she had not reviewed Vicktoria's chart in advance

of the interaction. These admissions occurred even during time-sensitive decision points, such as cycle planning and medication dosing.

210. More troubling, Dr. Shavell altered the treatment plan on the spot in direct response to Vicktoria's questions, without referencing prior hormone trends, cycle performance, or ultrasound findings. These spontaneous adjustments—made without clinical anchoring—reflected a broader pattern of disorganized and non-individualized oversight.

211. Despite Plaintiffs undergoing three cycles, the Clinic never once adjusted a medication dosage mid-cycle based on real-time monitoring. This is a fundamental failure in IVF care, where hormone levels and follicular development typically guide dosing strategy. The absence of any such adjustment strongly suggests that, although monitoring was performed procedurally, data was not meaningfully interpreted or acted upon.

212. The Clinic's casual approach extended to medication management. On one occasion, a nurse incorrectly advised Vicktoria and Alan to refrigerate Ganirelix, contrary to the manufacturer's clear instructions that it should be stored at room temperature.

213. After being corrected by Plaintiffs, the nurse left the room to verify, returned to confirm Plaintiffs were right, and nevertheless remarked that they could refrigerate it to "keep it fresh." This flippant response not only contradicted product

labeling but revealed a broader disregard for precision in handling temperature-sensitive fertility drugs.

214. This interaction typified a troubling lack of professionalism, attention to detail, and basic pharmaceutical knowledge among Clinic staff—issues that carry heightened risk in the context of controlled ovarian stimulation.

215. On another occasion, Vicktoria was presented with a critical embryo transfer consent form before Alan had the opportunity to review it. The form appeared largely pre-filled and included a checkbox indicating authorization for transfer of only a single embryo—despite Plaintiffs' repeated and clearly expressed desire to transfer more than one embryo, if medically appropriate.

216. Alan identified the discrepancy and raised it with staff. Rather than take corrective action, the staff member dismissed his concern and advised Plaintiffs to "just sign it," calling the form a "formality" for Ovation Fertility ("Ovation") and stating that "the Clinic does what it wants" regardless of what the form says. This cavalier approach to consent and embryo disposition reflects a disturbing disregard for patient autonomy, ethics, and regulatory compliance.

### F.  Ejection from Program

217. Beginning on June 4, 2025, Plaintiffs submitted a series of respectful, detailed communications via the Clinic's patient portal, raising evidence-based concerns about repeated deviations from standard IVF protocols, inconsistent

medication regimens, and the persistent lack of hormone monitoring—particularly FSH and LH. (*See* ECF Nos. 19–20, 23–25.) These concerns were submitted while Dr. Shavell was reportedly attending an out-of-state conference and unavailable to respond directly. Plaintiffs requested written clarification of these issues before proceeding with another cycle.

218. Plaintiffs' June 4 message specifically cited internal notes indicating that other physicians had recommended repeating the Round 1 protocol. Yet Rounds 2 and 3 had involved significant, unexplained departures—including early use of Ganirelix, altered Clomid timing, and changes in stimulation dosage—none of which had been discussed with or justified to Plaintiffs.

219. On June 5, 2025, Dr. Giuliani responded, stating that if Plaintiffs required written answers, they would need to reschedule their June 9 appointment. (*See* ECF. No. 9-23.) Plaintiffs agreed but requested that a time-sensitive question regarding Clomid dosing still be answered. (*See id.*) No substantive response was ever provided. (*Cf. id.*)

220. On June 6, 2025, Vicktoria reiterated the request for written responses and indicated Alan would be handling communications going forward. (*See id.*) She also expressed frustration that her prediction the cycle would fail—based on basic hormone principles—had been ignored and was subsequently proven correct. (*See id.*)

221.    On June 8, 2025, Plaintiffs sent another message, this time focusing on the erratic use of Ganirelix across all three cycles. (*See* ECF No. 9-24.) They noted that its timing did not correlate with individualized hormone data, and that current explanations conflicted with both prior records and statements from other physicians. (*See id.*)

222.    On June 9, 2025, Dr. Shavell returned to the office and responded briefly, claiming all protocols had been deliberate and individualized. (*See id.*) She did not address any of the specific concerns raised but stated she would confer with colleagues before determining next steps. (*See id.*)

223.    On June 10, 2025, Alan responded, noting that the clinic's rationales had changed frequently and seemed unmoored from clinical data. (*See* ECF No. 9-25.) He flagged an inconsistency: Dr. Shavell had previously cited elevated FSH as the reason for early Ganirelix—yet FSH had not been tested during that window. (*See id.*)

224.    Alan requested confirmation that future cycles would include baseline and mid-cycle monitoring of FSH, LH, estradiol, and progesterone. (*See id.*) While Dr. Shavell had previously questioned the utility of LH testing, Alan noted that LH monitoring is especially important in cycles using high-dosage, off-label protocols affecting the LH axis. (*See id.*)

225. On June 11, 2025, Dr. Shavell canceled the June 12 appointment, stating that more time was needed to review Vicktoria's history. (*See id.*) She vaguely referenced "experimental protocols used elsewhere" and potential future collaboration, but again declined to answer the pending medical questions or confirm whether hormone monitoring would occur. (*See id.*)

226. That same day, Alan submitted a formal request for administrative review, citing:

    a. Clinical inconsistencies and contradictions;

    b. Use of off-label, high-dosage regimens without justification;

    c. Failure to monitor key hormones;

    d. Rescheduled appointments following accountability requests; and

    e. The lack of an independent review process due to Dr. Shavell's dual role as treating physician and Clinic director.

227. On June 12, 2025—rather than responding to the review or meeting request—Plaintiffs received a letter signed by Stiles terminating their relationship with the Clinic. (*See* ECF No. 9-2.)

228. The letter stated that the Clinic had "decided to discontinue the physician/patient relationship" and imposed a 90-day deadline to transfer the remaining embryo. (*See id.*) No clinical or behavioral reason was cited. (*See id.*) The

letter made no mention of Plaintiffs' pending review request or their urgent need for continuity of care. (*See id.*)

229.   Plaintiffs believe this abrupt termination was retaliatory. Rather than engage in good faith discussion or clinical review, the Clinic severed care days after Plaintiffs requested accountability, thereby depriving them of time-sensitive treatment and endangering their only embryo.

230.   Shortly after the termination letter, Plaintiffs were locked out of the communication function of the Corewell-branded patient portal without warning or explanation.

231.   This cut off Plaintiffs' primary means of communication during an ongoing fertility protocol.

232.   The circumstances strongly suggest retaliatory motive, designed to insulate the Clinic from scrutiny.

233.   By disabling communication in response to protected complaints, the Clinic further jeopardized continuity of care and placed Vicktoria at additional medical risk.

234.   Stiles repeated her defamatory conduct on June 13, 2025, again flagging Alan as dangerous and falsely asserting that both Plaintiffs had used "foul language" and "threatening tone[s]" toward staff. (Ex. A.)

235. The note (shown below)—internally blocked from patient view based on an alleged risk of "physical harm of the patient or another person"—was baseless and demonstrably retaliatory.



(*Id.*)

236. There is no documentation or witness account supporting any such threats against staff or use of profanity, either in person or on the phone.

237. To the contrary, the note followed shortly after Plaintiffs were terminated from the program for questioning treatment and protocol rationale. Worse still, this defamatory entry was transmitted to Corewell through the patient portal and to Plaintiffs' new provider via facsimile, compounding the reputational harm and undermining continuity of care.

238. Contrary to claims made by Defendants, Plaintiffs' portal messages were in no way harassing, threatening, or inappropriate.

239. Rather, Plaintiffs consistently and respectfully requested clarification regarding treatment decisions and explanations for medication protocols—information to which they were legally entitled and for which they had paid.

240. These requests were essential for understanding the course of treatment and for assessing personal, logical, and medical propriety.

241. Defendants' characterization of these inquiries as "harassment" was false, retaliatory, and intended to deflect accountability for substandard care.

242. The Clinic and its agents acted with actual malice, weaponizing the electronic medical record system to conceal critical information from Plaintiffs while simultaneously damaging their ability to seek administrative review and/or care elsewhere.

243. On June 13, 2025, Alan emailed Dori Harrison ("Harrison"), a billing employee whose email had been used previously for administrative matters. He also copied what he believed to be Corewell's appropriate contact.

244. The message explained that portal access had been terminated and requested that Harrison forward their attached correspondence to appropriate leadership.

245. The message laid out the issues: unjustified termination of care during a critical fertility window, unresolved symptoms suggestive of PCOS and/or OHSS, and Vicktoria's status as a person with a disability under the ADA.

246. Alan also asserted rights under the ADA's "regarded as" prong and requested a reasonable accommodation—namely, immediate referral to another provider and coordination of records.

247. He further asked to communicate with the Clinic's designated ADA coordinator, if one existed.

248. Corewell responded later that day in a separate thread, stating unequivocally that the Clinic was not part of Corewell and that Corewell had no jurisdiction over its operations.

249. Plaintiffs were told to direct all concerns to the Clinic's leadership. Plaintiffs then removed Corewell from the chain.

250. Alan then sent two additional emails to Harrison. The first demanded contact information for the Clinic and Ovation's attorneys, noting that the June 12 letter appeared to assert improper control over embryo disposition.

251. The Clinic never responded until after the underlying lawsuit was filed (through counsel).

252. The pattern is unmistakable: as Plaintiffs raised legitimate concerns about medical care and sought accountability, the Clinic responded by canceling appointments, cutting off communication, terminating care, and abandoning coordination for the disposition of their embryo.

253. The retaliatory nature of these acts is undeniable.

254. Despite the seriousness of the allegations and the demonstrable harm caused by their transmission to third parties, neither the Clinic, Dr. Shavell, nor Stiles has identified any factual basis for the statements.

255. As of the date of this Complaint, no retraction has been issued, and no corrective action has been taken.

256. The failure to retract or substantiate the defamatory remarks further underscores the malicious and retaliatory intent behind their creation and dissemination.

### G. Corewell

257. Defendants have engaged in a deliberate campaign to mislead patients into believing that the Clinic is a division or direct subsidiary of Corewell—akin to other affiliated reproductive medicine programs (e.g., The University of Michigan's Center for Reproductive Medicine).

258. The public-facing name "The Fertility Center" omits any corporate or legal identifier, and no reasonable consumer would understand it to be a separate entity materially unaffiliated with Corewell.

259. This omission is not incidental; it is part of a coordinated strategy to capture the brand value and institutional trust associated with Corewell while evading corresponding oversight and accountability.

260. Throughout their treatment at the Clinic, Plaintiffs reasonably believed Corewell was directly affiliated with and oversaw the operations of the Clinic.

261. This belief was based on multiple factors, including: (1) the use of Corewell's MyChart system for clinical messaging and billing; (2) laboratory services, including FSH and AMH testing, performed and invoiced by Corewell; (3) public representations; and (4) promotional materials.

262. A Google search of "Dr. Shavell" and "Corewell" leads to multiple misleading results.



263.   The first result, Corewell's online directory, clearly shows Dr. Shavell is an affiliate of Corewell.



A preserved version of the link can be found at https://perma.cc/AY7V-9NGZ.

264.   The second result is the Clinic's website.

265.   The third result shows a third-party website recognizing Dr. Shavell's affiliation with Corewell.



266.  The fourth result is a Corewell branded video—hosted on Corewell's official YouTube channel with Corewell branding—promoting Dr. Shavell.



A preserved version of the link can be found at https://perma.cc/L9UR-LP65.

267.  The video unmistakably and deliberately misleads viewers into believing that Dr. Shavell is a Corewell physician.

268.  The video is hosted directly on Corewell's official YouTube channel—without any disclaimer—and displays the Corewell name, logo, and corporate branding throughout.

269.    The video includes a YouTube certification that the video is from an "accredited U.S. hospital."

270.    The video description also explicitly references "The Fertility Center."

271.    The fifth result is Dr. Shavell's Facebook page, which connects Dr. Shavell, Dr. Giuliani, and the clinic directly to Corewell.



272.    These materials, which remained publicly accessible even after Plaintiffs raised concerns, directly contradict Corewell's post hoc claim that the Clinic operates outside Corewell's jurisdiction.

273. The deception extends well beyond signage or marketing. Internally, patients are funneled through what appears to be a seamless Corewell system. Every stage of the patient experience—from registration and billing, to messaging, scheduling, and records access—is conducted through Corewell's electronic infrastructure, creating the appearance that the Clinic is a fully integrated division.

274. For example, Plaintiffs interacted with their fertility physicians, including Dr. Shavell, through the Corewell-branded "MyChart" portal. This system included Corewell logos, Corewell appointment headers, and Corewell-designated interfaces, reinforcing the perception of institutional unity.

275. Vicktoria's MyChart portal reflects this Corewell branding and lists appointments with Dr. Shavell as Corewell visits.



276. Plaintiffs also received medical bills explicitly listing "Corewell" as the billing provider for fertility services. These statements did not disclose that billing was being conducted on behalf of a legally separate entity. As a result, patients were

denied meaningful notice of, among other things, who was responsible for care, payment disputes, or data governance.



(Ex. B.)

277.   During the course of their treatment, Plaintiffs were never furnished invoices from the Clinic. Instead, payments were made in person, through the Corewell portal, or directly to Bundl and Ovation.

278.   It was only after the filing of this lawsuit that Plaintiffs received—for the first time—a direct invoice from the Clinic, sent via U.S. Mail, for services purportedly rendered between April 24, 2025, and June 4, 2025. (Ex. C.)

279.   Plaintiffs were never given prior notice that services during this timeframe would be billed separately or retroactively.

280.   The sudden shift in billing practices is suspicious and unexplained. The invoice arrived after litigation commenced and appears retaliatory, particularly given its deviation from prior billing protocols.

281. Plaintiffs sent payment under protest via U.S. Mail to the Clinic's.[1]

282. The invoice contains materially false and fraudulent entries. It includes charges for laboratory and ultrasound services that were clinically unnecessary, mistimed, or wholly irrelevant to treatment decision-making. For example, several blood draws occurred either outside of the follicular stimulation window or without any documented clinical response or dose adjustment, rendering the procedures functionally useless and financially exploitative. These charges reflect not only poor clinical practice but also fraudulent conduct in violation of federal and state law.

283. Third, record queries through Corewell's system identify fertility visits with Dr. Shavell as "Corewell Billing Encounter[s]." These notations further obscured the separate legal identity of the Clinic and misrepresented Dr. Shavell's affiliation and/or the nature of the affiliation.



---

[1] Counsel subsequently indicated the check would not be deposited.

62

284.    Fourth, Corewell sent Plaintiffs, among other emails, Corewell branded appointment reminders to their joint email prior to every appointment at the Clinic. An example is provided below.



(Ex. D.)

285.    The email confirmation lists the Clinic's address and phone number. Thereafter, it states: "Before your appointment, learn how we are keeping you safe. Please visit corewellhealth.org/readyforyou to review resources that will help prepare you for your visit . . . Thank you for partnering with us for your healthcare needs." (*Id.*)

286.    The link directs patients to Corewell's homepage. A permanently preserved version can be found at https://perma.cc/5C7B-PJDW.

287.    Finally, Plaintiffs received text messages from Corewell to confirm appointments with the Clinic. An example is provided below.



288.   In the course of requesting an internal review and raising concerns regarding their termination from care, Plaintiffs contacted Corewell Patient Relations, seeking clarification as to oversight and a referral to responsible administrators.

289.   On June 13, 2025, Brett (last name was never provided and missing from the signature line), a Patient Relations Specialist, responded via email stating unequivocally: "The Fertility Center is not a Corewell Health Medical Group office, and therefore patient relations/Corewell Health does not have jurisdiction over their operations."

290.   This assertion directly contradicted Plaintiffs' experience. All billing had been processed through the Corewell system. Plaintiffs' FSH and AMH laboratory testing had been conducted by Corewell facilities. Their appointments and communications were managed through a Corewell-branded portal. These were not isolated technicalities—they were fundamental aspects of the patient experience, and consistent with public representations made by Corewell.

291.   Plaintiffs promptly responded by providing documentation to Corewell showing (a) payment confirmations through the Corewell portal; (b) a screenshot of Corewell's MyChart interface indicating an active relationship with "The Fertility Center"; and (c) a link to Corewell's YouTube channel where promotional videos for Dr. Shavell and the Clinic were hosted under Corewell branding.

292.   Despite these facts, Corewell reiterated its position. In multiple subsequent communications, Plaintiffs requested legal contact information to resolve the issue professionally and without litigation. These requests went unanswered.

293.   On June 28, 2025, Plaintiffs requested a litigation hold be put into effect on related materials. Corewell failed to respond.

294.   By June 30, 2025, Plaintiffs sent an email to Corewell through patient relations, advising Corewell that Plaintiffs were in the process of amending their

federal Complaint to include Corewell and offered to engage in a pre-filing discussion with counsel. Still, Corewell did not respond.

295.　On July 1, 2025, Alan sent a final message to Corewell, reiterating that Corewell had conducted diagnostic testing for both Plaintiffs, processed payments, and branded itself as the parent entity of the Clinic. Corewell never responded.

296.　On July 11, 2025, after Corewell was added to the lawsuit (on July 4, 2025), Brett sent a final email reiterating Corewell's position and stating, "[a]s of today, our review is complete."

297.　Plaintiffs believe Corewell's conduct reflects a pattern of deliberate concealment: publicly branding the Clinic as a Corewell facility while disclaiming responsibility—across the board—when concerns arose or arise.

298.　The absence of a clear oversight structure, combined with Corewell's conflicting representations, deprived Plaintiffs of procedural fairness and various regulatory protections.

## H.　　Patient Harm and Emotional Impact

299.　As a direct and foreseeable result of Defendants' conduct, Vicktoria and Alan have suffered profound and multifaceted harm—medical, emotional, and psychological. These harms are not speculative; they are immediate, measurable, and ongoing.

300. Vicktoria, who has been diagnosed with DOR, faces a narrow and rapidly closing window to conceive a biological child. Defendants' repeated and unjustified deviations from appropriate care, refusal to adjust treatment in response to hormone levels, and ultimately, their retaliatory ejection of Plaintiffs from the program, have irreversibly undermined Vicktoria's reproductive chances.

301. Across three cycles, Plaintiffs were subjected to aggressive, off-label, and poorly justified medication protocols—each diverging further from the original, effective Round 1 approach. Each round carried physical side effects, financial burdens, and emotional investment. Cycles 2 and 3, which yielded no embryos, were especially devastating.

302. Rather than being met with empathy, transparency, or medical clarity, Plaintiffs were gaslit, stonewalled, and ultimately expelled from the program when they asked legitimate clinical questions.

303. Alan's emotional harm is uniquely compounded by his active role in administering every injection (except one)—subcutaneous and intramuscular—throughout all three IVF cycles. He not only managed the daily logistical and medical burden but bore witness to the physical and emotional strain Vicktoria endured.

304. Alan's involvement was intimate and unrelenting; he was not a passive observer. The pain of knowing that he personally administered treatments that were

later revealed to be medically unsupported and internally contested has left him with enduring guilt, helplessness, and grief.

305.   The June 12, 2025, termination letter left Plaintiffs without access to clinical staff or patient portal communications—while simultaneously placing a 90-day deadline to transfer their sole remaining embryo. The psychological impact of that ultimatum cannot be overstated. It represented not only the sudden severance of care, but an existential threat to their ability to share a biological child.

306.   Vicktoria has endured the physical toll of repeated IVF cycles: daily injections, transvaginal ultrasounds, hormonal volatility, and surgical retrieval—all without the minimum standard of hormone monitoring or individualized support. The cumulative effect has led to heightened anxiety, insomnia, and trauma.

307.   Alan has likewise endured intense psychological distress. In addition to coordinating logistics, communicating with providers, and reviewing medical data, he watched as his wife's body and hope were repeatedly manipulated and dismissed by a clinic that refused to provide clear rationale or clinical consistency.

308.   Defendants not only compromised the integrity of medical care—they degraded the humanity of the experience.

309.   Vicktoria and Alan were forced to become their own advocates in the face of withheld records, inconsistent clinical rationales, and threats to the disposition of their embryo.

310. Requests for information were ignored. Requests for accountability were punished.

311. The cumulative result is not merely loss of reproductive opportunity, but profound and enduring emotional injury. Plaintiffs now face the urgent and daunting task of rebuilding their care—financially, clinically, and emotionally—in a system that already failed them.

## I. Pattern of Misconduct

312. Plaintiffs' experiences were not isolated. Numerous former patients of the Clinic have independently reported similar misconduct through public forums, including Google, Yelp, and FertilityIQ. (*See* Exs. F–H.)

313. Vicktoria and Alan are standing up, not just for themselves, but all past, current, and future victims.

314. These accounts describe a persistent pattern of unethical, negligent, and retaliatory behavior that aligns with Plaintiffs' allegations. The misconduct spans categories including medication mismanagement, improper billing, victim blaming, falsified records, patient mistreatment, and retaliatory conduct by both clinical and administrative staff.

## 1. *Dosage, Protocol, and Diagnostic Mismanagement*

315.    Multiple patients recounted dangerous or ineffective fertility protocols, including excessive medication doses, unadjusted treatment plans, and failed monitoring.

316.    Paige Moser ("Moser") wrote: "What I experienced here wasn't just a mistake, it was **medically dangerous and emotionally traumatic**. A major prescription error went uncorrected for weeks, caused serious physical side effects, and ultimately compromised my IUI cycle. Even worse, I was met with dismissiveness, gaslighting, and total lack of accountability from parts of their staff." (Ex. E (emphasis added); *see also* Ex. F.)

317.    Moser explained: "I was prescribed Cabergoline 0.5 mg—30 tablets to be taken daily, which I followed exactly . . . . What I didn't know? The prescription was seven times the correct dosage—it should've been once per week." As a result, Moser "experienced hallucinations, migraines, abdominal pain, and emotional distress. Still, no one corrected the error or advised [her] to stop." (Ex. E.) Ultimately, the Clinic only offered Moser a $400 credit. (*Id.*)

318.    In response, Moser "received a letter from a doctor [she] had never seen claiming [she] failed to follow instructions—completely ignoring everything that had happened." (*Id.*)

319. Vic ("Vic") wrote: "This was a mess. Dr. Bjorkman had explained a course of treatment that I was in agreement with and was fully outlined in my chart. Not one other individual I interacted with seemed to know this. At one point, I was given the wrong dose of Letrozole after a failed round. I brought this up to the nurse and **instead of checking my** treatment **plan, she doubled down** and would only prescribe the 2.5 dose instead of the 5 dose it was supposed to be." (*Id.* (emphasis added).)

320. Nichole Sturdavant wrote: "No HSG done and was told everything with my husband looked good . . . . Until I went to a different center . . . . As for my husband's side. Everything was not. So we **wasted time, money and heart aches when I should have been informed**." (*Id.* (emphasis added).)

321. Drew and Kaila Zobel ("Zobels") wrote: "Like most of the other reviews, we felt like a number, found it difficult to get information, worked with a different nurse every visit (who clearly did not have time to read notes from the last visit), and wound up paying thousands of dollars for a unsuccessful procedure and no answers of what went wrong. The entire process the doctor was reluctant to make a recommendation. Instead we'd receive information on a couple options and we're told to choose what we'd like. It was only after our embryos grew 95% of the way and then 'very unusual(ly)' **mysteriously did not survive** (**with no** medical

**explanation** as to why), the doctor made her first recommendation of trying again." (*Id.* (emphasis added).)

322.   Erin Donahue ("Donahue") wrote: "This facility is **awful** all **across the board**. They do not care and treat patients like numbers . . . . They sent me spiraling down an **extensive and expensive route** of testing **when nothing was wrong** from the beginning. They did not offer crucial options for our best chances of getting pregnant. **They do not provide specialized, individual treatment plans for patients** . . . . My husband and I switched to a fertility center in Chicago and it has been a totally different experience for the better. We regret spending so much time and money at this clinic." (*Id* (emphasis added).)

323.   Jared Deweerd wrote: "Just FYI they charge iui for natural intercourse so **you pay them for literally doing nothing**. Also the nurse used hcg levels for a pregnancy that was 3 years old." (*Id.*)

324.   Mary Reif ("Reif") wrote: "**The inconsistency** of all of their information **is unbelievable!** One person says you're on Day 1 of your cycle, the next says Day 2. A nurse tells you to give yourself a shot at 10pm, but your doctor says by 4pm. A nurse says a certain dimension is good for your eggs, then your doctor says a different diameter . . . . **The one consistency is that they hound you** at each appointment for a signature from your husband who is only allowed in the office to sign the paperwork!" (*Id.* (emphasis added).)

325. Richard Cardenas wrote: "We utilized TFC's IUI and IVF treatments, and when we would ask for the doctors professional recommendations the response was 'whatever you two want to do' . . . . My wife and I found this response unprofessional because we did not understand what to do and felt that we were not given adequate information to make an educated decision for ourselves. Our feeling is the professionals here should have directed us through this process and not put so much of the decision making process on us. Often **we would return home** after our appointments, **do a lot of research**, **and would make our decision with the best understanding we had**. Ultimately we went through multiple IUI treatments, a round of IVF, and two embryo transfers. We were unsuccessful in becoming pregnant. When we were not successful in becoming pregnant **our doctor's response was 'I'm stumped'** . . . . My wife and I then went to Colorado's Center of Reproductive Medicine (CCRM) and were successful in becoming pregnant, utilizing IVF treatment." (*Id.* (emphasis added).)

326. Kacie Davis wrote: "I switched clinics found out I Have MTHFR and had issues with in my uterus. Polyps, Scar Tissue, and Shape issues which **all would of[] be[en] caught if they did more testing**. They were a waste of time and caused more stress and heart ache than anything." (*Id.* (emphasis added).)

327. Dustin C wrote: My wife has endometriosis. She was seen and told she had two options. Hysterectomy or IVF. And time was critical because of her age.

73

We just got back from a trip to the University of Michigan['s] Women's Hospital in Ann Arbor. She was told that's totally not correct. Doing a Hysterectomy has little to no effect on endometriosis apparently. PLUS there are about 6 other options that are much less expensive than IVF. Her age? NOT EVEN CLOSE to being a factor or an issue. Thanks for that Fertility Center. **Greedy. Karma will get you for this**." (*Id.* (emphasis added).)

328.   David D. wrote: "This clinic is riddled with incompetence. From the confused accounting department who never know which one of their systems your information is in to the medical staff who fail to get to know their patients and always appear to be caught off guard in consultations. **Grand Rapids deserves better**." (Ex. F (emphasis added).)

329.   An anonymous patient wrote: "I did not feel like my care was specific to me and what had or had not worked for me in the past. I had a friend who had previously been a patient under the Fertility Center and she told me the exact recommendations and treatment plan I would receive from them after my initial consultation. **What my friend told me was the exact treatment protocol I receive[d] even though her and I were seeking fertility treatment for different reasons**. Both of my appointments with Dr. Shavell were less than 15 mins long. She often would defer to my husband and I on how we would like to approach things

instead of getting her medical opinion on the most appropriate approach for us." (Ex. G (emphasis added).)

330. The patient went on to state: "5, 7.5, 10 mg of femara with estrogen started immediately after completion of 7.5 and 10 mg of femara and x1 cycle of 100 mg clomid with immediate start of estrogen. I didn't mature any follicles with that cycle. The other fertility doctor from a different clinic I work with assumes that the estrogen was preventing [m]y body from maturing the follicles and acting more like a birth control because it was started too soon . . . . I had more extensive hormonal testing completed to further rule out PCOS and I never heard anything from the clinic after completion of this bloodwork. When I went to my appt a month later, Dr. Shavell never brought anything up about the bloodwork so when I brought it up, **she wasn't even aware of it or that I had it done**. She then looked it up in my chart and said 'oh, if something had been concerning, I would have called you.' **I was just unconvinced** that this was the case in this situation and felt like testing that she recommended I have completed was not taken seriously." (*Id.* (emphasis added).)

331. An anonymous patient wrote: "I think **they take standard protocol and go through the motions. I had to start fighting** for what I wanted. **They** also **are not** exactly **forthcoming** on information. **I had to ask** a lot of **questions I learned through podcasts and others** who have gone through it all before . . . . I

75

just **had conflicting dosage information** a couple times. Seemed like I **had to inform the nurse as opposed to her knowing it** when she called me." (*Id.* (emphasis added).)

332.   An anonymous patient wrote: "I felt like the clinic had too much going on to focus on the individuals. I frequently saw different providers and got mixed messages about my treatment and next steps. I later went onto another clinic and found out that **this clinic missed my diagnosis of PCOS** . . . . **Doctors couldn't agree on the treatment they wanted to do** . . . . As stated earlier, I felt like a number. I didn't feel like the clinic was overly motivated to get me pregnant." (*Id.* (emphasis added.)

333.   An anonymous patient wrote: "My wife and I felt like **she wasn't forthcoming** with information **and** basically **waited for us to lead the conversation** rather than sharing info upfront and using that to guide the conversation and treatment plan . . . . After one of her lab tests, it became clear that **my wife has Hashimoto's thyroiditis, but no one informed her of that until the information came up almost accidentally** in a conversation with Dr. Shavell." (*Id.* (emphasis added.))

334.   An anonymous patient wrote: "I have to re explain my situation every time I am at the fertility center. There is no consistent treatment . . . . A complete lack of communication and **they clearly don't look at files** before talking to you.

I've have had to re explain my miscarriage what feels like 1000 times. **I get different answers depending on the nurse** I'm talking to . . . . Conflicting information is my biggest complaint. It's almost as if **nurses and doctors don't communicate**. **I've had them drop the ball several times** related to my thyroid treatment and I've had to question advice they've given. **It's hard for me to trust** what they are saying." (*Id.* (emphasis added).)

335.   An anonymous patient wrote: "It didn't feel like Dr. Shavell led the conversation. I brought a lot of questions and she offered thoughts, but didn't go into detail. **She'd say just one sentence and then wait.** There were times where information she shared surprised me (I wasn't aware of a diagnosis) but **she seemed hesitant to go into more conversation**." (*Id.* (emphasis added).)

336.   Plaintiffs' experience mirrors the disturbing pattern of misconduct detailed in numerous public reviews. Like others, they were subjected to overly aggressive and poorly individualized medication protocols, including excessive Clomid and hormone supplementation regimens that went unadjusted despite nonresponse and adverse effects.

337.   As in the case of multiple reviewers, their concerns were met with defensiveness, miscommunication, and blame shifting rather than corrective care. Plaintiffs were routinely denied meaningful consultation, had to prompt their physician to interpret test results, and received conflicting information.

338. Perhaps most troubling, several of the same failures—untimely or incorrect hormone testing, one-size-fits-all treatment, and passive or absent physician oversight—directly parallel those experienced by Plaintiffs. These reviews underscore that Plaintiffs' injuries were not isolated mistakes, but part of a longstanding pattern of indifference and institutional gaslighting.

339. Ultimately, like many other victims, Plaintiffs were forced to pay the Clinic on multiple occasions merely to educate the Clinic's staff about, among other things, basic protocols, prescribed drug regimens, standard procedures, proper medication handling, and the patients' prior test results.

### 2. *Mistreatment and Abusive Conduct*

340. Several patients described being treated with hostility, judgment, or coldness, especially when they questioned medical decisions or raised concerns.

341. Moser wrote: "**The final straw was a combative call from** the practice manager, **Dawn, who was unprofessional, condescending, and dismissive**—despite the clinic already admitting fault. **She** accused me of misunderstanding the instructions and **twisted my words** before I ended the call . . . . **What happened** to me **wasn't just a clerical error**—**it was a breakdown in care, professionalism, and basic human empathy. I wouldn't wish this experience on anyone**." (Ex. E (emphasis added).)

342. Vic wrote: **"[N]urses and ultrasound techs were dismissive and just seemed pissed off that they had to deal with a patient**. I always felt rushed and like I was inconveniencing them. When I received my IUI, I had never met **the nurse** before, she **did not care** that my body was responding in pain, **and didn't** even **acknowledge my wife in the room**. When I received an ultrasound that showed my follicles had not responded to treatment, a nurse met with me for about 3 minutes after, had no empathy, and told me to just call when I get my cycle. I have PCOS and at that point had only had one cycle in a year. **She did not even look at my treatment plan or know my situation, she just gave me a blanket statement**." (*Id*. (emphasis added).)

343. X X wrote: "**Zero stars**. I am trying to donate my eggs but the application process is not the best. I'm getting no return phone calls and rude people at the front desk. Not a place to be if looking for something easy and easy going. Should have people at the front desk who can explain some procedures and most of everything there. **I'm just a woman trying to help another woman. That's all**." (*Id.* (emphasis added).)

344. An anonymous patient wrote: "The ultrasound techs did not display good bedside manner. Rarely did they introduce themselves or even explain what they were doing. **They assumed knowledge and competence** of the process even on my first mid cycle ultrasound. I was having to ask questions, ask which rooms I

needed to go to next, etc. **As someone who works in healthcare and understands what good bedside manner looks like, I truly didn't feel like I got that with majority of the people** I worked with at the fertility center, with the exception of some of the nursing staff. I never really felt like anyone was "on my team" at this center . . . . " (Ex. G (emphasis added).)

345. An anonymous patient wrote: "Despite thoroughly discussing my medical history with Dr. Shavell, I was not notified that they would not be able to perform an egg retrieval for me until after I had paid the non-refundable cycle management fee and after I had started suppression medication to prepare for a retrieval. Not only did I feel like **she left me scrambling to try to find a new fertility specialist**, but **she also had a physician I had never even met call me to give me the news**." (*Id.* (emphasis added).)

346. An anonymous patient wrote: "They treat it like **a true for profit business not a doctors office**." (*Id.* (emphasis added).)

347. An anonymous patient wrote: "We just had a very bad experience and decided to never go back. **The strain on our emotional health was just horrible**. Not just because of the horizons fluctuations due to the treatments, but just the level of care for us as an actual couple desiring to have a family." (*Id.* (emphasis added).)

348. The pattern of mistreatment and abusive conduct described in these reviews strongly parallels the emotional and psychological harm experienced by

Plaintiffs. Like others, Plaintiffs were dismissed or ignored when they raised questions about care, subjected to indifferent or hostile staff interactions, and left feeling like burdens rather than patients.

349. In particular, the actions of Stiles—who falsely flagged Alan as dangerous without justification—fit squarely within the pattern of retaliatory, judgmental behavior highlighted by multiple reviewers.

350. As with others, Plaintiffs were often met with clinicians unfamiliar with their records, abrupt messaging, and cold interactions during intimate and sensitive procedures. The consistent theme across reviews—that patients were treated more like transactions than human beings seeking care—is precisely what Plaintiffs endured, contributing to their injuries and reinforcing that the harm here was systemic, not incidental.

### 3. *Improper Billing*

351. Numerous reviews also highlight billing irregularities and post-treatment financial abuse.

352. Moser wrote: "I . . . received a $250 coupon for my first appointment. The front desk was cold and dismissive, and **I was** still **billed despite presenting the coupon**. **When I called to clarify, I was spoken to condescendingly—setting the tone for what was to come**." (Ex. E (emphasis added).)

353. Donahue wrote: "[B]illing department has **no idea what they are doing and our entire experience was painful and terrible**." (*Id.* (emphasis added).)

354. Reif wrote: "**They charge an office fee** for when you chatted with the nurse **one month**, **but they didn't charge it the month before**." (*Id.* (emphasis added).)

355. Michael Spiekerman wrote: "My wife needed a procedure done at the local hospital and other than a generic comment about the hospital may have it own charges they say nothing else and send you there. And low and behold my wife's insurance did not cover most of the procedure costing us $1800 dollars and also to note the procedure ended up showing nothing wrong! They really should have an estimated cost for this procedure. Because **we** likely **would not have done this after finding out we would have to pay that much**." (*Id.* (emphasis added).)

356. C W wrote: "Difficult to pay bills correctly because **there is nowhere to see how much you currently owe**, and by the time you receive letters, it might already be paid or irrelevant." (*Id.* (emphasis added).)

357. Ella Prawdzik wrote: "Front desk lady very rude don't know how to speak to people.. Also was told I wouldn't have to pay anything insurance would cover it but **now here I am paying out of pocket get it together seriously** . . . ." (*Id.* (emphasis added).)

358. Kimberly Salgado Sosa wrote: "**This place[] is a joke I want to put 0 star[s]** . . . . [T]hey are refusing our refund after they told us we could get it back and I got an email the next day after I had 3 different people tell me I'm getting something back and then now I got an email saying they can't refund me because that is there policy." (*Id.* (emphasis added).)

359. Patra G. wrote: "**I paid the bill** over the phone **as soon as I received it, but** every month after that **they kept sending me past due bills and eventually a freaking collections notice** for the $100+ that I had paid for the consultation which would have been free had they helped me register for that (see below)." (Ex. F (emphasis added).)

360. Irish S. wrote: "The unsavory experience was after we decided to stop the treatments. I had a couple more invoices to pay and was matching my payments to my collection of invoices. I paid all of it already based on my records but I got an invoice - saying I still owe some money. I called and asked for a detailed charges and payment report. And as expected, **the listed payments on their record does not match all the payments I made**. **When I called** again to ask for a different report **their billing lady was rude and told me she can't do anything because it is now in collections**." (*Id.*)

361.    Jason H. wrote: "**Multiple problems wi[th] billing**. One instance they told us we were approval through our insurance. **We** we're not and **paid big**." (*Id.* (emphasis added).)

362.    An anonymous patient wrote: "**I honestly still could not tell you exactly**. **They are not transparent** with their billing. **The only breakdown** of cost **I received was from my insurance statements**, not from The Fertility Center. They have an option to talk to someone from billing to try to get an estimate for costs but **different people** from that department **gave me different answers** regarding costs for specific procedures. If you are planning on IVF, **they pressure you to pay a nonrefundable cycle management fee before they provide detailed information** about their protocols and costs. **It honestly felt very secretive and shady**." (Ex. G (emphasis added).)

363.    The Clinic has been the subject of repeated complaints regarding billing irregularities, lack of transparency, and financially exploitative practices. Patients described being misled about costs, pressured into prepaying for services before receiving adequate information, and repeatedly overcharged or sent to collections despite timely payments. Reviews detail refusals to honor promotional offers, inconsistent or unexplained charges, difficulty obtaining clear billing statements, and discrepancies between patient and clinic records. The billing department was frequently characterized as rude, unresponsive, or confused.

364.   These experiences mirror Plaintiffs' own encounters with opaque billing practices and unexpected charges, reinforcing a broader pattern of financial misconduct.

## COUNTS

## COUNT I: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c)) [ALL DEFENDANTS]

365.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

### A.      The Enterprise

366.   Defendants conducted, or participated directly or indirectly in the conduct of, the affairs of an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). This enterprise ("Enterprise") is distinct from the Defendant entities themselves and includes:

   a. The Clinic;

   b. Dr. Shavell, Dr. Giuliani, and Stiles, acting not merely as employees but as individuals coordinating decisions and communications across departments and with third parties;

   c. Does, as-yet unidentified lawyers, consultants, strategic advisors, and/or related persons or entities that, on information and belief, advised or coordinated with the Clinic in crafting and executing decisions to suppress internal

oversight, retaliate against Plaintiffs, and enforce the 90-day embryo transfer directive;

d. Bundl and Ovation, as financially and logistically integrated external entities; and

e. Corewell, which facilitated billing, clinical infrastructure, and public branding that induced Plaintiffs into treatment under materially false pretenses, and whose name appeared on billing and test results, including AMH and FSH testing.

367. The Enterprise is an association-in-fact, united by a shared purpose: to extract payments from vulnerable fertility patients through fraudulent representations, misstatements about treatment and financial terms, coercive leverage over stored embryos, and systemic retaliation against patients who questioned care.

368. The Enterprise is structurally and functionally distinct from the Clinic's corporate existence. It includes external actors (e.g., Corewell, Ovation, Bundl, etc.), third-party consultants, and individuals coordinating decisions across legal, clinical, and administrative roles.

369. Corewell, while now denying accountability, acted as a co-branded provider of services including diagnostic testing, medical infrastructure, and public-facing affiliation. The use of Corewell's name on MyChart portals, laboratory

results, and videos, as well as billing invoices indicating a Chicago address, reflect coordinated action designed to induce trust and suppress scrutiny.

370. The conduct at issue involves not merely malpractice or billing error, but ongoing deceptive, coordinated schemes driven by interlocking actors who worked together to induce payments, manipulate consent, and eliminate dissent or accountability.

## B. Effect on Interstate Commerce

371. The Enterprise engages in, and substantially affects, interstate commerce, including:

a. Plaintiffs' contract with Bundl, a Delaware corporation and Texas-based entity;

b. Funds wired by Plaintiffs from Michigan across state lines to Bundl in reliance on Clinic representations;

c. Brochures mailed or delivered to the Clinic from out-of-state and physically distributed to Plaintiffs;

d. Use of U.S. mail to transmit bills, appointment letters, and financial documents;

e. Email and patient portal communications exchanged via interstate electronic systems, including communications

intended to mislead Plaintiffs about care plans, coverage, and consent; and

f. Processing of insurance claims submitted for fraudulent and/ore materially defective services.

## C.    Predicate Acts

372.    Defendants engaged in a pattern of racketeering activity, including the following predicate acts under 18 U.S.C. § 1961(1).

### 1.    *Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343).*

373.    Defendants used the U.S. mail and interstate wire systems to execute, advance, and conceal a fraudulent scheme involving misrepresentations, omissions, and deceptive billing practices tied to fertility services. The predicate acts alleged below were not isolated errors, but part of an intentional pattern of deceit for financial and reputational gain.

### a.    *Mail Fraud (18 U.S.C. § 1341)*

374.    Post-lawsuit, the Clinic sent Plaintiffs a bill via U.S. mail that included charges for fraudulent and medically unnecessary procedures. This bill was knowingly false and part of an effort to collect on treatment that lacked a legitimate medical purpose.

375.    Plaintiffs, under protest and reservation of rights, sent a check by U.S. mail to defense counsel to address the purported balance while preserving claims of fraud and misrepresentation.

376. Bundl sent Plaintiffs a partial refund through the U.S. mail in connection with the bundled IVF program, confirming the existence of cross-state commercial transactions associated with the scheme.

377. Upon information and belief, Bundl brochures and promotional materials were sent to the Clinic by mail and/or distributed to patients, including Plaintiffs. These materials falsely promised reduced financial risk and enhanced emotional certainty while concealing constraints imposed on medical decision-making.

378. The Clinic and Corewell jointly or separately sent billing statements through the U.S. mail, including invoices bearing Corewell's predecessor branding (e.g., Spectrum Health). These bills created the false impression that the services were clinically appropriate and provided under Corewell's supervision.

### b.    Wire Fraud (18 U.S.C. § 1343)

379. Plaintiffs wired funds to Bundl across state lines based on representations made by the Clinic that enrollment in the bundled IVF program would provide cost-effective and medically appropriate treatment. This constituted an act of inducement via interstate wire communication.

380. Defendants uploaded defamatory and fraudulent statements by Stiles to the Corewell patient portal, where they were viewable by Corewell physicians and

third-party providers. These messages falsely, among other things, portrayed Alan as a danger to others and were intended to interfere with continuity of care.

381. The Clinic also faxed these same defamatory and fraudulent messages to Plaintiffs' new physician. This transmission was made via interstate wire systems.

382. Plaintiffs paid for services electronically via Corewell's online billing portal. These payments were induced by deceptive branding, emails, and text confirmations sent from "corewellhealth.org" addresses, which fraudulently suggested a formal integration or oversight relationship between Corewell and the Clinic.

383. Payments were also made to Ovation over the telephone in connection with the provision of fraudulent services.

384. Defendants made fraudulent oral statements by telephone to Plaintiffs regarding diagnostics, protocols, and treatment management.

385. Throughout treatment, Defendants concealed material facts and made affirmative misrepresentations using phone calls, emails, digital appointment confirmations, and the Corewell-branded portal—each constituting a distinct wire act in furtherance of the scheme.

### 2. *Extortion (18 U.S.C. § 1951)*

386. On June 12, 2025, Defendants terminated care and issued a letter demanding that Plaintiffs transfer their only remaining embryo within 90 days.

387. This demand came within days of Plaintiffs' protected communications, which raised concerns about treatment practices and requested administrative review. Rather than engage in good faith discussion or review, Defendants attempted to silence Plaintiffs through intimidation, economic coercion, and threats to their reproductive future.

388. At the time of the letter, Defendants knew that Plaintiffs had few viable alternatives for fertility care, particularly in light of advanced maternal age, prior treatment failures, and regional wait lists. By conditioning access to their remaining embryo on immediate transfer—and refusing to provide care in the interim—Defendants placed Plaintiffs in an impossible position: comply uncritically or forfeit the opportunity for a biological child.

389. Compounding this threat, Defendants displayed a sign next to check-in at their primary location that states in full:

> We're here to support you. Threatening or aggressive behavior will not be tolerated. Any threatening or aggressive behavior towards our team members or others will result in **immediate dismissal from our practice**. **Further penalties may** also **be pursued**. Thank you for being respectful.

(Ex. H (emphasis added).)

390. While seemingly benign, this signage functions as an overarching threat: patients who question or resist treatment directives may be summarily expelled. The sign, prominently placed in the waiting area, creates a culture of fear

and submission—particularly in the fertility context, where time is limited, stakes are high, and options are few.

391. This message—reinforced by Defendants' conduct—suggests a standing policy: patients must accept all recommendations without protest or risk losing care altogether. Defendants weaponized this power asymmetry by retaliating when Plaintiffs raised concerns.

392. As further evidence of extortionate intent, Defendant Stiles authored false, defamatory entries in Vicktoria's medical record on May 2 and June 13, 2025. These entries, hidden from Plaintiffs at the time, falsely characterized Alan as a danger to Vicktoria and others and were shared with third parties.

393. These fabrications served no legitimate clinical purpose and were plainly designed to discredit complaints and justify the Clinic's retaliatory expulsion. The use of defamatory records in this context constitutes a corrupt means of asserting leverage and threatening reputational harm in response to protected conduct.

394. Together, the June 12th Letter, the defamatory entries, and the threatening signage reflect a coordinated campaign to silence dissent through fear, coercion, and deprivation of essential services.

395. The threat carried clear and coercive power. Noncompliance risked the loss of reproductive opportunities, Plaintiffs' only remaining embryo, reputational

harm based on false medical records, exposure to potential legal jeopardy, and indefinite delays in future treatment.

396.   Defendants offered no clinical rationale for their abrupt termination or 90-day demand. Rather, the action was plainly retaliatory and intended to punish Plaintiffs for asserting their rights, suppress further inquiry, and preempt administrative or legal review.

397.   This conduct constitutes extortion under the Hobbs Act, 18 U.S.C. § 1951, as it involved the wrongful use of fear—of losing medical access, reproductive opportunity, and reputation—as a means to obtain compliance and suppress protected speech other legal rights.

398.   It also directly impacted Plaintiffs' property interest in their embryo and disrupted the interstate delivery of medical and logistical services, including embryo storage and shipment.

### 3.   *Honest Services Fraud and/or Embezzlement (18 U.S.C. §§ 664, 1346, 1347)*

#### a.   *Honest Services Fraud (18 U.S.C. § 1346)*

399.   Defendants engaged in a scheme to defraud Plaintiffs and third-party payors by misrepresenting the nature, quality, and legitimacy of fertility services rendered.

400. Plaintiffs were led to believe that care was being administered at "an accredited US hospital" and under the oversight of Corewell, a major regional health system.

401. This belief was reinforced by, among other things, digital portals, appointment confirmations from a "@corewellhealth.org" domain, and marketing materials. In reality, the care was provided by a materially unaffiliated entity, without proper hospital-level accreditation, continuity of oversight, or institutional protections.

402. Plaintiffs further relied on representations that treatment would conform to accepted clinical standards. Instead, Defendants failed to monitor or adjust protocols in response to hormone trends and prescribed unnecessary procedures and medications without informed consent.

403. These omissions and misrepresentations deprived Plaintiffs of the honest services of licensed medical professionals, who are obligated by law and ethics to act in the best interests of their patients—not to maximize billing, obscure accountability, or retaliate against complaints.

### b. Embezzlement, Theft, and Scheme to Defraud Health Care Programs (18 U.S.C. §§ 664, 1347)

404. Plaintiffs were charged thousands of dollars for services whose necessity was misrepresented or altogether lacking. Payments were electronically

transmitted across state lines, often to entities not clearly disclosed at the time of service. The flow of funds—whether to Corewell, Ovation, Bundl, or other entities—remained opaque, with no consolidated billing or audit trail. This lack of transparency made it impractical for Plaintiffs to verify who was paid, for what, and whether those charges were legitimate.

405.   The structure of Defendants' medical records system was itself designed to thwart accountability. Plaintiffs received over 850 pages of often unintelligible records with no consolidated chart summarizing care, dosages, or treatment rationale.

406.   Plaintiffs were forced to manually reconstruct the record—something no ordinary patient could reasonably be expected to do—solely to detect the fraud.

407.   As a result of this intentional obfuscation, both Plaintiffs and third-party payors (e.g., insurers) were billed and misled into paying for medically unnecessary, incomplete, or entirely fictitious services—constituting theft and healthcare fraud under 18 U.S.C. §§ 664 and 1347.

### 4.   *Obstruction of Justice and/or Witness Retaliation (18 U.S.C. §§ 1503, 1513).*

#### a.   *Obstruction of Justice (18 U.S.C. § 1503)*

408.   After Plaintiffs formally requested review of their treatment, Defendants took immediate retaliatory steps to block further scrutiny. The Clinic canceled all future appointments, unilaterally revoked access to the communication

function in the patient portal (which contained critical records and communications), and ceased direct contact—thereby blocking routes to a second opinion and/or further review.

409. These acts occurred while Plaintiffs were actively invoking federal rights, requesting institutional oversight, and preparing to engage external regulatory or legal authorities. The Clinic's sudden and total shutdown of communication and care was not medically justified and served no therapeutic purpose.

410. Instead, the conduct functioned to obstruct Plaintiffs' ability to investigate, report, or litigate potential violations—thus constituting obstruction of justice under 18 U.S.C. § 1503.

### b. *Witness Retaliation (18 U.S.C. § 1513)*

411. In parallel with this obstruction, Defendants imposed a rigid 90-day deadline to remove the Plaintiffs' only remaining embryo from storage, creating immediate pressure and existential risk to Plaintiffs' reproductive opportunity. This condition was imposed while denying all care or access—thereby placing Plaintiffs in a vulnerable position and leveraging their embryo as a form of coercion.

412. In addition, Defendants fabricated defamatory entries in the medical chart—falsely portraying Alan as a danger to others—shortly after protected complaints were made. These false records were later disclosed to third parties,

including Corewell and Plaintiffs' new provider, thereby damaging Plaintiffs' reputations and compromising future medical care.

413. These actions—taken in response to Plaintiffs' protected complaints and aimed at deterring further pursuit of legal or administrative remedies—constitute unlawful retaliation under 18 U.S.C. § 1513.

## D.        Proximate Cause

414.   Each predicate act alleged herein was a direct, foreseeable, and proximate cause of the injuries suffered by Plaintiffs.

415.   The Bundl brochures and related marketing materials coupled with the Clinic's representations fraudulently induced Plaintiffs to enter a bundled contract governed by Texas law, relying on materially false or misleading claims regarding coverage, medical flexibility, and patient protection—thus triggering substantial financial commitments via interstate transfer.

416.   Misrepresentations by Dr. Shavell and Clinic staff regarding treatment protocols, medication timing, and consent procedures deprived Plaintiffs of the ability to make informed medical decisions and directly led to failed IVF cycles, emotional trauma, and missed time-sensitive fertility opportunities.

417.   Defendants' sudden termination of care—coupled with the arbitrary 90-day embryo deadline and disabling of portal access—obstructed Plaintiffs from

seeking alternative treatment without a gap in care, further exacerbating the financial, logistical, and medical burden.

418.   Corewell's dual posture—publicly branding the Clinic as a Corewell entity while privately disclaiming responsibility—affirmatively misled Plaintiffs into believing they were entitled to oversight protections and administrative recourse through Corewell.

419.   Indeed, Corewell directly participated in the delivery of services (e.g., AMH and FSH testing), patient billing, and infrastructure support, and maintained clinical records within its branded patient portal—thereby contributing materially to the harm suffered.

420.   As a direct and proximate result of the Defendants' conduct, Plaintiffs sustained financial loss, severe emotional distress, and a materially diminished opportunity to conceive a biological child.

421.   Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the affairs of an enterprise through a pattern of racketeering activity, causing injury to Plaintiffs' property and rights.

## E.   Damages and Relief

422.   Plaintiffs seek all forms of relief available under law and equity, including the following:

a. Actual damages, including all out-of-pocket expenses incurred for improperly delivered or aborted services, medication costs, and costs of care transition;

b. Compensatory damages, reflecting the physical toll, psychological trauma, and emotional anguish caused by Defendants' conduct;

c. Pecuniary damages, including lost fertility cycles, diminished embryo viability, reproductive opportunity loss, and travel, legal, and embryo transfer costs;

d. Non-pecuniary damages, including humiliation, anxiety, pain and suffering, and the violation of Plaintiffs' fundamental dignity and autonomy;

e. Consequential damages, including follow-on costs reasonably incurred due to Defendants' malfeasance, such as delay-related medical consequences and administrative burdens;

f. Treble damages, as expressly authorized under 18 U.S.C. § 1964(c) for injuries sustained by reason of a RICO violation;

g. Restitution, including the return of funds paid for cycles that were abandoned, ineffectively administered, or failed due to clinically unjustified protocols; and

h. Nominal damages, to the extent required to recognize violations of statutory and constitutional rights not fully measurable in economic terms.

423. Plaintiffs further request equitable and injunctive relief, including but not limited to:

a. Orders preserving the status quo, including medical charts, appointment records, video and audio files, patient communications, and billing histories; and

b. Declaratory relief, affirming Plaintiffs' rights to clinical transparency and fair treatment under applicable law.

424. Monetary compensation alone cannot redress the existential harm suffered, particularly the disruption of Plaintiffs' only chance to conceive. Equitable relief is therefore essential to prevent continued, compounding harm and to safeguard Plaintiffs' remaining medical and legal rights.

## COUNT II: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(D)) [ALL DEFENDANTS]

425. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

426. This claim is brought pursuant to 18 U.S.C. § 1962(d), which makes it unlawful for any person to conspire to violate the provisions of 18 U.S.C. § 1962(c).

## A. Conspiracy

427. Defendants knowingly and willfully conspired to conduct and participate, directly or indirectly, in the affairs of a racketeering enterprise through a pattern of criminal acts, as alleged in Count I. Each Defendant agreed—explicitly or tacitly—to pursue unlawful objectives through coordinated fraud, coercion, retaliation, and concealment.

428. The conspirators committed, attempted to commit, or aided and abetted multiple predicate acts, including but not limited to: mail fraud, wire fraud, extortion, honest services fraud, obstruction of justice, and witness retaliation. Each Defendant took affirmative steps to further the unlawful goals of the Enterprise or to conceal its operation from scrutiny.

429. Defendants coordinated and reinforced one another's conduct in the following specific respects:

a. **Fraudulent inducement**. Defendants used interstate wire and mail to solicit Plaintiffs into bundled IVF programs (e.g., through "Bundl") by falsely advertising flexible, patient-centered care. Defendants concealed that treatment would be

dictated by rigid internal protocols, financial quotas, and insurance constraints—rather than medical need.

b. **Treatment manipulation**. Care plans were designed and enforced in a manner that prioritized cost-containment and cycle completion rates over patient health or efficacy. Medications were prescribed without clinical justification, hormones were left unmonitored, and premature retrievals were scheduled—all while staff refused to disclose the medical rationale for decisions, even when directly questioned.

c. **Billing fraud**. Defendants issued opaque, misleading invoices—often branded as "Corewell Health"—that disguised who was performing the services, what was being billed, and whether those services were medically necessary or actually performed. Patients were frequently unaware whether they were being billed by Corewell, the Clinic, Ovation, or a third-party lab. Additionally, Plaintiffs were billed for purported consultations with nurses who lacked access to the patients' medical records and were therefore

incapable of offering informed or clinically meaningful guidance.

d. **Data falsification**. Defendants deliberately manipulated patient records to cover up treatment deficiencies, conceal the lack of informed consent, and create pretextual bases for retaliatory discharge. This included false entries, hidden defamatory remarks, and the omission of key hormone tests.

e. **Retaliation and coercion**. When Plaintiffs raised protected concerns, Defendants canceled appointments, cut off portal access, issued a non-negotiable 90-day embryo transfer demand, and disseminated false records to third parties. The message was clear: comply or forfeit reproductive care.

f. **Oversight suppression**. Defendants actively leveraged Corewell's public brand and digital infrastructure (including the MyChart portal and "corewellhealth.org" communications) to attract patients and create a false sense of institutional oversight. But when concerns were raised, Defendants claimed no material affiliation existed— effectively creating a bait-and-switch designed to thwart administrative or legal recourse.

g. **Interstate concealment**. To obscure the scheme's structure and limit accountability, payments were routed across state lines and correspondence (including Corewell-branded bills) originated from out-of-state locations such as Chicago. These steps were designed to frustrate inquiries into who was actually responsible.

430. Upon information and belief, each Defendant—including Corewell—was aware of the general scope, structure, and unlawful objectives of the Enterprise. Corewell knowingly enabled and materially supported the scheme by providing billing systems, recordkeeping infrastructure, and patient-facing technology, while allowing its brand to be used to shield misconduct and suppress reporting.

## B. Damages and Relief

431. Plaintiffs are entitled to damages arising from the conspiracy, including but not limited to:

a. Actual damages, including amounts paid under fraudulent pretenses, medication costs, and financial losses stemming from incomplete or misrepresented services;

b. Compensatory damages, for physical distress, emotional anguish, and reproductive harm arising from Defendants' collective conduct;

c. Pecuniary damages, encompassing legal, medical, and logistical expenses incurred due to retaliatory acts and mismanagement;

d. Non-pecuniary damages, including pain and suffering, humiliation, and a profound erosion of trust in medical institutions;

e. Consequential damages, arising from delay, discontinuity in care, and the urgent relocation of Plaintiffs' sole embryo;

f. Treble damages, as authorized by 18 U.S.C. § 1964(c);

g. Restitution, including reimbursement for failed IVF rounds and misrepresented or undelivered services; and

h. Nominal damages, recognizing infringements on statutory rights and violations of public policy.

432. Plaintiffs also seek equitable relief, including but not limited to:

a. Orders restraining retaliation, ensuring that no further adverse action is taken against Plaintiffs for pursuing this litigation or seeking external review; and

b. Declaratory relief, affirming Plaintiffs' rights under RICO and federal law and clarifying the legal obligations of all

Defendants—including Corewell—regarding patient care, oversight, and accountability.

433. Monetary damages alone are insufficient to redress the scope and gravity of harm inflicted. Equitable relief is essential to protect Plaintiffs' reproductive rights, preserve the integrity of medical decision-making, and prevent ongoing or future abuse by the Enterprise and its co-conspirators.

## COUNT III: MICHIGAN RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [ALL DEFENDANTS]

434. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

435. Defendants violated MCL 750.159i(1) by being employed by or associated with an enterprise and knowingly conducting or participating in the affairs of that enterprise through a pattern of racketeering activity, as defined in MCL 750.159g.

## A. MRICO

436. The enterprise includes the persons and entities described in Count I, namely, the Clinic, individual actors such as Dr. Shavell and Stiles, third-party vendors such as Bundl and Ovation, Does, and Corewell, which operated the patient portal, issued branded invoices, and publicly represented an affiliation with the Clinic. The enterprise is distinct from any single Defendant and was organized around a shared illicit purpose.

437. The enterprise operated with structure and continuity, engaging in coordinated efforts to extract financial payments from fertility patients, including Plaintiffs, through fraud, concealment, retaliation, and coercive control of stored embryos and access to care.

438. Predicate acts supporting this claim include, but are not limited to:

> a. Fraudulent billing under MCL 750.218(4)(a), including invoices issued under Corewell's name from a Chicago-based billing address;
>
> b. False pretenses under MCL 750.218, including inducing Plaintiffs into financial agreements and care protocols through deceptive omissions and fabricated consent histories;
>
> c. Use of mail and wire to defraud, including false email statements from clinic staff and Corewell MyChart billing;
>
> d. Retaliatory threats, including the June 12, 2025, letter conditioning access to the Plaintiffs' sole embryo on compliance with an arbitrary 90-day deadline; and
>
> e. Misappropriation or unauthorized diversion of funds, including charging for incomplete or medically unjustified services and denying reimbursement despite lack of clinical follow-through.

439. Corewell's involvement was not limited to passive infrastructure support. It participated in or knowingly facilitated the enterprise's fraudulent scheme by:

    a. Issuing billing communications and MyChart access under its brand and license;

    b. Accepting payments from Plaintiffs without ensuring clinical oversight;

    c. Providing no correction of its public misrepresentations regarding its affiliation once identified and challenged by Plaintiffs; and

    d. Continuing to deny involvement after direct communications highlighted its role in billing, branding, and medical access.

440. Plaintiffs were directly and proximately harmed by Defendants' racketeering activity, including but not limited to:

    a. Financial losses from misrepresented or unrendered care;

    b. Emotional and psychological distress from coercive treatment structures and sudden care termination; and

    c. Loss of reproductive opportunity due to interference with medically time-sensitive treatment.

**B.      Damages and Relief**

441.   Plaintiffs are entitled to all available forms of monetary and equitable relief under Michigan's racketeering statute, including:

      a.   Actual and compensatory damages, including unreimbursed medication and cycle costs, portal and record access losses, and lost opportunities for timely fertility care;

      b.   Treble damages, as authorized by MCL 750.159j;

      c.   Restitution, for amounts paid under false pretenses or without delivery of contracted services;

      d.   Attorneys' fees and costs, as provided under MCL 750.159j(2); and

      e.   Nominal damages, to the extent necessary to establish liability for statutory violations.

442.   Plaintiffs further seek equitable and injunctive relief as necessary to:

      a.   Prevent continued retaliation or disposal of their remaining embryo;

      b.   Preserve critical evidence, including MyChart data, financial records, and consent documentation;

      c.   Enjoin Corewell and other Defendants from continuing to misrepresent the nature or scope of their affiliation; and

d. Protect the integrity of future care and patient autonomy by clarifying legal obligations across affiliated entities.

## COUNT IV: AMERICANS WITH DISABILITY ACT – TITLE III (42 U.S.C. §§ 12181 ET SEQ.) [CLINIC, DR. SHAVELL, STILES]

443. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

444. This claim is brought pursuant to Title III of the ADA, 42 U.S.C. §§ 12181–12189, and its implementing regulations against the Clinic, Dr. Shavell, and Stiles.[2]

### A. Disability Rights

445. The Clinic is a place of public accommodation under 42 U.S.C. § 12181(7)(F), as it is a professional office of a healthcare provider open to the public. On information and belief, Corewell also qualifies as a public accommodation insofar as it provided billing, portal, and administrative infrastructure for patients

---

[2] Upon information and belief, Corewell maintains significant administrative and infrastructural control over patient portals, billing systems, and clinical facilities used in the provision of fertility services under the Clinic's brand. To the extent discovery reveals that Corewell (1) qualifies as a public accommodation under 42 U.S.C. § 12181, and (2) directly participated in, authorized, or facilitated discriminatory conduct—including the denial of accommodations, the imposition of communication barriers, or the abrupt termination of access—Plaintiffs expressly reserve the right to amend this Complaint to include Corewell under Title III of the ADA.

receiving reproductive care, and represented itself as responsible for fertility-related services.

446. Vicktoria is a person with a disability under 42 U.S.C. § 12102(1) due to her diagnosis of DOR, prior pregnancy loss, and other reproductive conditions that substantially limit one or more major life activities, including reproductive and endocrine function. She is also "regarded as" disabled under § 12102(3)(A).

447. Alan is "regarded as" disabled under § 12102(3)(A) based on the erroneous diagnosis of azoospermia.

448. Alan is also protected under 42 U.S.C. § 12182(b)(1)(E), which prohibits discrimination against an individual or entity because of their known association with a person with a disability.

449. Throughout the IVF process, Alan was an active participant in care, physically administered nearly all injections, and jointly submitted accommodation and oversight requests on behalf of himself and his wife. The retaliatory actions taken against both Plaintiffs—including ejection from the Clinic, revocation of communication capabilities in the portal, and the imposition of a coercive embryo transfer deadline—were at least in part motivated by Alan's known association with Vicktoria and his support of her disability-related rights.

450.　Defendants violated 42 U.S.C. § 12182(b)(2)(A)(ii) by failing to make reasonable modifications to policies, practices, or procedures necessary to provide equal access. Specifically:

     a. Defendants failed and/or refused to modify IVF treatment protocols based on Plaintiffs' hormone levels and known medical history;

     b. Defendants applied rigid, pre-filled treatment plans without medical justification;

     c. Defendants denied a request for medical review and accommodation submitted on June 13, 2025; and

     d. No reasonable basis was offered for refusal, and the requested modifications would not have fundamentally altered the nature of the services.

451.　Defendants violated 42 U.S.C. § 12182(b)(2)(A)(iii) by failing to remove communication barriers that impeded equal access. This includes:

     a. Disabling Plaintiffs' access to the patient portal—hosted by Corewell—without notice or alternative means of communication;

     b. Refusing to provide a designated ADA coordinator or written process for lodging complaints; and

c. Failing to provide timely access to medical records or billing data necessary to coordinate time-sensitive care.

452. Defendants violated 42 U.S.C. § 12182(b)(2)(A)(i) by maintaining discriminatory eligibility criteria and applying clinical policies in a way that excluded Plaintiffs based on disability. For example:

a. The rigid embryo transfer deadline imposed post-termination served no clinical function and had disparate impact on persons with time-sensitive reproductive conditions; and

b. Plaintiffs were excluded from participation in ongoing care based on requesting accommodation and oversight.

453. Defendants engaged in disparate treatment and intentional discrimination, in violation of 42 U.S.C. § 12182(a). This includes:

a. Refusing to continue services after Plaintiffs requested hormone-specific review and documentation;

b. Misrepresenting medical facts to justify treatment deviations, while refusing to permit alternative input; and

c. Imposing a standard of care that was facially inconsistent with Plaintiffs' medical needs and histories.

454. Upon information and belief, Dr. Shavell and the Clinic intentionally discourage or obstruct patients diagnosed with DOR from undergoing multiple IVF

cycles (without a donor egg) in order to protect the Clinic's publicly reported success statistics, such as those submitted to SART or CDC reporting systems.

455. Because DOR patients often require more than one cycle to achieve success, this policy or practice has a disparate impact on individuals with disabilities as defined under the ADA. The Clinic's treatment of Vicktoria—including repeated cycle abandonment, refusal to adapt protocols to her documented condition, and abrupt termination of care—reflects this discriminatory pattern. Such conduct constitutes a failure to provide equal access, as well as de facto eligibility screening based on disability status, in violation of 42 U.S.C. §§ 12182(a) and 12182(b)(2)(A)(i).

456. Defendants engaged in retaliation and coercion, in violation of 42 U.S.C. § 12203(a)–(b), by:

    a. Terminating the provider relationship within days of Plaintiffs submitting protected requests and complaints;

    b. Revoking access to the medical portal and staff communications;

    c. Imposing a coercive 90-day transfer deadline on Plaintiffs' sole embryo after asserting legal rights;

    d. Creating and distributing defamatory and fraudulent statements; and

e. Using these actions to deter protected activity, including legal complaints and accommodation requests.

457. Collectively, these actions resulted in a constructive and actual denial of services. Defendants implemented a pattern of delays, denials, and burdensome procedures that made it impossible for Plaintiffs to continue care and substantially interfered with their ability to access time-sensitive medical interventions.

**B.      Relief**

458. Plaintiffs seek equitable and declaratory relief pursuant to 42 U.S.C. §§ 12188(a)(1) and 12205, including but not limited to:

a. Preliminary and permanent injunctive relief prohibiting Defendants from denying, limiting, or conditioning access to fertility services, reproductive counseling, or embryo preservation based on disability status, perceived disability, or protected requests for reasonable accommodations;

b. An order requiring Defendants to preserve, maintain, and produce upon request all medical records, internal communications, treatment protocols, and embryo storage documentation relating to Plaintiffs, and to refrain from transferring, altering, or destroying any records or genetic material without Plaintiffs' express written consent;

c. An order requiring Defendants to implement system-wide ADA compliance measures, including:

    i. The designation of an ADA compliance officer;

    ii. Development and publication of written procedures for patients to request reasonable accommodations;

d. Mandatory annual training for all clinical, administrative, and billing personnel on Title III obligations and disability-related access in fertility care;

e. A mechanism for confidential patient complaints, with a requirement that complaints be reviewed and responded to in writing within ten business days; and

f. Public posting on the Clinic's website, in physical offices, and on any patient portals-of patients' rights under the ADA and contact information for the compliance officer;

g. An order requiring Defendants to undergo, at their own expense, an independent ADA compliance audit conducted by a qualified third party, with the results made available to Plaintiffs and subject to court review;

h. Declaratory relief affirming that Defendants' actions, including denial of services, failure to provide reasonable

modifications, imposition of coercive policies, and retaliation for protected conduct-violated Title III of the ADA and denied Plaintiffs full and equal enjoyment of the Clinic's services;

i.  An award of attorneys' fees and litigation costs, as authorized by 42 U.S.C. § 12205 and other applicable law; and

j.  Any further equitable or remedial relief deemed appropriate by the Court to ensure continued compliance and prevent recurrence of discriminatory or retaliatory practices.

459.  Plaintiffs do not seek compensatory or monetary damages under this Count, as such relief is unavailable under Title III of the ADA. However, injunctive and declaratory relief are essential to redress past harm, prevent future violations, and safeguard Plaintiffs' remaining reproductive rights and access to nondiscriminatory care.

## COUNT V: REHABILITATION ACT (29 U.S.C. § 794 ET SEQ.) [CLINIC, DR. SHAVELL, STILES, COREWELL]

460.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

461.  This claim arises under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

462.    Corewell is additionally subject to Section 504 liability as a recipient of federal financial assistance and as a corporate entity engaged in a joint enterprise with the Clinic.

463.    Corewell facilitated patient access through its infrastructure, systems, and provider branding, and it held out the Clinic as an affiliated entity. Plaintiffs were funneled through Corewell's systems and reasonably understood the Clinic to operate within its healthcare network.

464.    Upon information and belief, Corewell received federal reimbursement in connection with fertility-related services and delegated significant functions to the Clinic while retaining oversight over branding, marketing, and digital infrastructure. Accordingly, Corewell bears direct and/or vicarious liability for the Clinic's violations of the Rehabilitation Act.

465.    Upon information and belief, both the Clinic and Corewell receive federal financial assistance—either directly, through Medicare, Medicaid, or other federal reimbursement programs or indirectly, through affiliation with federally funded entities and shared electronic health systems. Accordingly, both entities are subject to the non-discrimination mandates of Section 504.

**A.      Disability-Based Discrimination**

466.   Vicktoria is an individual with a disability as defined in 29 U.S.C. § 705(20)(B), due to her diagnosis of DOR, which substantially limits the major life activity of reproductive function. Her diagnosis is confirmed by medical records, hormone panels, and treatment history, including the need for urgent and closely monitored fertility interventions.

467.   Vicktoria was otherwise qualified to receive and benefit from fertility treatment services, and she met all eligibility requirements for IVF care under both the Clinic's stated protocols and Corewell's standards of patient acceptance.

468.   Alan is entitled to protection under Section 504 both as an individual "regarded as" having a disability-based on the Clinic's erroneous diagnosis of azoospermia and under the association clause, due to his close relationship with Vicktoria, who is indisputably disabled under federal law. *See* 28 C.F.R. 35.130(g).

469.   Defendants discriminated against Vicktoria solely by reason of her disability or perceived disability, through conduct including but not limited to:

    a. Failing to make reasonable modifications in treatment protocols and medication strategies, despite repeated documentation of her reproductive impairment and requests for individualized care;

b. Terminating fertility services after protected requests for accommodation, transparency, and clinical oversight;

c. Refusing to acknowledge, process, or respond to a formal ADA/Section 504 accommodation request submitted by Plaintiffs;

d. Denying access to coordination and follow-up care by disabling the patient portal and refusing to provide alternative communication mechanisms;

e. Enforcing medically unnecessary, time-compressed deadlines for embryo transfer, while withholding information essential to informed medical decision-making;

f. Failing to implement or publicize any grievance procedures, accommodation policies, or designated ADA/Section 504 coordinator-despite being a medical provider serving patients with known disabilities; and

g. Failing to train clinical or administrative staff on recognizing disability-based requests or initiating appropriate accommodation protocols.

470. On information and belief, Defendants—including Corewell by virtue of its affiliation, control over patient-facing platforms, and branding—participated

in or ratified the denial of access, refusal to accommodate, and retaliatory expulsion that followed Plaintiffs' protected requests for oversight and care modification.

471.    The discrimination alleged was not justified by any legitimate medical rationale, clinical conduct, or behavioral issue. Instead, it was triggered by Plaintiffs' invocation of their rights and insistence on responsive, individualized care—rendering disability the sole and proximate cause of the harm they endured.

472.    Upon information and belief, Defendants, including Dr. Shavell, intentionally and systematically limit the number of IVF cycles offered to patients with DOR or other reproductive impairments, in order to artificially boost clinic success rates—a policy or practice that has a disparate impact on patients with reproductive disabilities, and that reflects systemic disability—based exclusion in violation of Section 504.

**B.    Sex-Based Discrimination**

473.    Defendants also discriminated against Plaintiffs based on sex, in violation of Section 504's incorporated protections against sex-based exclusion in federally funded programs.

474.    With respect to Vicktoria, Defendants imposed discriminatory practices based on her sex and sex-specific condition, including:

a. Disparate treatment in fertility protocol planning, with heightened scrutiny and arbitrary cycle cutoffs imposed on female patients with poor prognosis;

b. Denial of accommodations for known sex-related disabilities, such as DOR and PCOS, despite clearly communicated medical need; and

c. Targeting female patients for coercive consent practices and threats of cycle exclusion following protected advocacy.

475. With respect to Alan, Defendants discriminated based on sex by:

a. Failing to personally notify him of his own diagnosis (i.e., azoospermia) and excluding him from clinical decisions;

b. Systematically treating him as peripheral to fertility care, in contrast to female patients who were the default focus of communication;

c. Denying him the opportunity to provide or withhold informed consent for procedures affecting his reproductive role; and

d. Failing to engage in equitable treatment planning or communication that acknowledged his equal role in the fertility process.

476. Defendants' actions reflect outdated sex-based stereotypes and systemic inequities in care delivery, which had a direct and damaging effect on both Plaintiffs' ability to access equal care, participate in decision-making, and preserve reproductive options.

## C.  Damages and Relief

477. Plaintiffs are entitled to legal and equitable relief under Section 504 of the Rehabilitation Act, including but not limited to:

a. Actual and compensatory damages, for emotional distress, pain and suffering, psychological injury, and loss of reproductive opportunity caused by discriminatory conduct and unjustified treatment abandonment;

b. Pecuniary damages, for out-of-pocket losses reasonably incurred, including costs of fertility medication, cycle-related travel, embryo transfer delays, and replacement care coordination necessitated by the termination of services;

c. Consequential damages, stemming from increased medical complexity, time-sensitive hormonal deterioration, and disruption of fertility planning directly attributable to Defendants' failure to accommodate and provide continuity of care;

d. Attorneys' fees and costs, as authorized under 29 U.S.C. § 794a(b), for enforcing rights protected by Section 504, including expenses related to this action.

478. Plaintiffs also seek equitable relief, including:

a. Preliminary and permanent injunctive relief, enjoining Defendants from destroying, transferring, or otherwise disposing of Plaintiffs' stored embryo or medical records without explicit, written consent;

b. An order requiring Defendants to implement, publicize, and enforce written disability accommodation and grievance policies, consistent with Section 504 and its implementing regulations, including designation of a Section 504 coordinator;

c. Mandatory retraining of staff, including treating physicians, clinical administrators, and front-line personnel, on legal obligations under federal disability law and the duty to recognize and respond to protected accommodation requests; and

d. Declaratory relief, affirming that Defendants, including Corewell, by virtue of its affiliations and operational

participation, violated Section 504 by discriminating against Plaintiffs on the basis of actual and perceived disability and protected association.

479. Defendants' conduct reflected deliberate indifference to Plaintiffs' clearly articulated medical needs and statutory rights. Despite multiple opportunities to accommodate, clarify, or engage, Defendants chose instead to disable access, escalate coercive deadlines, and withhold basic support. As a result, Plaintiffs suffered foreseeable and avoidable harm—including emotional trauma, financial loss, and material degradation of their reproductive prospects—warranting compensatory and equitable redress.

## COUNT VI: MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (MCL 37.1101 ET SEQ.) [CLINIC, DR. SHAVELL, STILES, COREWELL]

480. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

481. The PDCRA, MCL 37.1101 et seq., prohibits places of public accommodation from denying services, access, or equal enjoyment on the basis of actual or perceived disability or association with a person with a disability.

## A.    Disability-Based Discrimination

482.    The Clinic is a place of public accommodation within the meaning of MCL § 37.1301(a), as it is a healthcare provider offering services to the general public.

483.    Vicktoria qualifies as an individual with a disability under MCL 37.1103(d)(i) and (ii), based on her diagnosis of DOR, which substantially limits her reproductive function—recognized as a major life activity under both federal and state law. *See also* 42 U.S.C. § 12102(2)(A); 29 U.S.C. § 705(20)(B).

484.    Alternatively, Defendants regarded Vicktoria as having such a disability, within the meaning of MCL 37.1103(d)(iii), based on her reproductive diagnoses and the course of treatment recommended by the Clinic.

485.    Alan is independently protected under MCL 37.1202(1)(b), as a person associated with an individual with a disability. He was also regarded as having a disability based on the Clinic's incorrect diagnosis of azoospermia. These protections parallel those afforded under 42 U.S.C. § 12182(b)(1)(E) and 29 U.S.C. § 794.

486.    Defendants discriminated against Plaintiffs on the basis of actual or perceived disability, and protected association, including by:

> a.  Denying continued fertility services and access to the patient portal despite ongoing medical need and urgency;

b. Terminating care shortly after Plaintiffs submitted protected accommodation requests and complaints;

c. Failing to make reasonable modifications to policies, procedures, and treatment timelines necessary to accommodate Vicktoria's reproductive limitations, in violation of MCL § 37.1302(b) (parallel to 42 U.S.C. § 12182(b)(2)(A)(ii)); and

d. Imposing arbitrary and coercive restrictions, including a rigid 90-day embryo transfer deadline, without any individualized justification or process for exceptions.

487. Failing to maintain or disclose any disability access policy, grievance mechanism, or designated PDCRA coordinator for patients seeking accommodation or redress.

488. Upon information and belief, Defendants intentionally and systematically discouraged patients with DOR from pursuing multiple retrieval cycles, in order to protect or manipulate success statistics, despite such conduct having a disparate and foreseeable impact on individuals with reproductive disabilities.

489. Defendants' conduct lacks any legitimate, non-discriminatory justification. The adverse actions followed immediately after Plaintiffs asserted

protected rights and cannot be explained by treatment outcomes, patient conduct, or clinic capacity. Plaintiffs were qualified and willing to proceed but were excluded solely because of disability-related concerns and protected advocacy.

### B.    Sex-Based Discrimination

490.    Defendants also discriminated against Plaintiffs based on sex, in violation of MCL § 37.2302(a), which prohibits denial of services in a public accommodation based on sex.

491.    Vicktoria experienced sex-based discrimination in the form of disparate treatment in cycle eligibility, increased barriers to embryo access, and the imposition of restrictions not applied equally to male patients.

492.    Alan likewise experienced sex-based discrimination, including being excluded from communication about his own medical status, denied access to medical documentation and forms, and treated as a non-participant despite his active involvement in care. These acts reflect gendered assumptions that male patients are ancillary or non-decision-makers in fertility care. Indeed, the termination letter neglected to mention his frozen semen (as if it were irrelevant).

493.    Defendants' practices resulted in denial of full access to services and imposed unequal burdens based on sex. Plaintiffs were subjected to intentional, disparate treatment solely due to their sex or sex-linked status in the fertility treatment process.

## C. Damages and Relief

494. Plaintiffs are entitled to full relief under MCL 37.2801, including:

    a. Compensatory damages for emotional distress, psychological injury, and the loss of reproductive opportunity;

    b. Economic damages for treatment costs, medication and embryo storage expenses, and damages tied to lost benefit from fertility packages and cycles;

    c. Exemplary damages, due to the intentional, retaliatory, and knowing nature of the discriminatory conduct; and

    d. Attorneys' fees and costs, as authorized by MCL 37.2802.

495. Plaintiffs also seek equitable relief, including:

    a. An order preserving the stored embryo and prohibiting any destruction, thawing, or transfer without both Plaintiffs' express written consent; and

    b. A mandate that Defendants revise internal policies and training procedures to ensure sex-based equity in treatment planning, patient communication, and access protocols.

496. Defendants' conduct was undertaken with knowledge of Plaintiffs' protected status and with intent or reckless disregard for their rights under Michigan

law. Corewell's shared infrastructure, branding, and oversight responsibilities support its joint liability for the discriminatory acts alleged herein.

## COUNT VII: AFFORDABLE CARE ACT (42 U.S.C. § 18116) [CLINIC, DR. SHAVELL, COREWELL]

497.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

498.   Section 1557 of the Affordable Care Act (ACA), codified at 42 U.S.C. § 18116, prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in any healthcare program or activity receiving federal financial assistance.

499.    The implementing regulations for Section 1557, including 45 C.F.R. Part 92, incorporate the standards and enforcement mechanisms of:

    a.  Section 504 of the Rehabilitation Act (disability),

    b.  Title VI of the Civil Rights Act (race, color, national origin),

    c.  Age Discrimination Act of 1975 (age), and

    d.  Title IX of the Education Amendments of 1972 (sex).

500.   Defendants operate a healthcare program or activity within the meaning of the ACA and, upon information and belief, receive federal financial assistance. The Clinic is a covered entity and subject to Section 1557 and its implementing regulations.

501. Upon information and belief, Corewell is a covered entity under Section 1557 of the Affordable Care Act, as it operates healthcare programs or activities that receive federal financial assistance, including through Medicaid reimbursements, federally subsidized insurance, and ERISA-governed plans.

502. Corewell holds itself out as materially affiliated with and responsible for the operations of the Clinic, including through shared branding, use of the Corewell patient portal, public listings, and video content featuring Dr. Shavell under the Corewell name.

503. Upon information and belief, Corewell has the authority to exercise oversight over affiliated practices, including those providing reproductive and fertility services, and is therefore jointly responsible for compliance with Section 1557 and its anti-discrimination mandates.

504. Corewell is independently liable under Section 1557 as a healthcare entity receiving federal financial assistance and as a joint participant in the fertility services offered by the Clinic.

505. Corewell's patient portal was used for scheduling, communication, and care coordination. Its branding was prominently featured in digital and video materials representing the clinic.

506. These public representations created a reasonable belief that Corewell operated or oversaw the fertility program.

507. Plaintiffs relied on those representations when pursuing treatment. As such, Corewell qualifies as a covered entity under 42 U.S.C. § 18116 and 45 C.F.R. § 92.4 and may be held jointly responsible for discriminatory conduct carried out through the clinic under its auspices.

## A. Disability-Based Discrimination

508. Vicktoria qualifies as a person with a disability under Section 504 and Section 1557 based on her diagnosis of DOR, which substantially limits her reproductive function, a major life activity. *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102. She was also treated by Defendants as having a disability, satisfying the "regarded as" prong.

509. Alan qualifies for protection under Section 1557 both as an individual regarded as having a disability—due to the erroneous diagnosis of azoospermia— and as a person associated with an individual with a disability.

510. Defendants discriminated against Plaintiffs on the basis of actual or perceived disability in violation of Section 1557 by:

> a. Failing to make reasonable modifications to care plans, timelines, or monitoring protocols despite known medical limitations;
>
> b. Retaliating against Plaintiffs after they submitted formal accommodation requests and disability-based concerns;

c. Terminating care mid-cycle and imposing a rigid embryo removal deadline without individualized justification;

d. Failing to designate or provide access to an ADA or Section 504 coordinator or process for requesting accommodations; and

e. Denying full and equal access to medical care, fertility coordination, and essential communications, including via portal access.

511. These acts constitute a violation of Section 1557 under the standard of intentional discrimination and/or deliberate indifference as adopted from Section 504 of the Rehabilitation Act. Defendants' conduct resulted in the exclusion of Plaintiffs from participation in a covered healthcare program based on disability.

**B.    Sex-Based Discrimination**

512. Defendants also discriminated against both Plaintiffs on the basis of sex, as prohibited by Title IX and incorporated into Section 1557.

513. With respect to Vicktoria, Defendants engaged in sex-based discrimination through:

a. Denial of equal treatment in fertility care on account of sex-specific conditions, including DOR and reproductive hormone imbalance;

b. Imposing non-medically justified treatment cutoffs and deadlines targeted at women with poor prognosis to artificially improve clinic success statistics;

c. Applying heightened scrutiny, arbitrary delays, or cycle cancellations not similarly imposed on male participants;

d. Conditioning embryo access and continuation of care on rigid timelines not based on medical necessity, disproportionately impacting female patients; and

e. Retaliating following protected advocacy based on her sex and disability status, including portal restrictions and termination of care.

514. With respect to Alan, Defendants discriminated on the basis of sex by:

a. Treating male patients as disposable or peripheral to care, including failing to personally inform Alan of his own diagnosis of azoospermia;

b. Relegating him to a secondary role in the patient relationship, including systematically excluding him from clinical conversations unless physically present;

c. Failing to obtain informed consent from Alan for decisions and procedures affecting his body, reproductive material, and legal rights;

d. Refusing to communicate with or involve him in treatment discussions despite being a co-patient, resulting in unequal participation in care coordination; and

e. Denying access to accommodations or modifications that would have allowed equal participation in medical decision-making and oversight.

515. Defendants' actions reflect a broader pattern of discriminatory treatment based on sex stereotypes—i.e., treating fertility care as primarily the woman's responsibility and treating male patients as ancillary or unnecessary. These practices violate Section 1557's prohibition on sex-based discrimination and mirror historical gender-based exclusions barred by Title IX.

516. Defendants acted with at least deliberate indifference to both Plaintiffs' rights under federal law. Their policies and practices had a discriminatory effect and reflect intentional bias against both women and men in the context of sex-based fertility care.

## C.      Damages and Relief

517.   Plaintiffs seek relief under 42 U.S.C. § 18116 and 45 C.F.R. § 92.301, including:

a. Compensatory damages, for emotional distress, mental anguish, and out-of-pocket losses caused by discriminatory treatment and medical abandonment;

b. Consequential damages, including for reproductive harm, cycle cancellations, and costs incurred for replacement treatment, medication, and transportation; and

c. Attorneys' fees and costs, including under 42 U.S.C. § 1988 and other incorporated enforcement statutes.

518.   Plaintiffs also seek the following equitable and injunctive relief:

a. A preliminary and permanent injunction preserving Plaintiffs' embryo, medical records, and access to future fertility treatment;

b. A court order requiring Defendants to adopt, publish, and train staff on nondiscriminatory fertility care policies consistent with Section 1557;

c. Mandatory staff training regarding Section 504 and Title IX standards, as incorporated into the ACA; and

d. Declaratory relief affirming that Defendants' conduct violated Section 1557 through unlawful discrimination on the basis of sex and disability.

519. Defendants' actions were taken with full knowledge of Plaintiffs' protected statuses and in deliberate disregard of their federally protected rights. Relief under Section 1557 is therefore warranted to remedy past harm and prevent future violations.

## COUNT VIII: MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 et seq.) [CLINIC, DR. SHAVELL, COREWELL]

520. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

521. ELCRA, MCL 37.2302(a), prohibits a place of public accommodation from denying an individual the full and equal enjoyment of its services, goods, facilities, privileges, advantages, or accommodations because of sex, marital status, or other protected characteristics.

522. The Clinic and Corewell are places of public accommodation under MCL 37.2301(a), as both offer healthcare services to the public and advertise joint services under shared branding, platforms, and infrastructure. Corewell exercises branding oversight over the Clinic, including online listings, patient portal systems, and video content that represent the Clinic and Dr. Shavell as a closely affiliated entity and person.

**A.     Sex-Based Discrimination**

523.    Vicktoria is a woman who sought access to fertility services on equal terms. Throughout her care, she was subject to unequal, medically unjustified treatment on the basis of her sex and reproductive capacity, including:

> a.  The application of rigid, non-individualized, and sex-specific protocols that disregarded her actual hormonal profile;
>
> b.  A shift from planned fresh embryo transfer to FET based on internal, undisclosed assumptions about female physiology, without her informed consent;
>
> c.  Protocol reversals and drug dosages inconsistent with clinical indications, which directly affected her reproductive outcomes; and
>
> d.  Dismissive responses to her concerns and requests for explanations regarding treatment variations across cycles.

524.    Plaintiff was also retaliated against for challenging these decisions, including being excluded from treatment, denied access to the patient portal, and threatened with a 90-day embryo removal deadline, all shortly after requesting transparency and an administrative review.

525.    These actions were not applied equally to male patients or other similarly situated individuals. To the contrary, the Clinic's internal documentation

and verbal representations reflect differential treatment of patients based on sex-specific expectations about reproductive function and protocol compliance.

526. Defendants' actions also affected Alan, a male patient and Vicktoria's spouse. As a co-patient, he suffered exclusion from participation in treatment decisions, was falsely diagnosed with azoospermia, and was ultimately barred from communicating through the clinic's systems—all in connection with the adverse treatment of his female partner. These facts support a claim of associative discrimination based on Vicktoria's sex and protected activity.

527. Defendants' conduct constitutes discrimination "because of sex" under ELCRA, as interpreted by Michigan courts to include unequal treatment tied to reproductive function, sex-specific medical assumptions, and retaliatory exclusion following protected requests.

## B.      Damages and Relief

528. Plaintiffs are entitled to full relief under MCL 37.2801, including:

> a. Compensatory damages, including emotional distress, psychological injury, and the loss of reproductive opportunity;
>
> b. Economic damages, including treatment expenses, costs of embryo transfer and storage, and loss of benefit under Bundl program arrangements;

c. Exemplary damages, due to the retaliatory, willful, and knowing nature of the discrimination; and

d. Attorneys' fees and costs, including as authorized by MCL 37.2802.

529. Equitable relief, including:

a. An order preserving the embryo, prohibiting its destruction or transfer without Plaintiffs' written consent; and

b. Training for staff and revision of clinic protocols to ensure sex-based equity in reproductive treatment and communication.

530. Defendants' actions were undertaken with knowledge of Plaintiffs' protected status, and with intent or reckless disregard for their civil rights under Michigan law.

## COUNT IX: MICHIGAN CONSUMER PROTECTION ACT (MCL 445.901 ET SEQ.) [CLINIC, DR. SHAVELL, STILES, COREWELL]

531. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

532. The MCPA, MCL 445.901 et seq., prohibits the use of unfair, unconscionable, or deceptive business practices in trade or commerce, including

misrepresentations, material omissions, and false advertising in connection with consumer transactions.[3]

533. Defendants—including the Clinic, Dr. Shavell, and Corewell—engaged in deceptive practices by misrepresenting the nature of their affiliation and the oversight structure governing Plaintiffs' care. Corewell publicly associated itself with the Clinic through co-branded materials, shared digital platforms, patient portals, and promotional videos. These representations led reasonable consumers to believe that Corewell exercised operational control or quality assurance over the Clinic and its fertility offerings.

534. Corewell now disclaims any oversight, control, or responsibility for the Clinic, its staff, or its services. This disavowal exposes the alleged affiliation as a misleading marketing device—engineered to draw in patients who would otherwise be hesitant to trust an independent clinic with no hospital-based protections, grievance systems, or institutional oversight.

535. Defendants' representations were not isolated or incidental. They were the result of a deliberate, system-wide strategy to mislead consumers—particularly fertility patients—into believing that "The Fertility Center" was a division and/or close affiliate of Corewell.

---

[3] Plaintiffs reserve the right to amend or pursue a separate false advertising claim (e.g., under the Lanham Act) should future rulings or discovery clarify that such a claim would avoid duplicative relief or zone-of-interest limitations.

536. This impression was cultivated through Corewell-branded digital infrastructure (including the MyChart portal), appointment confirmations, diagnostic testing, billing statements, and public-facing video materials hosted directly on Corewell's official YouTube channel. These representations were reinforced by directory listings, metadata, and social media content explicitly linking Dr. Shavell and the Clinic to Corewell.

537. The Corewell name and logo appeared across all major touchpoints in the patient experience, creating a reasonable belief that Corewell exercised operational control, institutional oversight, or legal responsibility over the Clinic and its staff.

538. Patients received Corewell-branded appointment reminders, lab invoices, and payment confirmations—even for fertility services—and had no way of discerning that care was being rendered by a materially unaffiliated and legally distinct entity.

539. The cumulative effect of these representations gave rise to a consumer-facing illusion of integration, quality assurance, and hospital-backed accountability. That illusion was shattered only after the relationship soured, at which point Corewell denied meaningful affiliation, rejected responsibility for services marketed and rendered under its name, and refused to provide administrative redress.

540. These practices constitute deceptive commercial conduct within the meaning of MCL 445.903(1), and fall squarely within the scope of the MCPA.

## A.        Deceptive and Unconscionable Practices

541. Defendants engaged in deceptive acts and omissions in violation of MCL 445.903(1), including but not limited to:

a. Section 445.903(1)(a): Causing a likelihood of confusion as to the source, approval, and affiliation of the Clinic's services by deploying Corewell branding in connection with non-Corewell care, creating the false impression of hospital oversight;

b. Section 445.903(1)(c): Representing that services had benefits, sponsorship, and quality standards that they did not have, including through co-branded materials and Corewell's digital infrastructure;

c. Section 445.903(1)(m) and (n): Creating confusion about who had authority to make binding clinical decisions, and about patients' legal rights to appeal or review improper treatment decisions;

d. Section 445.903(1)(s): Failing to disclose material facts necessary to prevent deception, including that Corewell had

no control over care quality, did not review complaints, and would disclaim all responsibility if issues arose; and

e. Section 445.903(1)(bb): Making affirmative factual representations that led Plaintiffs to reasonably believe their care was subject to Corewell standards and that any deviation from protocol would be subject to institutional remedy.

542. While not the gravamen of this claim, additional deceptive conduct occurred in connection with the Bundl program, a prepaid fertility package marketed by the Clinic and endorsed by administrative staff including Stiles. Violations include:

a. Presenting Bundl as a financial safeguard, while concealing that Bundl patients were triaged separately, faced care restrictions, and could be denied medications;

b. Falsely advertising Bundl packages as inclusive of multiple retrievals, without enforceable guarantees;

c. Failing to disclose that Bundl status could result in earlier retrievals, rigid protocols, and loss of continuity; and

d. Promoting Bundl alongside Corewell branding, creating the false impression that these packages were approved, regulated, or quality-controlled by Corewell.

**B.**      **Damages and Relief**

543.    Plaintiffs are entitled to relief under MCL 445.911, including:

      a.   Actual damages for financial losses, denied treatment access, and costs incurred to secure new care and obtain complete records;

      b.  Statutory damages under § 911(2), as Defendants' misconduct was willful and targeted vulnerable consumers making time-sensitive reproductive decisions; and

      c.  Attorneys' fees and litigation costs, as permitted under MCL 445.911(2).

544.    Plaintiffs seek injunctive and declaratory relief, including:

      a.  An order requiring Defendants to cease deceptive co-branding, particularly through Corewell domains, portals, or digital media;

      b.  A public retraction or disclaimer correcting the impression that Corewell oversees or certifies the Clinic's services;

      c.  Mandatory consumer disclosures regarding any fertility package, including risks, exclusions, refund terms, and potential treatment limits; and

    d. Implementation of policies prohibiting undisclosed branding affiliations and requiring transparency about operational control and liability.

545. Defendants' deceptive practices were particularly egregious because:

    a. They involved high-cost, emotionally sensitive services with life-altering consequences;

    b. Plaintiffs had no reasonable opportunity to verify the truth before committing substantial sums of money; and

    c. Defendants acted with deliberate indifference to the harm likely to result from misleading representations about safety, continuity, and oversight.

## COUNT X: FRAUD, SILENT FRAUD, AND/OR NEGLIGENT MISREPRESENTATION [ALL DEFENDANTS]

546. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

## A.    Fraud (Intentional Misrepresentation) [The Clinic, Dr. Shavell, Stiles, Corewell]

547. The Clinic, Dr. Shavell, Stiles, and Corewell made materially false representations to Plaintiffs, including but not limited to:

a. Statements suggesting that Plaintiffs' participation in the Bundl program would not influence clinical care decisions or treatment limitations;

b. Assertions that medical protocols were "individualized," despite the use of uniform templates and protocol reversals that conflicted with both hormone trends and external physician recommendations;

c. Representations that Round 1 would culminate in a fresh embryo transfer, when contemporaneous internal notes and conduct show the transfer had already been predesignated as frozen;

d. Assurances that hormone testing (e.g., FSH) was being conducted "as needed," despite records showing these levels were omitted at key cycle inflection points;

e. Representations that Vicktoria's treatment plan reflected sound medical necessity and evidence-based decisions, while internal communications suggest the opposite—that protocols were altered or constrained based on Bundl policies and internal staff disputes;

f. Representations in the termination letter that Defendants would assist in any urgent transfer or embryo-related emergency, when in fact Defendants went radio silent and refused to respond after terminating the physician-patient relationship—placing Plaintiffs' reproductive material at risk; and

g. Representations—through branding, portal usage, and co-marketing—that Corewell supervised or participated in the Clinic's services, when in fact it later disclaimed any operational control, leaving patients misled about available recourse and oversight.

548. These representations were false or misleading at the time they were made. Defendants either knew them to be false or made them recklessly without verifying their truth.

549. Plaintiffs relied on these misrepresentations in choosing to enroll in the Bundl program, initiate IVF treatment at the Clinic, follow medical instructions, and defer transfer of their sole embryo.

550. As a direct and proximate result, Plaintiffs suffered damages including emotional trauma, financial loss, reproductive harm, and medical risks from abandoned cycles and incomplete treatment.

**B.      Silent Fraud (Fraudulent Omission) [All Defendants]**

551.   Defendants concealed or failed to disclose material facts in contexts where they had a duty to speak, including but not limited to:

a.  Failing to disclose that Bundl patients would be marked as such on their charts, triggering differential treatment, cycle restrictions, and staff bias;

b.  Failing to disclose that the Clinic would override or ignore prior physician recommendations (e.g., from Dr. Bjorkman and Dr. Giuliani) favoring repetition of the successful Round 1 protocol;

c.  Failing to disclose that Round 1 had been internally reassigned as a frozen transfer cycle without patient consent—contrary to written and oral representations;

d.  Failing to disclose that baseline and mid-cycle hormones (e.g. FSH and LH) were not being adequately monitored, despite being necessary for any medically sound assessment;

e.  Failing to disclose that Ganirelix was administered off-label and at off-guideline intervals, including during the follicular phase where literature contraindicates its use;

f. Failing to disclose that despite issuing written assurances, Defendants would not provide support in the event of treatment termination or embryo transfer crises, and would instead withhold communications entirely; and

g. Failing to disclose that Corewell's name and patient portal infrastructure were being used in a way that created an appearance of integration or oversight, when Corewell later disclaimed any role—leaving patients exposed to harm with no functional oversight body.

552. These omissions occurred in a fiduciary and trust-based context, where Defendants possessed superior medical and procedural knowledge, and Plaintiffs had no independent means to verify the truth.

553. Plaintiffs justifiably relied on Defendants' silence and omissions in making significant decisions about care planning, timing, and the allocation of financial and reproductive resources.

## C.      Negligent Misrepresentation [All Defendants]

554. In the alternative, Defendants negligently misrepresented critical facts in ways that induced Plaintiffs to act to their detriment, including but not limited to:

a. Statements about individualized care and adherence to hormone-responsive protocols, when in fact protocols were altered without medical justification or sufficient monitoring;

b. Reassurances that Bundl enrollment had no bearing on clinical care, despite Defendants' internal restrictions and denials of service related to Bundl categorization;

c. Statements about embryo transfer planning, hormone testing, and medication administration that contradicted contemporaneous records and actions; and

d. Corewell's failure to correct false impressions created by its co-branding, portal hosting, and infrastructure support—misleading Plaintiffs about continuity of care, patient rights, and institutional accountability.

555. Defendants owed Plaintiffs a duty of reasonable care to provide accurate and complete information in the course of medical treatment and related financial transactions.

556. That duty was breached when Defendants communicated false, misleading, or incomplete information on matters critical to patients' medical autonomy and treatment planning.

557. As a result, Plaintiffs suffered foreseeable harm, including unnecessary expense, interruption of care, physical risk from mistimed medication, and emotional and reproductive injury.

## D. Damages and Relief

558. Plaintiffs seek damages and relief, including:

    a. Compensatory damages for financial losses, emotional distress, reproductive delay, and physical injury from cycle mismanagement;

    b. Restitution of payments made in reliance on false and misleading information;

    c. Consequential damages for costs associated with re-establishing care, potential embryo harm, and deferred fertility opportunities;

    d. Exemplary damages, given the egregious nature of the deception and breach of trust; and

    e. Attorneys' fees and litigation costs where permitted by law.

559. Defendants' conduct was at minimum grossly negligent and, in several instances, intentional and malicious—particularly given the asymmetry of information and vulnerability of Plaintiffs as fertility patients.

## COUNT XI: FRAUDULENT INDUCEMENT [CLINIC, DR. SHAVELL, COREWELL]

560.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

**A.      Inducement**

561.  Prior to selecting the Clinic for fertility care, Plaintiffs were exposed to a coordinated set of representations by The Clinic, Dr. Shavell, and Corewell that created materially false impressions about the nature, quality, and independence of services being offered.

562.  These representations included:

     a. Verbal assurances and written materials stating that participation in bundled fertility programs would not alter or constrain treatment decisions;

     b. Statements that care would be individualized and responsive to the patient's medical needs; and

     c. Joint branding, shared digital infrastructure, and Corewell's patient portal, which created the impression that the Clinic operated under Corewell's institutional oversight and ethical standards.

563. These representations were false or materially misleading. Defendants either knew them to be false or made them with reckless disregard for their truth, as evidenced by the following:

  a. Bundled patients were flagged internally, which triggered constraints and differential treatment not disclosed to Plaintiffs;

  b. Protocols were reversed and medications adjusted based on cost containment rather than patient need, including the predesignated use of frozen embryo transfer despite earlier statements to the contrary;

  c. Plaintiffs' care was abruptly terminated after questioning the role of financial incentives in treatment decisions, and they were threatened with embryo removal;

  d. Corewell's patient portal, branding, and systems gave Plaintiffs the reasonable impression that Corewell had supervisory or clinical oversight, when in fact Corewell later disclaimed responsibility—leaving patients with no clear recourse; and

  e. Defendants' joint presentation of care falsely suggested a unified, ethically integrated medical provider, rather than a

loose "affiliated" relationship obscured from the patient's view.

564. Plaintiffs justifiably relied on these inducements in:

    a. Electing to initiate care at the Clinic instead of other facilities;

    b. Deferring to the expertise of Clinic staff and assuming good faith in treatment planning; and

    c. Forgoing independent verification or external second opinions during critical junctures in their IVF treatment.

565. As a direct and proximate result of this inducement, Plaintiffs suffered:

    a. Financial harm, including unreimbursed treatment and medication costs, and transfer-of-care expenses;

    b. Reproductive harm, through mismanaged protocols, abandoned cycles, and risk to their sole embryo; and

    c. Emotional and psychological distress resulting from betrayal, deception, and the collapse of their medical plan during a time-sensitive fertility window.

## B.      Damages and Relief

566. Plaintiffs are entitled to the following relief:

    a. Rescission of the transaction, and invalidation of obligations entered into based on fraudulent inducement;

b. Compensatory damages for financial losses, reproductive impact, and emotional harm;

c. Consequential damages arising from loss of reproductive opportunity, embryo jeopardy, and care transition costs;

d. Exemplary damages due to Defendants' willful, calculated, and misleading conduct; and

e. Attorneys' fees and costs, where authorized by law;

567. Equitable relief, including:

a. An injunction prohibiting any destruction or unilateral transfer of the embryo;

b. A mandate requiring preservation of treatment records and communications; and

c. A directive requiring Corewell to disassociate from or disclose non-supervisory relationships in fertility care contexts going forward.

568. Defendants' inducements were intentional or grossly negligent, made with knowledge that Plaintiffs would rely on them in making deeply personal medical and financial decisions.

569.   Plaintiffs seek exemplary damages to address the humiliation, distress, and reproductive jeopardy caused by Defendants' coordinated misrepresentations and the exploitation of a position of medical trust.

## COUNT XII: FRAUDULENT CONCEALMENT [ALL DEFENDANTS]

570.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

571.   Defendants had a legal duty to disclose material facts to Plaintiffs by virtue of the fiduciary and contractual relationship between patient and provider, as well as their role in promoting, coordinating, and administering third-party bundled care (i.e., Bundl).

## A.      Concealment

572.   Defendants owed Plaintiffs a duty to disclose material facts based on their fiduciary and contractual obligations as healthcare providers, and through their roles in promoting, coordinating, and administering bundled treatment in a context of trust and reliance.

573.   Despite that duty, Defendants intentionally concealed or failed to disclose critical facts necessary for informed medical and financial decision-making, including but not limited to:

a. That Plaintiffs' enrollment in the Bundl program would materially impact clinical discretion, cycle access, and drug regimens, despite representations to the contrary;

b. That a FET had already been designated internally during Round 1, while Plaintiffs were led to believe a fresh transfer would occur;

c. That key hormone levels were not monitored at standard clinical intervals, rendering claims of individualized or medically guided care inaccurate;

d. That internal recommendations from supervising physicians favored repeating a prior successful protocol—recommendations that were later ignored or reversed without disclosure;

e. That the Clinic intended to terminate care following Plaintiffs' protected complaints and requests for oversight, and impose a 90-day embryo removal deadline; and

f. That Corewell's name, branding, and digital infrastructure were being used to create the impression of integrated oversight and ethical alignment—when in fact Corewell

would later deny any responsibility, revealing the co-branding as misleading and functionally illusory.

574. These omissions were not inadvertent, but part of a calculated strategy to retain Plaintiffs' participation in a constrained treatment model while insulating Defendants from challenge by suppressing relevant information and diluting lines of responsibility.

575. Defendants were in a position of superior knowledge and exercised near-total control over access to medical records, portal communications, and the framing of clinical decisions. Plaintiffs had no reasonable means to discover the concealed facts until after damage had occurred or retrospective review became possible.

576. Plaintiffs reasonably and detrimentally relied on the presumption that relevant medical, financial, and administrative details would be disclosed in good faith—particularly given the involvement of Corewell-branded systems and infrastructure.

577. As a direct and proximate result of this concealment, Plaintiffs suffered:

a. Reproductive harm, including failed or mismanaged cycles, missed treatment opportunities, and endangerment of their sole embryo;

b. Financial losses stemming from unreimbursed medications, procedures, and the cost of care transition; and

c. Emotional distress, including feelings of betrayal, abandonment, and trauma arising from the abrupt collapse of care in a context of urgency and high medical stakes.

## B. Damages and Relief

578. Plaintiffs seek the following relief:

a. Compensatory damages for financial losses, emotional harm, and disruption of family planning;

b. Restitution of payments made under fraudulent concealment of relevant treatment and institutional relationships;

c. Exemplary damages for intentional concealment and violation of fiduciary trust; and

d. Attorneys' fees and litigation costs, as authorized by law.

579. Equitable relief, including:

a. An injunction prohibiting any transfer, destruction, or tampering with the Plaintiffs' embryo without written consent; and

b. A requirement for Defendants to produce full medical records and internal correspondence concerning Bundl classification, cycle designation, and Corewell branding or infrastructure.

580. Defendants' concealment was not incidental—it reflected a coordinated effort to extract financial and clinical participation while shielding the true nature of institutional relationships and treatment limitations from scrutiny.

581. Plaintiffs seek exemplary damages to redress the personal indignity, reproductive harm, and psychological injury caused by Defendants' knowing and malicious concealment in the context of fertility care.

## COUNT XIII: INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS [CLINIC, DR. SHAVELL, STILES]

582. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

## A. Intentional

583. Defendants engaged in conduct that was extreme, outrageous, and beyond the bounds of human decency, including:

a. Terminating medically urgent fertility treatment mid-cycle without justification or clinical transition planning;

b. Delivering a letter, threatening Plaintiffs' sole embryo with destruction unless removed within 90 days, knowing the logistical and emotional burden imposed by such a timeline;

c. Retaliating against Plaintiffs for asserting rights protected under federal and state law, including disability accommodation, transparency, and patient autonomy;

d. Blocking patient portal access—hosted under Corewell infrastructure—at a time when medical continuity and communication were essential;

e. Refusing to coordinate transfer of care despite prior written assurances that the Clinic would assist in cases of termination or emergency;

f. Shouting "get a lawyer" in a public patient space following a financial discussion about Bundl, with the intent to shame and intimidate Plaintiffs;

g. Misrepresenting treatment plans, altering protocols without notice, concealing physician recommendations, and using financial structures to influence care under the guise of individualized medicine; and

h. Creating an appearance of oversight and affiliation through Corewell branding, infrastructure, and portals—only to later disclaim involvement, leaving Plaintiffs with no recourse or clarity as to institutional responsibility.

584.   Defendants acted with intent or reckless disregard for the emotional and reproductive vulnerability of Plaintiffs, especially given the known psychological toll of IVF failure and the high stakes associated with DOR.

585.   As a direct and proximate result of Defendants' conduct, Plaintiffs experienced profound emotional distress, including:

      a.  Acute anxiety, insomnia, and panic attacks;

      b.  Feelings of betrayal, helplessness, and humiliation; and

      c.  Enduring psychological trauma affecting reproductive planning, medical trust, and emotional well-being.

## B.        Negligence

586.   In the alternative, Defendants breached their duty of care to Plaintiffs through negligent acts and omissions that foreseeably caused emotional harm.

587.   Defendants owed Plaintiffs a duty of reasonable care in coordinating fertility care, responding to patient concerns, managing clinical transitions, and ensuring accurate communication—particularly where emotional sensitivity and trust are central.

588.   That duty was breached when Defendants acted in disregard of the foreseeable emotional harm their conduct would cause—culminating in medical abandonment, conflicting representations, and administrative cruelty.

**C.        Damages and Relief**

589.   Plaintiffs are entitled to the following relief:

      a.  Compensatory damages for emotional distress, psychological injury, and associated suffering;

      b.  Recovery of expenses for therapy, psychiatric care, or other support services required to address trauma caused by Defendants' conduct;

      c.  Exemplary damages for willful, malicious, or outrageous conduct, especially involving the use of institutional power and branding to facilitate harm; and

      d.  Any additional equitable or monetary relief deemed just and proper by the Court.

590.   The emotional harm inflicted here was neither speculative nor secondary—it was the predictable result of targeted mistreatment in a context requiring utmost care, honesty, and compassion.

591.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' calculated use of medical and administrative authority to mislead, abandon, and retaliate against vulnerable patients.

## COUNT XIV: UNJUST ENRICHMENT AND/OR QUANTUM MERUIT
### [CLINIC, DR. SHAVELL, COREWELL]

592.  Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

**A.     Unjust Enrichment**

593.  Plaintiffs conferred substantial financial and non-financial benefits on Defendants, including but not limited to:

a.  Out-of-pocket expenditures for laboratory tests, embryo storage, and consultations—many of which were never fully delivered or were prematurely and improperly terminated;

b. Participation in services and systems—including the Corewell-hosted patient portal and Corewell-branded materials—that conveyed an appearance of institutional integration and oversight; and

c. Sharing of sensitive personal, reproductive, and medical data through Corewell infrastructure, enabling Corewell and "affiliated" entities to derive reputational and financial benefit without providing reciprocal support or protection.

594.  Defendants unjustly retained these benefits despite:

a. Terminating medically necessary treatment mid-cycle without cause or transition plan;

b. Refusing to complete paid-for retrievals, transfers, or monitoring services;

c. Denying continued access to the Corewell-hosted portal and blocking critical communications following physician-initiated termination;

d. Retaining coordination fees despite failing to ensure continued access to Bundl-approved services; and

e. Failing to credit or refund Plaintiffs for unused portions of care, despite the disruption being entirely due to Defendants' own conduct.

595. It would be unjust and inequitable for Defendants—particularly given their collective roles in facilitating, hosting, and branding fertility services—to retain these benefits without restitution, coordination, or continued access to care.

## B.    Quantum Meruit

596. In the alternative, Plaintiffs seek recovery under quantum meruit for the value of services rendered, promises made, and obligations undertaken where no express contract governed—or where the express contract was disrupted by wrongful conduct.

597. While some services were nominally covered under the Bundl agreement, that agreement was thwarted or undermined by the Clinic's conduct, creating a gap in services and a corresponding right to recovery.

598. Plaintiffs relied on Defendants' representations—including those conveyed through branded portals, co-marketed materials, and cross-platform communications—that treatment would proceed according to reasonable standards of care.

599. The Clinic's abrupt withdrawal of care and Corewell's simultaneous denial of any operational involvement—despite its infrastructure and branding—prevented Plaintiffs from receiving the benefit of services for which they had already paid.

600. Plaintiffs also contributed their own time, effort, biological material, and logistical coordination—expecting treatment continuity and fair value that was ultimately denied.

## C.      Damages and Relief

601. Plaintiffs are entitled to the following:

   a. Restitution, including refunds or proportional reimbursement for undelivered, canceled, or improperly curtailed services;

   b. Compensatory damages, representing the fair value of what was paid and not received;

c. Equitable relief, including a declaration of Plaintiffs' continued right to access any paid-for medical services, records, and portal infrastructure; and

d. Constructive trust or other equitable remedies to safeguard any improperly retained fees or unjust gains obtained through misleading branding and coordinated services.

602. Defendants' conduct—both active and passive—was exploitative, retaliatory, and contrary to principles of good faith and fair dealing. Equity demands a remedy to prevent ongoing injustice.

## COUNT XV: PROMISSORY ESTOPPEL [CLINIC AND DR. SHAVELL]

603. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

### A. Clear and Definite Promise

604. Defendants, including Clinic staff, physicians, and affiliated infrastructure partners such as Corewell, made clear and repeated promises to Plaintiffs, including but not limited to:

a. That participation in the Bundl program would not affect access to care, quality of services, or clinical discretion;

b. That treatment protocols would be individualized and medically appropriate, rather than constrained by financial arrangements or institutional politics;

c. That medications associated with each retrieval would be made available and prescribed as needed for cycle success; and

d. That coordination of care—including appointment scheduling, pharmacy integration, patient records, and cycle transitions—would be supported through the Clinic's systems and Corewell-hosted portals.

605. These promises were made verbally, through brochures, in portal communications, and via written program materials—including through platforms and domains branded with Corewell's name and hosted under its infrastructure.

## B. Reasonable and Substantial Reliance

606. Plaintiffs relied reasonably and substantially on these promises in:

a. Selecting the Clinic as their IVF provider, in part based on its perceived affiliation with Corewell and the stability suggested by that affiliation;

b.  Entering into a bundled program exceeding $34,000, in reliance on representations about clinical continuity and financial neutrality;

c.  Proceeding with emotionally and physically intensive treatment cycles across multiple months and procedures;

d.  Forgoing alternative treatment options, second opinions, or supplemental coverage they may have otherwise pursued; and

e.  Continuing care through Corewell-hosted portals and systems with the expectation that institutional promises—including support in emergencies and care coordination—would be honored.

607.  Plaintiffs' reliance was both reasonable and substantial. They made irreversible reproductive and financial decisions in reliance on a coordinated, accessible care plan—only to have access revoked, communication severed, and care terminated.

608.  Defendants' subsequent refusal to honor these promises—including Corewell's disclaiming of operational responsibility despite its earlier role—caused foreseeable harm, including lost opportunity, financial hardship, and emotional distress.

609. It would be unjust to allow Defendants to benefit from Plaintiffs' reliance—particularly where such reliance involved intimate reproductive decisions, irreversible medical actions, and exposure to risk under false pretenses.

## C. Damages and Relief

610. Plaintiffs seek the following equitable and compensatory relief:

    a. Restitution for financial losses directly tied to reliance on Defendants' representations; and

    b. Compensatory damages for harm stemming from abandoned treatment, loss of access, and emotionally injurious reversals;

    c. Equitable relief, including a protective injunction over the embryo, compelled coordination of transfer, and unfettered access to medical records and patient portal history.

## COUNT XVI: BATTERY [VICKTORIA AGAINST CLINIC AND DR. SHAVELL]

611. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

612. Vicktoria provided limited consent to undergo specific fertility treatments premised on individualized protocols, evidence-based medical decisions, and transparent clinical communication.

613. Defendants performed physical interventions—such as blood draws, injections, medication administration, ultrasounds, and transvaginal procedures—

under materially false pretenses, including misrepresented treatment intent, concealed changes to protocol, and undisclosed internal disputes impacting care.

614. These acts constitute unauthorized physical contact when obtained by deception, omission, or coercion, particularly where informed consent was invalidated by concealment of medically material facts (e.g., pre-selected frozen transfer, misrepresented drug necessity).

615. As a direct and proximate result, Vicktoria suffered pain, emotional trauma, and reproductive harm from invasive and unnecessary procedures.

616. Plaintiffs seek compensatory damages, non-economic damages for pain and suffering, and exemplary damages given the deception and breach of bodily autonomy involved.

## COUNT XVII: BREACH OF FIDUCIARY DUTY [ALL DEFENDANTS]

617. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

618. As fertility care providers, Defendants assumed a fiduciary duty to Plaintiffs, which included obligations of loyalty, candor, confidentiality, diligence, and prioritization of patients' best interests over financial or institutional concerns.

619. Defendants breached these duties by:

        a. Concealing internal financial incentives and Bundl-related constraints affecting clinical decisions;

b. Failing to disclose material information about hormone suppression, protocol selection, and cycle planning;

c. Retaliating against Plaintiffs for asserting patient rights and seeking oversight; and

d. Placing institutional interests above the welfare and autonomy of the patients.

620. These breaches were knowing, systematic, and contrary to the ethical and legal obligations of providers handling medically urgent and emotionally charged fertility care.

621. Plaintiffs suffered direct harm as a result of the breaches, including emotional trauma, financial loss, and reproductive opportunity costs.

622. Plaintiffs seek compensatory damages, disgorgement of profits earned through self-dealing, and exemplary damages to deter fiduciary abuse.

## COUNT XVIII: MALPRACTICE [CLINIC, DR. SHAVELL, DR. GIULIANI]

623. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

624. To the extent any factual allegations may implicate both professional and non-professional conduct, Plaintiffs do not intend to collapse legal theories or impair the viability of any alternative counts pled above.[4]

625. This Count is being filed in federal court, where state procedural requirements—such as Michigan's affidavit of merit under MCL 600.2912d—do not apply.

626. To the extent required by MCL 600.2912b, this Complaint (and previous complaints) shall serve as Plaintiffs' Notice of Intent to file a claim for professional negligence and/or malpractice against the Defendants identified in this Count (as well as Corewell). Plaintiffs assert that time is of the essence and that no further waiting period is practicable or just.

627. Nevertheless, Plaintiffs properly served the Clinic, Dr. Shavell, Dr. Giuliani, and Corewell the NOI attached as Exhibit J.

---

[4] Plaintiffs have withdrawn their assertion of a medical malpractice claim against Corewell based solely on defense counsel's representations that Corewell exercises no operational control over the Clinic, its staff, or the care provided. Plaintiffs expressly reserve all rights to amend their complaint should discovery reveal that Corewell in fact directed, supervised, or materially participated in Plaintiffs' treatment. For the avoidance of all doubt, this exclusion is without prejudice to a future amendment should facts emerge indicating operational control, agency, or negligent supervision by Corewell.

## A.        Duty and Standard of Care

628.   Defendants owed Plaintiffs a duty of care arising from their physician-patient relationship, as well as duties imposed by Michigan common law and statutory standards governing the practice of medicine, assisted reproductive technology, and IVF protocol adherence.

629.   To the extent Corewell marketed, hosted, branded, or electronically supported the services rendered by the Clinic, and to the extent Plaintiffs reasonably believed Corewell oversaw or coordinated those services, Corewell owed a duty of care under theories of apparent agency, institutional liability, and assumed duty.

630.   Defendants were required to:

> a.  Exercise the degree of care, skill, and diligence ordinarily exercised by qualified fertility specialists and clinics under the same or similar circumstances;
>
> b.  Apply professional standards consistently, including those governing hormone monitoring, medication dosage, and protocol adjustments;
>
> c.  Accurately interpret and respond to hormone levels, clinical findings, and ultrasound results;
>
> d.  Act in alignment with internal physician recommendations unless contraindicated and clearly documented; and

e. Refrain from employing or continuing experimental or off-label protocols without informed consent and adequate clinical rationale.

## B. Breach of Standard of Care

631. Defendants breached their professional obligations by engaging in a pattern of substandard clinical conduct, including but not limited to:

a. Administering Ganirelix on CD 3 to CD 5 in Round 2 without appropriate FSH or LH testing to justify suppression;

b. Failing to monitor LH in any of the three cycles, despite elevated progesterone levels indicating a premature LH surge;

c. Prescribing Clomid at 200mg, exceeding typical dosing (50–150mg), and continuing use despite clear anti-estrogenic effects and follicular suppression;

d. Initiating stimulation on CD 5 in Round 2, a delay that undermined follicular synchronization;

e. Doubling estradiol and continuing progesterone at the end of Round 2 without hormone justification or documentation of clinical rationale;

f. Failing to adjust medication mid-cycle in response to lab results or follicular development, despite real-time monitoring being a cornerstone of IVF care;

g. Misrepresenting the intent to do a fresh embryo transfer, while planning a frozen transfer internally and failing to obtain informed consent for that change;

h. Terminating care during active fertility treatment without arranging continuity of care or identifying a qualified replacement provider; and

i. Representing through Corewell's branding, portal infrastructure, and marketing platforms that Plaintiffs' care was subject to Corewell oversight—thus compounding clinical reliance and trust—when in fact Corewell disclaimed involvement only after harm had occurred.

## C. Causation

632. These breaches of the standard of care were the direct and proximate cause of:

a. Round 2's failure despite 9 follicles, due to poor stimulation, early suppression, and timing errors;

b. Round 3's complete arrest and premature luteinization;

c. The irreversible loss of critical treatment time for a patient with DOR;

d. Emotional trauma and loss of trust in fertility care systems; and

e. Financial and reproductive consequences, including wasted medications, canceled procedures, and inability to complete contracted retrievals.

## D. Damages and Relief

633. Plaintiffs seek recovery of:

a. Compensatory damages, including the cost of the three failed or canceled cycles;

b. Medical expenses, including medications, procedures, and future replacement treatment;

c. Non-economic damages, including pain, suffering, and loss of reproductive opportunity; and

d. Exemplary damages, given the intentional and deceptive nature of Defendants' conduct.

634. Plaintiffs reserve the right to amend this claim to include additional breaches, expert opinions, and documentation following discovery.

635.   Plaintiffs seek exemplary damages to redress the humiliation, distress, and personal indignity caused by Defendants' willful, malicious, and deceptive conduct in the provision and misrepresentation of medical treatment.

## COUNT XIX: CIVIL CONSPIRACY [ALL DEFENDANTS]

636.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

637.   Defendants entered into an agreement—express or implied—to accomplish unlawful or tortious acts, including fraud, concealment, retaliation, malpractice, and breach of fiduciary duty.

638.   Each Defendant took concerted action in furtherance of that scheme, including altering protocols without disclosure, coordinating patient charting practices based on Bundl status, misleading patients about oversight, and terminating care following complaints.

639.   The conspiracy caused direct and foreseeable harm to Plaintiffs, including emotional distress, financial loss, and reproductive injury.

640.   Plaintiffs seek joint and several liability for all damages arising from the conspiracy, as well as exemplary damages for willful and malicious conduct.

## COUNT XX: DERIVATIVE AND INSTITUTIONAL LIABILITY [COREWELL]

641.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

642.   Corewell is liable for the acts and omissions of the Clinic, Dr. Shavell, and related staff under one or more of the following legal doctrines:

   a.   Vicarious liability, due to actual or apparent employment, agency, or partnership relationships;

   b.   Contributory liability, based on Corewell's material support, portal hosting, infrastructure provision, and enabling of deceptive practices;

   c.   Assumed duty, based on branding, co-marketing, and written representations indicating oversight, coordination, or integration of services; and

   d.   Ostensible authority, where Plaintiffs reasonably believed Corewell was responsible for the actions of the Clinic and relied on that belief to their detriment.

643.   Corewell failed to correct false impressions of institutional integration or intervene once aware of serious clinical and ethical violations conducted under its banner.

644.   As a result, Corewell is jointly and severally liable for the harms arising from the misconduct described above, including those committed directly by the Clinic or its agents.

645. Plaintiffs seek declaratory and injunctive relief, compensatory and consequential damages, and exemplary damages for Corewell's role in enabling and profiting from the conduct at issue.

## PRAYER FOR RELIEF

646. **WHEREFORE,** Plaintiffs Vicktoria Gocha and Alan J. Gocha respectfully request that this Court enter judgment in their favor and against Defendants Michigan Reproductive and IVF Center, P.C. d/b/a The Fertility Center, Dr. Valerie Shavell, Dr. Emma Giuliani, Dawn Stiles, Corewell Health f/k/a Spectrum Health, and John Does 1–10 and award the following relief.

647. Compensatory damages, in an amount to be determined at trial, including but not limited to:

        a.  Medical expenses;

        b.  Out-of-pocket costs;

        c.  Lost reproductive opportunity;

        d.  Lost contract value;

        e.  Lost use of services paid for but not received;

        f.  Battery-related injury;

        g.  Fiduciary breach losses; and

        h.  Associated economic harms.

648. Consequential and incidental damages, including expenses arising from:

    a. Treatment disruption;

    b. Embryo transfer complications;

    c. Emotional trauma;

    d. Constructive abandonment; and

    e. Forced relocation of care.

649. Non-economic damages, including but not limited to:

    a. Pain and suffering;

    b. Emotional distress;

    c. Psychological trauma;

    d. Reputational harm;

    e. Injury to bodily autonomy; and

    f. Other intangible harms.

650. Exemplary, punitive, and/or aggravated damages, to the extent permitted by law, based on:

    a. The willful, malicious, or egregious nature of Defendants' acts;

    b. Defendants' conscious disregard of harm; and

c. Coordinated concealment, fraud, and abuse of fiduciary and medical duties.

651. Treble damages, as authorized under:

a. RICO, 18 U.S.C. § 1964(c);

b. MRICO, MCL § 750.159g); and/or

c. The MCPA.

652. Restitution or disgorgement, including recovery of funds paid to Defendants or for services rendered:

a. Under false pretenses;

b. Without informed consent; or

c. In breach of fiduciary duties or promissory obligations.

653. Equitable Relief, including but not limited to:

a. An order requiring continued preservation and non-interference with Plaintiffs' embryo;

b. Disclosure of full and accurate medical records, including Bundl correspondence, portal metadata, and internal documentation;

c. A constructive trust over any funds or assets unjustly retained by Defendants or held by Corewell as a coordinating entity; and

d. Equitable tracing and recovery of assets or records wrongfully withheld or misrepresented.

654. Declaratory and injunctive relief, including:

    a. A declaration that Defendants' conduct violated Plaintiffs' statutory, contractual, and constitutional rights;

    b. A declaration that Corewell is liable for the acts of its affiliates, agents, or institutions acting under its apparent authority;

    c. A preliminary and permanent injunction preventing retaliation, obstruction, or continued interference with reproductive care, access to records, or affiliated insurance or referral systems; and

    d. Declaratory relief clarifying the nature and scope of Corewell's institutional responsibility and public representation in connection with the acts alleged herein.

655. Attorneys' fees and costs, to the extent permitted by:

    a. 42 U.S.C. § 1988;

    b. 18 U.S.C. § 1964(c) (RICO);

    c. Michigan's consumer and civil rights statutes; and

d. Applicable tort and equitable doctrines or other applicable laws.

656. Pre- and post-judgment interest on all monetary awards.

657. Any other relief the Court deems just, equitable, or appropriate, including continuing oversight or appointment of a monitor if necessary to ensure patient protection.

658. Plaintiffs further state that no specific relief requested under any individual Count above shall be construed to limit or exclude any form of relief sought herein, and that all legal, equitable, statutory, and common-law remedies are pled in the alternative and in combination, to the fullest extent permitted by law.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully Submitted,

Date: August 7, 2025

/s/ Lisa E. Gocha
Lisa E. Gocha (P42100)
PO Box 398
Hudsonville, MI 49426
lgchapter7@yahoo.com
(616) 797-4206
*Attorney for Vicktoria Gocha*

/s/ Alan J. Gocha
Alan J. Gocha (P80972)
PO Box 398
Hudsonville, MI 49426
alanjgocha@offlabellaw.com
(248) 505-4670
*Pro Se*