UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICKTORIA GOCHA, et al.,

      Plaintiffs,

                                    Case No. 1:25-cv-665

v.

                                    Hon. Hala Y. Jarbou

MICHIGAN REPRODUCTIVE AND IVF
CENTER, P.C., et al.,

      Defendants.

_____/

## OPINION

Plaintiffs Vicktoria and Alan Gocha sought fertility treatment at the Michigan Reproductive and IVF Center, P.C. (the "Clinic"). After several failed attempts to achieve intrauterine insemination ("IUI"), and several rounds of attempted in vitro fertilization ("IVF") that produced only one fertilized embryo, Plaintiffs raised concerns to the Clinic about its methods. About a week later, the Clinic told Plaintiffs it was terminating their physician-patient relationship. This lawsuit followed. Plaintiffs sue the Clinic and three of its employees: Dr. Valerie Shavell, Dr. Emma Giuliani, and Dawn Stiles. Plaintiffs also sue Corewell Health, a healthcare organization that is allegedly affiliated with the Clinic. Defendants have filed motions to dismiss. For the reasons herein, the Court will grant the motions and dismiss the case.

## I. BACKGROUND

### A. Plaintiffs' Allegations

#### 1. Initial Treatment

According to the complaint, Vicktoria started treatment at the Clinic in April 2022 due to a diagnosis of "diminished ovarian reserve" ("DOR").  (3d Am. Compl. ¶¶ 1, 60, ECF No. 89.) She underwent "multiple IUIs," without success, until December 2023.  (*Id.* ¶ 60.)

#### 2. IVF Treatment

In July 2024, Vicktoria returned to the Clinic with Alan, her husband, to pursue IVF.  Alan submitted a semen sample that month.  The following day, the sample results available on the Clinic's patient portal listed "azoospermia" and an infection, but the Clinic did not contact Alan about the results or treat him for these diagnoses.  (*Id.* ¶ 63.)  Alan submitted another sample the following month.  Analysis of the second sample showed "normal parameters."  (*Id.* ¶ 64.)

Vicktoria underwent three rounds of IVF, beginning on March 26, 2025, April 23, 2025, and May 30, 2025, respectively.  (*Id.* ¶ 65.)  Dr. Shavell managed these rounds "with involvement" by Dr. Giuliani and Stiles, the Clinic's "practice administrator."  (*Id.* ¶¶ 6, 66.)  Plaintiffs allege that "[p]rotocols varied materially across rounds without clinical explanation."  (*Id.* ¶ 69.) Medication that was used in some rounds was not used in others.  (*Id.*)  The timing of the medication in relation to the cycle also varied.  (*Id.* ¶¶ 69-70.)  And some hormone levels were never measured during the rounds, while other hormones were measured only "sporadic[ally]." (*Id.* ¶¶ 67-68, 71-72.)

##### (a) Round 1

During the first round Dr. Shavell initially recommended use of 300 IU of Follistism, a follicle-stimulation drug, but then increased the recommended dosage after learning that Vicktoria

"had previously used a higher dose." (*Id.* ¶ 14.)  This round produced "seven follicles, two mature oocytes, and one fertilized embryo"; the embryo was frozen for future implantation.  (*Id.* ¶ 98.)

### (b) Round 2

The second round "used a different [hormone] stimulation/suppression approach."  (*Id.* ¶ 77.)  When Plaintiffs questioned the "early" use of one particular drug, Dr. Shavell told them that it "addressed elevated FSH,"[1] yet no FSH had been tested.  (*Id.*)  Plaintiffs allege that this round was "functionally futile" because there were no "mid-stimulation adjustments" in medication and there was a "lack of response and monitoring." (*Id.* ¶ 106.)  After the second round failed, Plaintiffs asked for "written justification for protocol deviations and monitoring gaps." (*Id.* ¶ 78.)  The Clinic "did not provide a substantive explanation."  (*Id.*)

On May 2, 2025, Plaintiffs asked about the possibility of a frozen embryo transfer, but Stiles told them that Bundl, a "financial concierge service" Plaintiffs had contracted with to cover their fertility care, would not authorize a "second retrieval."  (*Id.* ¶¶ 19, 108-109.)  When Alan "referenced the Bundl materials," the exchange "escalated."  (*Id.* ¶ 109.)  Stiles allegedly told Plaintiffs to "get out," followed them into the hallway, and shouted "get a lawyer." (*Id.*)  After that point, "routine access to nurses and staff was curtailed, and communications were funneled to Dr. Shavell, who was often unavailable." (*Id.*)  Around that time, Stiles allegedly entered a "hidden chart note," "flagging that sharing the note could lead to 'physical harm.'" (*Id.* ¶ 112.)

Plaintiffs contacted Bundl directly, which authorized a second retrieval, contrary to Stiles's statement.

---

[1] FSH refers to follicle-stimulating hormone.  (3d Am. Compl. ¶ 16.)

### (c) Round 3

The third round started on May 30, 2025.  (*Id.* ¶ 113.)  It employed a different approach; this time, there was "no suppression, despite prior assertions that suppression was necessary."  (*Id.* ¶ 79.)  And one particular drug was used earlier in the cycle.  (*Id.*)  On June 4, a physician at the Clinic recommended stopping that round due to "poor [estradiol] response," but Dr. Shavell "overrode" that recommendation "while at a conference and without chart access."  (*Id.* ¶¶ 80, 115.)  The Clinic terminated that round two days later, after an ultrasound "confirmed failure."  (*Id.* ¶ 116.)  Plaintiffs allege that the Clinic failed to "adjust medication dosages mid-cycle in response to labs or ultrasound findings."  (*Id.* ¶ 82.)  And as with the second round, the third round "included departures from prior plans/protocols without documented rationale."  (*Id.* ¶ 117.)

The Clinic presented Plaintiffs with paperwork that was "pre-filled" to authorize transfer of a single embryo, even though Plaintiffs had "stated a willingness" to transfer more than one embryo "if medically appropriate."  (*Id.* ¶ 122.)  When Alan "flagged [this] discrepancy" on the paperwork, staff told Plaintiffs to "just sign it," calling it a "formality."  (*Id.*)

### 3. Termination of Treatment

Beginning June 4, 2025, Plaintiffs sent "detailed" messages to staff at the Clinic, "raising evidence-based concerns about protocol deviations, inconsistent medication sequencing, and the lack of FSH/LH[2] monitoring, and requested written clarification before proceeding."  (*Id.* ¶ 123.)  Plaintiffs cited "internal notes" indicating that other physicians at the Clinic had recommended repeating the protocol from the first round, yet the Clinic had changed the protocol without explanation.  (*Id.* ¶ 124.)  The following day, Dr. Giuliani responded that written answers would require rescheduling their June 9 appointment.  (*Id.* ¶ 125.)  On June 6, Vicktoria sent another

---

[2] LH is luteinizing hormone.

4

message asking for written responses.  On June 8, Plaintiffs again asked about changes in the sequencing of medication.  On June 9, Dr. Shavell responded that the protocols used were "deliberate and individualized" and that she would confer with her colleagues.  (*Id.* ¶ 128.)

On June 10, Alan "noted shifting rationales unmoored from data" and "flagged" that "elevated FSH" had been used as a justification for early use of a medication in one round even though FSH had not been tested.  (*Id.* ¶ 129.)  In a message to the Clinic, he explained "why LH monitoring is important in high-dose/off-label cycles" and he asked for confirmation that further cycles would "include baseline and mid-cycle" monitoring of various hormones.  (*Id.* ¶ 130.)

On June 11, Dr. Shavell canceled a June 12 appointment in order to "review history."  (*Id.* ¶ 131.)  Later that day, Alan asked for "administrative review" due to "clinical inconsistencies, off-label/high-dose use without justification, absent hormone monitoring, rescheduling following accountability requests, and lack of independent review due to Dr. Shavell's dual role."  (*Id.* ¶ 132.)

The following day, Plaintiffs received a letter signed by Stiles stating that the Clinic was terminating the physician-patient relationship and "imposing a 90-day deadline to transfer" Plaintiffs' embryo to another lab.  (*Id.* ¶ 133; *see* Termination Letter, ECF No. 1-1.)  The letter cited Plaintiffs' "tone and lack of trust."  (*Id.* ¶ 134.)  The Clinic also ended Plaintiffs' ability to use the patient portal for communications with the Clinic.

On June 13, Stiles allegedly entered an internal note "flagging" Alan as "dangerous" and asserting that "foul language" and "threatening tone[s]" required the note to be withheld from the patient in order to "prevent harm of [sic] the patient or another person."  (*Id.* ¶ 136.)  Plaintiffs claim this note was false.

That same day, Alan emailed Corewell and a billing staffer at the Clinic, complaining about lack of access to the patient portal and the termination of treatment "during a critical fertility

window"; he noted Vicktoria's "disability status" and requested "accommodation" under the Americans with Disabilities Act (ADA) in the form of "immediate referral and coordinated records." (*Id.* ¶ 139.)  Plaintiffs apparently believed that the Clinic was affiliated with Corewell because Plaintiffs' appointment confirmations, eCheck-ins, test result notices, billing statements, and patient surveys related to services received from the Clinic were all branded with the Corewell name. (*Id.* ¶ 185.)  Also, Corewell's website listed physicians at the Clinic as being affiliated with Corewell hospitals. (*Id.*)  However, Corewell responded to Alan's complaint by stating that the Clinic was not part of Corewell; the clinic was "outside Corewell's jurisdiction." (*Id.* ¶ 140.)

### B. Plaintiffs' Claims

Based on the foregoing, Plaintiffs assert a total of 17 claims arising under federal or state law.  The federal claims include the following: Count I, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962; Count II, a RICO conspiracy, 18 U.S.C. § 1962(d); Count IV, violation of the ADA, 42 U.S.C. § 12181 et seq.; Count V, violation of the Rehabilitation Act (RA), 29 U.S.C. § 794; and Count VII, violation of the Affordable Care Act (ACA), 42 U.S.C. § 18116.

The state law claims include the following: Count III, violation of the Michigan Racketeer Influenced and Corrupt Organizations Act (MRICO), Mich. Comp. Laws § 750.159g; Count VI, violation of the Michigan Persons with Disabilities Civil Rights Act (PDCRA), Mich. Comp. Laws § 37.1101 et seq.; Count VIII, violation of the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq.; Count IX, violation of the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 et seq.; Count X, fraud, silent fraud, negligent misrepresentation, fraudulent inducement and/or fraudulent concealment; Count XI, intentional and/or negligent infliction of emotional distress; Count XII, unjust enrichment and/or quantum

meruit; Count XIII, promissory estoppel; Count XIV, battery; Count XV, breach of fiduciary duty; Count XVI, medical malpractice; and Count XVII, civil conspiracy.

Defendants seek dismissal of the federal claims for failure to state a claim.  Defendants ask the Court to decline supplemental jurisdiction over the claims arising under state law.

## II. STANDARD

A plaintiff's complaint must make a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred.  *Id*.  "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true."  *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).  The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or a "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555.

The Court is generally bound to consider only the complaint when resolving a motion to dismiss under Rule 12(b)(6) unless the Court converts the motion to one for summary judgment.  *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint

7

and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (internal citations omitted).

### III. ANALYSIS – FEDERAL CLAIMS

#### A. RICO (Count I)

Plaintiffs allege that the Clinic, Shavell, Giuliani, Stiles, and Corewell were engaged in a common enterprise "to extract fertility payments through misrepresentations, concealment of clinical deviations, coercive leverage over embryos, and retaliation against patients who questioned care." (3d Am. Compl. ¶ 191.) Plaintiffs claim that Defendants' pattern of conduct in furtherance of this enterprise gives rise to a RICO claim. RICO provides a civil cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

"[T]o state a civil RICO claim, a plaintiff must allege (1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022). The last element—suffering injury "by reason of" the defendant's racketeering—is a "demanding" requirement. *Id.* It requires a plaintiff to show that "the defendant's racketeering offense 'led directly to the plaintiff's injuries.'" *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). In other words, a plaintiff "must show 'that the defendant's violation was both a factual and proximate cause of his injury.'" *Id.* (quoting *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 559 (6th Cir. 2022)).

Among other things, Defendants argue that the complaint fails to allege with specificity any racketeering activity. "The RICO statute sets forth an exhaustive list of "racketeering activit[ies]." *Nolt v. Knowles*, No. 24-5872, 2025 WL 2748006, at *2 (6th Cir. June 20, 2025)

(quoting 18 U.S.C. § 1961(1)).  Plaintiffs apparently contend that Defendants' racketeering activity involved "mail and wire fraud, health care fraud, and extortion."  (3d Am. Compl. ¶ 196.) In their briefing, Plaintiffs add that their complaint also supports the existence of "theft or embezzlement in connection with a health-care benefit program," "honest services fraud," "witness tampering," and "obstruction of justice."  (Pls.' Resp. to Clinic's Mot. to Dismiss 23, ECF No. 146.)  However, the complaint does not supply sufficient allegations to support a claim under any of these theories.

### 1. Mail Fraud, Wire Fraud, and Honest Services Fraud

The elements of wire and mail fraud are (1) "a scheme to defraud," (2) "use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme," *Advocacy Org. for Patients & Providers v. Auto Club Ins. Assoc.*, 176 F.3d 315, 322 (6th Cir. 1999), and (3) "intent to deprive a victim of money or property," *United States v. Robinson*, 99 F.4th 344, 354 (6th Cir. 2024) (quoting *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)).

Similarly, the elements of honest services fraud are: "(1) a scheme to defraud and intent to defraud another; (2) through use of an interstate carrier; and (3) of money, property, or honest services."  *United States v. Householder*, 137 F.4th 454, 497 (6th Cir. 2025) (Thapar, J., concurring).  When referring to a deprivation of honest services, Congress intended to cover "only bribery and kickback schemes."  *Skilling v. United States*, 561 U.S. 358, 368 (2010).

"A scheme to defraud includes any plan or course of action by which someone intends to deprive another . . . by deception of money or property by means of false or fraudulent pretenses, representations, or promises."  *Robinson*, 99 F.4th at 354 (quoting *Daniel*, 329 F.3d at 485-86). As an element of this scheme, there must be proof "that the defendant said something materially false."  *Id.* (quoting *Daniel*, 329 F.3d at 486).  The "defendant must knowingly make a material misrepresentation or knowingly omit a material fact" and "the misrepresentation or omission must

9

have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Id.* at 357 (quoting *Daniel*, 329 F.3d at 487).

A complaint alleging fraud must satisfy Rule 9(b) of the Federal Rules of Civil Procedure. "Under that rule, a party 'alleging fraud' must 'state with particularity the circumstances constituting fraud.'" *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quoting Fed. R. Civ. P. 9(b)). Generally, this means that the plaintiff must "specify the 'who, what, when, where, and how' of the alleged fraud." *Id.* (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). "More specifically, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 614-15 (quoting *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 411 (6th Cir. 2022) (internal quotation marks omitted)).

### (a) Fraud: Corewell Branding

Plaintiffs apparently rely on the fact that some billing notices, invoices, and other communications from Corewell (or its predecessor, Spectrum Health) to Plaintiffs displayed Corewell's (or Spectrum's) name or logo, suggesting that the Clinic was affiliated with Corewell when that was not the case. Plaintiffs allege that the Clinic was part of Corewell's "Community Connect" program, which allows independent medical practices like the Clinic "to use Corewell's name, Epic/MyChart platform, email domains, and patient-facing technology," in exchange for compensation from the practice. (3d Am. Compl. ¶¶ 25-26.) Corewell or the Clinic also posted a YouTube video promoting Dr. Shavell using Corewell's branding. And Corewell allowed the Clinic to use Corewell-branded "patient registration, billing, scheduling, and records" through Corewell's "Epic/MyChart" software, to issue billing statements listing "Corewell" as the

provider, and to use Corewell's name in appointment reminders, emails, and texts to Plaintiffs. (*Id.* ¶ 27.)

For instance, in 2022 and 2023, before every appointment at the Clinic, Vicktoria received email appointment confirmations that included Spectrum's or Corewell's name in them, along with a link to Spectrum's website and a statement saying, "Thank you for partnering with us for your healthcare needs." (*Id.* ¶ 28.) Also, after each appointment, or when new test results were available, Spectrum sent Vicktoria an email update or after-visit summary. (*Id.* ¶¶ 31-32.) When Vicktoria resumed treatment in 2025, Corewell sent similar communications to her. (*Id.* ¶ 34.) Vicktoria would also receive surveys from Corewell, stating, "Thank you for your recent Corewell Health visit," "We are always looking to make things as easy as possible for our patients," and "Thank you for trusting us with your care." (*Id.* ¶ 35.)

Plaintiffs do not adequately explain how these statements or the presence of Corewell's name or logo in communications or paperwork provided to Plaintiffs amount to intentionally fraudulent statements, let alone ones that were intended to deprive Plaintiffs of money or property and that led directly to Plaintiffs' injuries. Plaintiffs apparently contend that Corewell's name and "branding" "created the false impression of Corewell oversight" over the Clinic's operations, and that Plaintiffs relied on this impression when "selecting the Clinic, consenting to treatment, using Corewell-branded systems, and paying invoices." (*Id.* ¶¶ 187, 193, 201, 272.) But none of the alleged statements by Defendants asserted that Corewell exercised oversight over the treatment Plaintiffs received at the clinic. Conveying a statement that results in a false impression of such oversight is not the same as making an intentional misrepresentation. Plaintiffs have not alleged the latter.

11

Moreover, such a false impression is not adequate to support a fraud claim under RICO because it is not tied to any discernible injury suffered by Plaintiffs.  Plaintiffs apparently believe that services overseen by Corewell would have been superior in some way compared to services they received from an independent clinic.  But there are no facts alleged that would support such a belief.

In addition, as discussed above, a RICO claim requires a direct connection between the racketeering activity and the injury.  Here, Plaintiffs were aware of who provided their services and the services they actually received.  They do not allege any deception or mistake in that regard.  Thus, to the extent they suffered any injury to business or property from those services, it was not proximately caused by the Corewell branding or any statements Defendants made suggesting an affiliation between Corewell and the Clinic.

Plaintiffs compare their case to *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025), in which an individual sued the seller of a tincture containing cannabidiol ("CBD").  *Id.* at 597.  The seller represented that its product contained no tetrahydrocannabinol ("THC") and was "legal to consume," so the purchaser tried some.  *Id.*  But the seller's representation was false, which the purchaser discovered after failing a drug test administered by his employer.  *Id.*  Because he failed the test, he lost his job and then sued the seller under RICO.  Plaintiffs argue that *Horn* is similar to their case because *Horn* involved a RICO action stemming from "false or misleading advertising."  *See id.* at 598.  But the Supreme Court did not examine whether the false advertising in that case met the elements of mail or wire fraud.  Instead, the court examined only whether the plaintiff suffered injury to "his business or property," as is necessary to state a RICO claim.  *Id.* at 599.  That analysis does not aid Plaintiffs' claim.

Plaintiffs also contend that their case is like those in which medical providers used a "predetermined protocol" when treating patients, regardless of their patients' needs, leading to excessive and unnecessary treatment for the purpose of generating income from an insurer.  *See, e.g.*, *Allstate Ins. Co. v. AS Med. Grp., PLC*, No. 2:23-CV-10904, 2025 WL 2042262, at *1–2 (E.D. Mich. July 21, 2025); *Allstate Ins. Co. v. Ayman Tarabishy, M.D., PLLC*, No. 4:22-CV-12736, 2024 WL 4354699, at *1 (E.D. Mich. Sept. 30, 2024).  The health insurance companies in these cases brought RICO claims against the medical clinics for submitting false medical bills for services that were not rendered or that were based on fabricated medical records.  *AS Med. Grp.*, 2025 WL 2042262, at *1–2; *Ayman Tarabishy*, 2024 WL 4354699, at *1.

Those cases are distinguishable.  To start, Plaintiffs' have not alleged anything like a "predetermined protocol" in their case.  According to Plaintiffs, the Clinic used "varied" protocols for each round of IVF treatment.  (3d Am. Compl. ¶ 69.)  Moreover, unlike the foregoing cases, nothing in the complaint here indicates that Defendants defrauded Plaintiffs by presenting them with false medical bills for services not rendered, or by providing unnecessary services based on falsified information.  To be sure, Plaintiffs do claim that they incurred expenses for "unnecessary" medications and treatment.  (*See id.* ¶¶ 116, 176, 198.)  However, the complaint does not tie those unnecessary expenses to any fraudulent scheme by Defendants.  Instead, Plaintiffs apparently believe those expenses were unnecessary because Plaintiffs failed to obtain the results they desired; they blame that failure on treatment decisions made by the Clinic and its physicians.  Plaintiffs' disagreement with the Clinic's level of care does not plausibly render Defendants' conduct fraudulent or part of an intentionally fraudulent scheme to deprive Plaintiffs of money or property through deception.

**(b) Fraud: Miscellaneous Statements**

Plaintiffs also point to a handful of statements or doctor's notes that they claim were false, such as: (1) Dr. Shavell "told Vicktoria the [first] cycle would be freeze-all due to elevated progesterone," but progesterone had not been tested (3d Am. Compl. ¶ 171); (2) Dr. Shavell stated that "Ovation[3]—not the Clinic—decided to freeze the embryo" and that "the protocol was switched to freeze-all due to lining," but these decisions had been made by Shavell months earlier (*id.* ¶ 172); (3) Shavell justified the use of Ganirelex based on "elevated FSH" even though no FSH testing occurred (*id.* ¶¶ 173–74); (4) Shavell overrode Dr. Jones's recommendation to cancel Round 3 without reviewing Vicktoria's chart (*id.* ¶ 175); (5) Dr. Giuliani represented that Round 2 would "replicate Round 1's protocol, but Round 2 materially deviated" (*id.* ¶ 177); (6) Stiles told Plaintiffs that Bundl would not authorize another egg retrieval, which was not true because Bundl later authorized another retrieval (*id.* ¶¶ 111, 181); and (7) Stiles wrote in internal Clinic records that Plaintiffs "used foul language and were dangerous," but those statements were not true (*id.* ¶ 182).

Shavell's statements about the timing, source, or reason for the decision to freeze an embryo are immaterial. Shavell's decision to continue Round 3 is not a false statement. Stiles's statements about Bundl's coverage and about Plaintiffs' conduct in internal notes were harmless and are not plausibly tied to a scheme to defraud with intent to deprive Plaintiffs money or property. Similarly, assuming Shavell's and Giuliani's statements about the justification for using Ganirelex and the plan to replicate Round 1's protocol were false, Plaintiffs fail to allege a plausible connection between these isolated statements and a fraudulent scheme by Defendants. As indicated, Plaintiffs were aware of the treatment they received. They do not contend that

---

[3] Ovation is "a third-party lab." (Compl. ¶ 155, ECF No. 1.)

Defendants fraudulently charged Plaintiffs for services they did not receive.  Plaintiffs' claim amounts to a disagreement with the necessity or efficacy of that treatment, which does not give rise to a RICO claim based on fraud.

Defendants also note that there are no allegations of bribery or kickback schemes, as required for honest services fraud.  In response, Plaintiffs assert that "there were undisclosed financial arrangements and referral flows from Corewell that funneled patients into Bundl while concealing constraints on medical judgment and misrepresenting medical necessity."  (Pls.' Resp. to Clinic's Mot. to Dismiss 28, ECF No. 116.)  However, "undisclosed financial arrangements" (which are not alleged with any clarity in the complaint) do not equate to bribery or kickback schemes that deprived Plaintiffs of Defendants' "honest services."  Thus, for all the foregoing reasons, Plaintiffs do not state a RICO claim based on fraud.

### 2. Obstruction & Witness Tampering

Plaintiffs provide no argument or factual support for their assertion that Defendants were involved in any form of obstruction or witness tampering.  *See* 18 U.S.C. §§ 1510 (relating to obstructions of criminal investigations), 1511 (relating to the obstruction of state or local law enforcement as to illegal gambling), 1512 (relating to tampering with a witness, victim, or informant), and 1513 (relating to retaliating against a witness, victim, or informant).

### 3. Extortion

Plaintiffs claim that Defendants engaged in extortion by issuing the termination letter "demanding embryo transfer within 90 days," by "disabling portal communications," and by "fabricating chart entries portraying Alan as dangerous."  (3d Am. Compl. ¶ 200.)  "A plaintiff claiming a Hobbs Act violation of extortion as a predicate act in a civil RICO claim must establish that the defendant 'obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by . . . extortion or attempt[ed] or conspir[ed] so to do, or committ[ed]

or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so].'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 406–07 (6th Cir. 2012) (quoting 18 U.S.C. § 1951(a)).  Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  "Obtaining property requires 'not only the deprivation but also the acquisition of property.'"  *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404 (2003)).  "That is, it requires that the victim part with his property, and that the extortionist gain possession of it." *Id.* (cleaned up).

Defendants' conduct fails to support a RICO claim based on extortion because Plaintiffs do not allege that Defendants obtained any property, or sought to do so, by requiring transfer of Plaintiffs' embryo to another facility, by disabling Plaintiffs' access to the patient portal, or by entering information into Plaintiffs' chart about Alan's dangerousness.  Indeed, the termination letter simply required Plaintiffs to transfer their embryo to another facility within 90 days' time so that Plaintiffs could continue their treatment elsewhere.  (*See* Termination Letter.)  It also offered to transfer Plaintiffs' medical records "at no cost" upon completion of a medical records release form.  (*Id.*)  It did not threaten to use Defendants' control over the embryo or over Plaintiffs' medical records to pressure Plaintiffs to give up property.  And there is no suggestion that disabling Plaintiffs' access to the portal or entering notes in the Clinic's internal records induced or required Plaintiffs to turn over any property.  Thus, Plaintiffs have not plausibly alleged extortion as a predicate for a RICO claim against Defendants.

* * *

For the reasons stated, Plaintiffs fail to plausibly allege any racketeering activity that would give rise to a RICO claim.

### B. RICO Conspiracy (Count II)

Plaintiffs also claim Defendants were involved in a RICO conspiracy. This claim fails because the underlying RICO claim fails. *See Courser v. Mich. House of Representatives*, 831 F. App'x 161, 187 (6th Cir. 2020) ("Because Courser's RICO claim fails, the RICO conspiracy claim fails too.").

### C. Americans With Disabilities Act (Count IV)

Plaintiffs claim that Defendants discriminated against them on account of their disabilities or perceived disabilities. Vicktoria claims her DOR is a disability and Alan claims his azoospermia misdiagnosis caused Defendants to regard him as having a disability. Plaintiffs contend that Defendants discriminated against them when Defendants "refused to adapt treatment protocols to hormone data and medical history, applied rigid pre-filled plans, denied Plaintiffs' January 13, 2025 request for medical review, and offered no reasonable basis for refusal." (3d Am. Compl. ¶ 230.) In addition, Defendants "imposed communication barriers" when disabling Plaintiffs' access to the patient portal and "withheld timely access to records and billing data needed to coordinate urgent care." (*Id.* ¶ 231.)

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "To state a claim under Title III, a plaintiff must allege '(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and fair opportunity to enjoy the services defendants provide.'" *Powell v. Columbus Med. Enters., LLC*, No. 21-3351, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021) (quoting *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir.

17

2008)).  "The 'professional office of a health care provider' is considered a public accommodation for purposes of the ADA." *Id.* (quoting 42 U.S.C. § 12181(7)(F)).  "Title III does not provide for money damages to an aggrieved person except in a discrimination action brought by the Attorney General." *McComb v. Best Buy Co.*, No. 24-3900, 2025 WL 2940948, at *2 (6th Cir. June 2, 2025) (quoting *Reinoehl v. Whitmer*, No. 22-1343, 2023 WL 3046052, at *2 (6th Cir. Apr. 17, 2023)).

Plaintiffs do not plausibly allege that Defendants denied them full and equal enjoyment of services based on disability.  Indeed, Plaintiffs' complaint details the many ways in which Defendants (particularly the Clinic and its physicians and employees) provided treatment to address Plaintiffs' fertility issues.  In essence, Plaintiffs' complaint "voices [their] dissatisfaction" with Defendants' care, but that dissatisfaction "necessarily sounds in medical malpractice" and "'by itself, does not state a claim under the ADA.'"  *Powell*, 2021 WL 8053886, at *2 (quoting *Jones v. Willie*, No. 15-5658, 2016 U.S. App. LEXIS 23617, at *8 (6th Cir. Jan. 28, 2016)); *see Parker v. William Beaumont Hosp.*, No. 20-12475, 2023 WL 3606653 (E.D. Mich. May 23, 2023) ("It is well settled that the [Rehabilitation Act and the ADA] do not provide general causes of action to challenge the sufficiency of medical treatment.").

To the extent Plaintiffs complain about the termination of access to the patient portal, the refusal to provide a medical review, or the 90-day embryo-transfer deadline, there are no facts in the complaint from which to infer that Defendants' actions were motivated by Plaintiffs' real or perceived disabilities.

Plaintiffs also claim that Defendants retaliated against them by terminating care, by disabling access to the portal, by imposing the 90-day deadline for embryo transfer, and by "disseminating defamatory" clinical notes.  (3d Am. Comp. ¶ 236.)  The ADA's retaliation provision states, in relevant part, that "[n]o person shall discriminate against any individual

because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a).  To state a retaliation claim under the ADA, Plaintiffs must allege facts to establish that they "engaged in a protected activity that the defendants were aware of, the defendants took an adverse action against [them], and there was a causal connection between the protected activity and the adverse action." *Harmon v. Waterman*, No. 24-5773, 2025 WL 2434374, at *3 (6th Cir. June 6, 2025).  "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer v. City of Snow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (quoting *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 484–85 (S.D.N.Y. 2013)).

Here, Plaintiffs do not allege any protected activity taken to "protest or oppose" discrimination on the basis of disability.  Their complaint makes a vague reference to "protected accommodation requests" (3d Am. Compl. ¶ 249), but it provides few specifics.  The complaint mentions a "June 13, 2025 ADA/Section 504 request" (*id.* ¶ 249), but that allegation appears to refer to a "June 13, 2025 request for medical review" (*id.* ¶ 230).  A request for medical review does not meet the definition of protected conduct under the ADA; it has no connection to any of Plaintiffs' rights under the ADA.  And at any rate, almost all the allegedly retaliatory actions— terminating the patient-physician relationship, disabling portal access, and imposing a 90-day deadline for embryo transfer—occurred before that request.  (*See id.* ¶¶ 133-36.)  Plaintiffs cannot complain that Defendants retaliated against Plaintiffs for making this request when the purported retaliation occurred *before* the request.  Although Stiles entered an internal note about Alan's language and threatening tone that same day as this request, that internal note was not an adverse action, and there is no indication that Stiles was aware of the request for review, let alone that the request motivated her note.

The same logic applies to Alan's June 13, 2025, email to Corewell and to the Clinic's billing staffer, asking for an "accommodation" in the form of "immediate referral and coordinated records."  (*Id.* ¶¶ 138–39.)  It is not clear how that request would constitute protected conduct under the ADA, but even if it is protected, Plaintiffs offer no plausible connection between this request and any adverse conduct by Defendants, which had already occurred before the request.  Thus, for all the foregoing reasons, Plaintiffs do not state either a retaliation claim or a discrimination claim under the ADA.

### D. Rehabilitation Act (Count V)

The RA provides that a qualified individual with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Plaintiffs' RA claim fails for the same reasons as their ADA claim.  Plaintiffs have not plausibly alleged that Defendants denied them the benefits of a program receiving federal assistance or otherwise discriminated against them because of a disability.  Plaintiffs' challenge to the care they received does not give rise to an RA claim.  *See Reed v. Correct Care Sols.*, No. 20-11523, 2023 WL 3168658, at *3 (E.D. Mich. Apr. 28, 2023) ("[T]he law is well-settled that claims made under the ADA, the Rehabilitation Act, or the other discrimination-based statutes generally cannot be based on medical treatment decisions concerning the alleged medical needs of allegedly disabled prisoners.").  And as discussed above, Defendants provided care to Plaintiffs in response to Plaintiffs' asserted (or perceived) disabilities; none of the facts alleged permit a plausible inference of discrimination against Plaintiffs on account of those disabilities.

Insofar as Plaintiffs claim that Defendants retaliated against them in violation of the RA, the Sixth Circuit recently held that the RA "does not provide a private right of action for retaliation."  *Smith v. Mich. Dept. of Corrs.*, --- F.4th ---, No. 24-1439, 2025 WL 3251117, at *14

(6th Cir. Nov. 21, 2025).  And even if such a claim was available, it would fail for the reasons discussed above with regard to Plaintiffs' retaliation claim under the ADA.  *See A.C. ex rel J.C. v. Shelby Cnty. Bd. of Ed.*, 711 F.3d 687, 696 (6th Cir. 2013) (applying the same analysis to retaliation claims under the ADA and the RA).  Thus, Plaintiffs do not state a claim under the RA.

### E. Affordable Care Act (Count VII)

Plaintiffs assert a claim under Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits discrimination under "any health program or activity . . . receiving Federal financial assistance" on any ground "prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.)," or Section 504 of the RA.  42 U.S.C. § 11186(a).  "In other words, Section 1557 prohibits discrimination in the provision of healthcare based on 'race, color, and national origin (Title VI); sex (Title IX); age (Age Discrimination Act); and disability (Rehabilitation Act),' and it incorporates the 'enforcement mechanisms' provided for under these statutes."  *Galuten ex rel. Galuten v. Williamson Cnty. Hosp. Dist.*, No. 21-5007, 2021 WL 3043275, at *4 (6th Cir. July 20, 2021) (quoting *Doe v. BlueCross Blue Shield of Tenn., Inc.*, 926 F.3d 235, 238 (6th Cir. 2019)).

Drawing on the prohibition of sex discrimination in Title IX, Plaintiffs claim that Defendants discriminated against them on account of sex when providing healthcare services.  In particular, Plaintiffs contend that terminating their treatment and their access to the patient portal was a form of sex discrimination because their treatment was for DOR, which is a sex-specific condition.  While there might be some circumstances where an outright refusal to treat a sex-specific condition is evidence of sex discrimination, Defendants did not refuse to treat Vicktoria. Instead, they ended treatment after multiple attempts failed (or led to only one embryo), and after Plaintiffs complained and demanded that Defendants follow Plaintiffs' preferred protocols when

21

providing future treatment.  Notably, Defendants treated both Plaintiffs (a male and a female) alike when terminating the patient relationship and disabling access to the portal.   In these circumstances, the sex-specific nature of Vicktoria's treatment could not, by itself, give rise to a plausible inference of sex discrimination.

Plaintiffs argue in their response brief that access to the patient portal was "necessary to coordinate treatment and transfer reproductive materials."  (Pls.' Resp. to Corewell's 2d Mot. to Dismiss 3, ECF No. 122.)  That assertion is not supported by the complaint and defies common sense.  Plaintiffs do not contend that Defendants cut off all communication with them and thereby prevented them from transferring care to another provider.  But even if that had happened, it would not plausibly suggest that Defendants discriminated against Plaintiffs on the basis of sex.  In short, Plaintiffs make no allegations from which to infer that Defendants terminated treatment due to Plaintiffs' sex or otherwise discriminated against them on the basis of sex in the provision of healthcare services.  Accordingly, Plaintiffs' ACA claim fails.

* * *

For the reasons discussed above, the Court will dismiss Plaintiffs' claims arising under federal law—Counts I, II, IV, V, and VII of the third amended complaint—for failure to state a claim.

## IV. ANALYSIS - STATE LAW CLAIMS

After dismissal of the federal claims, Plaintiffs' remaining claims arise under state law.  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715,

726 (1966)); *see also Southard v. Newcomb Oil Co., LLC*, 7 F.4th 451, 455 (6th Cir. 2021) (citing *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (recognizing that once a federal court no longer has federal claims to resolve, it "should not ordinarily reach the plaintiff's state-law claims")); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182. Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). At this stage of the case, the balance of considerations weighs against the continued exercise of supplemental jurisdiction over the state-law claims.

Even if the Court was not dismissing all the federal claims, it would decline to exercise supplemental jurisdiction because the state-law claims "substantially predominate" over the claims arising under federal law in terms of proof and the scope of the issues raised. *See* 28 U.S.C. § 1367(c)(2). There is some overlap between the federal claims and some of the state-law claims, particularly those involving fraud and discrimination, but other state-law claims delve into issues like medical malpractice, promissory estoppel, unjust enrichment, battery, and infliction of emotional distress, which far exceed the scope of the federal claims. Consequently, declining to exercise supplemental jurisdiction over the state-law claims is also warranted under 28 U.S.C. § 1367(c)(2).

## V. AMENDMENT OF THE COMPLAINT

In passing, Plaintiffs' response briefs request leave to amend their complaint to correct any deficiencies. A response brief is not the appropriate place to make such a request. "'If plaintiffs believe they need to supplement their complaint with additional facts to withstand [a motion to

23

dismiss] . . . they have a readily available tool: a motion to amend the complaint under Rule 15.' They cannot 'amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020) (quoting *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (citations omitted)); *see also Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 552 (6th Cir. 2008) (collecting cases for the proposition that a plaintiff is not entitled to amend their complaint where no motion to amend has been filed).

Moreover, the Court's local rules require a party to file a proposed amended complaint when seeking leave to amend.  W.D. Mich. LCivR 5.7(f).  Plaintiffs have not complied with that requirement.

Finally, the Court notes that Plaintiffs have already amended their complaint twice, and they filed their most recent version after Defendants had filed motions to dismiss (ECF Nos. 69, 71).  Those motions put Plaintiffs on notice of many of the deficiencies in the previous version of their complaint.  But even with that notice, the federal claims in the latest version cannot survive dismissal.  The Court is not persuaded that "justice so requires" another opportunity to amend.  *See* Fed. R. Civ. P. 15(a)(2).  Accordingly, the Court will dismiss the complaint without granting leave to amend.

## VI. CONCLUSION

The Court will grant Defendants' motions to dismiss.  The Court will dismiss the claims arising under federal law for failure to state a claim.  The Court will dismiss the claims arising under state law because the Court declines to exercise supplemental jurisdiction over them.

The Court will enter an order and judgment consistent with this Opinion.


Dated: December 18, 2025                          /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 CHIEF UNITED STATES DISTRICT JUDGE