UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICKTORIA GOCHA, et al.,

Plaintiffs,

v.

MICHIGAN REPRODUCTIVE AND IVF CENTER, P.C., et al.,

Defendants.
______________________________/

Case No. 1:25-cv-665

Hon. Hala Y. Jarbou

**OPINION**

Plaintiffs Vicktoria and Alan Gocha sought fertility treatment at the Michigan Reproductive and IVF Center, P.C. (the "Clinic"). After multiple rounds of IVF treatment for Vicktoria, Plaintiffs raised concerns to the Clinic about its methods. Plaintiffs believe that the Clinic and its physicians did not adequately measure or monitor Vicktoria's hormone levels through each round and then adjust the treatment plan accordingly. About a week after Plaintiffs raised concerns, the Clinic told Plaintiffs it was terminating their physician-patient relationship. This lawsuit followed.

Plaintiffs sue the Clinic and three of its employees: Dr. Valerie Shavell, Dr. Emma Giuliani, and Dawn Stiles. Plaintiffs also sue Corewell Health, a healthcare organization that is allegedly affiliated with the Clinic. In an opinion, order, and judgment entered on December 18, 2025, the Court dismissed the case. The Court dismissed Plaintiffs' federal claims for failure to state a claim and declined to exercise supplemental jurisdiction over the state-law claims. Before the Court is Plaintiffs' motion for relief from judgment (ECF No. 145) and motion to supplement the record (ECF No. 146). For the reasons herein, the Court will deny the motions.

## I. PROCEDURAL HISTORY

Plaintiffs brought this action in June 2025 by filing a 105-page complaint containing 17 counts for relief (ECF No. 1). Three weeks later, Plaintiffs filed an amended complaint consisting of 151 pages and approximately 21 counts (ECF No. 24). The following month, Plaintiffs asked for leave to amend their complaint again. The Court granted leave to amend, allowing Plaintiffs to file a proposed 186-page complaint with 20 counts (Proposed Am. Compl., ECF No. 36), but directing Plaintiffs to file a "clean" version without revisions highlighted. (8/4/2025 Order, ECF No. 39.) Plaintiffs did so, filing their second amended complaint (ECF No. 40). Three days later, Plaintiffs filed a "corrected" version of the second amended complaint (ECF No. 41).

After Defendants filed motions to dismiss, the Court reviewed Plaintiffs' second amended complaint and determined that it was far more lengthy than necessary, rendering it "unmanageable." (9/25/2025 Order 3, ECF No. 78.) The Court directed Plaintiffs to file another version that was no longer than 50 pages. After Plaintiffs filed a third amended complaint in accordance with the Court's order,[1] Defendants again moved to dismiss for failure to state a claim. The Court granted those motions and dismissed the case. Plaintiffs now move for relief from judgment under Rule 59(e) of the Federal Rules of Civil Procedure and ask for leave to file an 82-page amended complaint that contains only their federal claims.

## II. STANDARD

Typically, "[u]nder Rule 15, a court may grant permission to amend a complaint 'when justice so requires' and in the normal course will 'freely' do so." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (quoting Fed. R. Civ. P. 15(a)). "Factors that may affect that determination include undue delay in filing, lack of notice to the opposing party,

[1] Plaintiffs were able to meet the page limit by removing content and reducing the font size.

bad faith by the moving party, repeated failure to cure deficiencies by previous amendment, undue prejudice to the opposing party, and futility of the amendment." *Seals v. Gen. Motors Corp.*, 546 F.3d 766, 770 (6th Cir. 2008).

But "[w]hen a party seeks to amend a complaint after an adverse judgment . . . , the claimant must meet the requirements for reopening a case established by Rules 59 or 60." *Leisure Caviar*, 616 F.3d at 616. "If a permissive amendment policy applied after adverse judgments, plaintiffs could use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Id.* Here, Plaintiffs rely on Rule 59. Under that rule "a court may alter the judgment based on: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Id.* at 615 (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). For post-judgment motions to amend, "the Rule 15 and Rule 59 inquiries turn on the same factors." *Id.* at 616 (quoting *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002)). "As with Rule 15 motions, district courts have considerable discretion in deciding whether to grant Rule 59 motions." *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014).

## III. ANALYSIS

### A. Legal Error

#### 1. Pleading Fraud

Plaintiffs argue that the Court committed legal error when dismissing Plaintiffs' RICO claims because the Court purportedly required Plaintiffs to plead fraudulent intent with particularity. To the contrary, the Court reviewed the facts alleged and determined that it was not plausible to infer necessary elements of a RICO claim premised on fraud, including (1) a materially false misrepresentation, (2) an intent to defraud, and (3) an injury to business or property resulting from the fraudulent scheme.

As the Court explained, Plaintiffs' fraud theory is premised on the notion that Plaintiffs selected the Clinic because Corewell-branded messages Plaintiffs received regarding appointments or services at the Clinic gave them the false impression that Corewell exercised oversight over the services provided at the Clinic and that Corewell would respond to Plaintiffs' grievances about those services. Yet Plaintiffs failed to identify any particular statements that made assertions about that oversight or grievance process. Their proposed amended complaint fares no better. Though Plaintiffs now claim that the misrepresentations included assertions that "care would be individualized and physician-directed; diagnostics and monitoring would guide treatment; Corewell provided oversight and patient protections; and consent decisions reflected real-time medical judgment" (Proposed 4th Am. Compl. ¶ 317, ECF No. 145-1), they do not identify the statements making these particular representations, which is what Rule 9 of the Federal Rules of Civil Procedure requires of them.

As to fraudulent intent, Plaintiffs acknowledge that the Clinic was, in fact, affiliated with Corewell through Corewell's "Community Connect" program, which allows "independent practices" to "use Corewell's name, Epic/MyChart platform, email domains, and patient-facing technology." (3d Am. Compl. ¶ 25, ECF No. 89.) And Plaintiffs' proposed fourth amended complaint provides additional facts underscoring the close ties between the Clinic and Corewell: "Corewell laboratories perform testing ordered by the Clinic" and "[p]atient data generated by the Clinic is stored, transmitted, and accessed through Corewell-controlled systems." (Proposed 4th Am. Compl. ¶¶ 93–94.) The existence of that relationship indicates that any representations implying an affiliation between the Clinic and Corewell were not fraudulent or made with intent to defraud.

In effect, Plaintiffs contend that they were deceived as to what entity was responsible for the services they received. They thought the Clinic was under Corewell's umbrella when in fact the Clinic is an independent entity. But they provide no authority for that theory of fraud as a predicate for a RICO action. And that theory makes little sense here, where Plaintiffs were fully aware of the services they received and what individuals were providing them. Indeed, the Clinic provided Plaintiffs with fertility services (resulting in one viable embryo); there is no plausible suggestion in the third amended complaint or the proposed fourth amended complaint that the Clinic deceived Plaintiffs as to the nature or quality of the services provided, which further undermines an inference of fraudulent intent.

In addition, it is common knowledge that physicians and medical practices have varying degrees of affiliation with larger hospital systems, and that hospitals themselves often hire independent contractors to perform some medical services within the hospital. It cannot be the case that any mention or suggestion of an affiliation between the hospital and the provider amounts to criminal fraud whenever a patient selects the provider due to an incorrect belief that the hospital is ultimately responsible for the provider's conduct.

For similar reasons, the Court cannot discern a plausible injury to business or property as required by the RICO statute for Defendants' alleged scheme to make patients think that Corewell provided oversight for the Clinic. Plaintiffs argue that their injury is the fees they paid the Clinic for its services. Plaintiffs argue that, so long as Defendants' misrepresentations about Corewell's relationship to the Clinic "caused Plaintiffs to part with money or property," their RICO claim can proceed because they "received something materially different from what was promised." (Pls.' Mot. to Am. J. 10, ECF No. 145.) But they cite no authority for that principle. As discussed in the Court's prior opinion, *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) does not stand

for that point. Moreover, Plaintiffs fail to plausibly allege that what they received was materially different from what they were supposedly promised.

In an attempt to rectify the latter deficiency, Plaintiffs' proposed fourth amended complaint focuses on Corewell's "Code of Excellence," which purportedly applies to all Corewell healthcare providers but not the Clinic. However, that code merely contains vague, empty promises akin to puffery. It assures patients that Corewell will "do the right thing," "make sure everyone has a voice," "treat everyone with compassion, dignity and respect," "maintain a healthy workplace," "bill services appropriately," be "transparent with quality and pricing," and "protect the confidentiality and privacy of . . . patients." Code of Excellence [https://perma.cc/2L7E-QWGP]. No one would regard those bland aspirational statements as evidence that an entity overseen by Corewell would have provided Plaintiffs a materially different form of treatment than what they received.

Plaintiffs also make allegations about Corewell's status as a nonprofit entity compared to the Clinic's status as a for-profit entity, arguing that they selected Clinic, in part, because they believed it operated with the financial incentives of a nonprofit system, and thus would have provided more "individual[ized]" care than what the Clinic provided. (Proposed 4th Am. Compl. ¶ 119.) These assertions are too speculative to support their claim.

Along similar lines, Plaintiffs' proposed fourth amended complaint doubles down on evidence of a "predetermined protocol" for treatment decisions by the Clinic as support for fraudulent conduct by Defendants. (Proposed 4th Am. Compl. ¶¶ 122–48.) Based on the existence of standardized protocols developed by the Clinic for pre-IVF medication for five different categories of patients (*see* IVF Protocols, ECF No. 145-35), and Plaintiffs' assertion that the Clinic did not adequately test or monitor Vicktoria's hormone levels and adjust her medication during

her rounds of IVF treatment, Plaintiffs conclude that the Clinic relies on a standardized protocol that is "applied across patients regardless of individualized diagnostic differences." (Proposed Am. Compl. ¶ 136.) Missing from any version of the complaint, however, is a plausible link between these practices and fraudulent conduct that would serve as a predicate for a RICO claim.

Plaintiffs attempt to fit their action into cases where "medical providers used a 'predetermined protocol' when treating patients, regardless of their patients' needs, leading to excessive and unnecessary treatment for the purpose of generating income from an insurer." (12/18/2025 Op. 13, ECF No. 142.) But in those cases, the health insurance companies bringing RICO claims were defrauded because the medical providers "submitt[ed] false medical bills for services that were not rendered or that were based on fabricated medical records." (*Id.*) Among other things, the medical providers falsely told the insurers that the services provided "were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 790 (E.D. Mich. 2015). Here, though Plaintiffs allege that some of the services they received were unnecessary, they do not allege the false representations that are required for mail, wire, or any other type of criminal fraud. Receiving unnecessary services does not by itself give rise to a RICO claim.

Moreover, Plaintiffs' proposed fourth amended complaint does not address the deficiencies identified by the Court with Plaintiffs' theory that Defendants engaged in honest services fraud, obstruction, or extortion. Plaintiffs now argue that Defendants engaged in extortion by freezing and retaining their embryo without their informed consent. Regardless, Plaintiffs have not alleged that Defendants threatened "physical violence to any person or property" as part of the alleged

racketeering scheme, so Plaintiffs' extortion-based RICO claim fails. (*See* 12/18/2025 Op. 15–16 (discussing elements of extortion).)

**2. Complaint Page Limitations**

Plaintiffs argue that the Court erred by restricting them to 50 pages for their complaint because it prevented them from alleging the facts necessary to assert their claims. Plaintiffs contend that the Court dismissed some theories of fraud argued in their brief because they did not have space to plead those theories in the complaint. For instance, Plaintiffs refer to the Court's conclusion that they failed to plead sufficient allegations of a bribery and kickback scheme for purposes of alleging honest services fraud. Plaintiffs have now attempted to correct this issue by alleging that Defendants had "ownership and revenue-sharing interests in Ovation/FPG," a laboratory that provides services for the Clinic. (Proposed 4th Am. Compl. ¶ 323.) In addition, Plaintiffs allege that the Clinic has a contract with Bundl, a "financial concierge service for fertility treatment, offering bundled payment packages intended to reduce patients' upfront financial risk associated with IVF." (*Id.* ¶ 49.) Victoria purchased one of these payment packages from Bundl at the recommendation of Defendants. (*Id.* ¶ 52.) The contract between Bundl and the Clinic allegedly requires the Clinic to promote Bundl packages to patients with "limited or no IVF insurance coverage" and prohibits the Clinic from promoting competing packages. (*Id.* ¶¶ 54–55.) Plaintiffs contend that the "financial incentives" created by these packages "rewarded cycling and discouraged individualized care." (*Id.* ¶ 323.)

But at most, Plaintiffs have alleged potential financial conflicts of interest that are not covered by the federal statute prohibiting honest services fraud. *See Skilling v. United States*, 561 U.S. 358, 410 (2010) (excluding from scope of the honest services fraud statute cases involving only a "failure to disclose a conflict of interest" or "official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he

owes a fiduciary duty"). They have not alleged anything resembling a deceptive scheme involving bribes or kickbacks. For similar reasons, they have not shown that the Court's page limitation prejudiced them. Even with additional space, they fail to state a claim.

**3. Dismissal of Discrimination and Retaliation Claims**

Plaintiffs also challenge the Court's dismissal of their discrimination and retaliation claims. The Court discerns no error in that decision. In their proposed complaint, Plaintiffs have added a claim that Defendants discriminated against Alan on the basis of sex under the Affordable Care Act by, among other things, not informing him "directly of embryo-disposition decisions" and "excluding him reproductive decision-making." (Proposed 4th Am. Compl. ¶ 399.) Defendant Shavell allegedly acknowledged that "decisions regarding embryo disposition are communicated exclusively to the female patient, even where the patient is married and the embryo is jointly created and subject to joint consent requirements." (*Id.* ¶ 401.)

The Court is not persuaded that these allegations suffice to allege a claim for sex discrimination, particularly where Vicktoria was the patient receiving IVF treatment, not Alan. In other words, Alan and Vicktoria were not similarly situated. There is no plausible factual basis in the third amended complaint or the proposed fourth amended complaint for concluding that any adverse conduct toward Alan was motivated by his sex.

**B. Newly Discovered Evidence**

Plaintiffs contend that their complaint contains new facts based on newly-discovered evidence, including evidence of Defendants "non-individualized protocols," "undisclosed financial relationships," and "non-clinical influences." (Pl.'s Mot. to Am. 15.) For reasons discussed above, the Court is not persuaded that this evidence would change the outcome. In other words, after reviewing the proposed amended complaint in full, the Court concludes that

amendment would be futile because the proposed amended complaint would not withstand a motion to dismiss.

## IV. MOTION TO SUPPLEMENT

Plaintiffs' motion to supplement the record asks the Court to consider a 2015 Medical Board of California decision to reinstate the license of Steven L. Katz, subject to probation (ECF No. 146-1) and a 2020 decision by the State of Arizona Department of Insurance to revoke Katz's non-resident insurance producer license (ECF No. 146-2). Plaintiffs contend that they discovered before dismissal of the case that Katz was involved in decisions regarding their care and in the decision by the Clinic to terminate its relationship with Plaintiffs. They submit these records as evidence that an individual with a "documented history involving embryo mishandling and record integrity" participated in the Clinic's decisions. The Court will deny the motion because the records are irrelevant. They have no bearing on the sufficiency of Plaintiffs' claims or their motion for relief from judgment.

## V. CONCLUSION

In short, the Court is not persuaded that it erred in dismissing the federal claims in the third amended complaint for failure to state a claim, or in declining to exercise supplemental jurisdiction over Plaintiffs' state law claims. Nor is the Court persuaded that Plaintiffs should be given leave to amend their complaint again. Their proposed amended complaint, which focuses only on their federal claims, exceeds the reasonable page limits that the Court imposed on the earlier version of the complaint. Even then, it does not fix the deficiencies in their federal claims. Accordingly, the Court will deny the motion for relief from judgment. The Court will also deny the motion to supplement.

An order will enter consistent with this Opinion.

Dated: September 1, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE